**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DE LAGE LANDEN FINANCIAL SERVICES, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| VIEWPOINT COMPUTER ANIMATION, INC., | : | NO. 08-534 |
| | : | |
| Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| 3COM CORP. AND CAPITAL 4, INC., | : | |
| | : | |
| Third Party Defendants and Defendants on the Counterclaim. | : | |

**MEMORANDUM**

**Baylson, J.**                                                    **March 11, 2009**

_____Presently before this Court is Plaintiff De Lage Landen's (hereinafter "DLL" or

"Plaintiff") Motion to Dismiss the Amended Counterclaim of Defendant Viewpoint Computer

Animation, Inc. (hereinafter "Viewpoint" or "Defendant") for failure to state a claim under Fed.

R. Civ. P. 12(b)(6).  This dispute arises from a series of contracts entered into by DLL,

Viewpoint, and additional third parties for the provision of telephone services and equipment.

For the foregoing reasons, this Court will deny in part and grant in part, with leave to amend.

I.     **Factual Background**

_____The specific facts asserted in this case differ between the Complaint and Counterclaim, so

this Court will describe each document's factual assertions separately.

-1-

###### A.      Complaint

DLL, a Michigan corporation with a place of business in Pennsylvania, asserts that it entered a Business Communications Lease Agreement (hereinafter "Rental Agreement" or "Funding Agreement") with Viewpoint, a Massachusetts corporation, on October 12, 2005. (Compl. ¶ 5).  Pursuant to the Rental Agreement, Viewpoint allegedly leased phone equipment from DLL with monthly payments of $3,594.10.  (Id. ¶¶ 6, 10).  This payment included a $691.16 per month "pass through" payment to Third Party Defendant and Defendant on the Counterclaim, Capital 4, Inc. (hereinafter "Capital 4"), a Texas corporation.  (Id. ¶ 11).  DLL alleges that Capital 4 provided telephone services to Viewpoint pursuant to a Power of $Zero Customer Agreement between Capital 4 and Viewpoint (hereinafter "Customer Agreement").  (Id. ¶ 9).

According to DLL, Capital 4 became insolvent and stopped providing services to Viewpoint in September 2007.  (Id. ¶ 12).  DLL claims that it reduced Viewpoint's lease payments by the amount of the pass through payment in October 2007.  (Id. ¶ 13).  DLL asserts that Viewpoint stopped making its lease payments under the Rental Agreement.  (Id. ¶ 14).  DLL alleges that the Rental Agreement contained a clause stating that DLL was not responsible for providing maintenance and / or service for the equipment; that any claims regarding maintenance and / or service must be made to the supplier or manufacturer; and that such claims did not affect Viewpoint's obligations to make all required lease payments.  (Id. ¶ 8).

DLL then filed this suit against Viewpoint, claiming breach of contract and unjust enrichment.  (Id. ¶¶ 17-22).  The Rental Agreement contained a choice-of-law provision selecting Pennsylvania law to govern any issues arising under that contract, as well as a forum selection clause also choosing Pennsylvania as the non-exclusive jurisdiction.  (Id. Ex. A ¶ 22).

**B.      Counterclaim**

Viewpoint has brought counterclaims against DLL as well as claims against Capital 4 and another party, 3Com Corporation (hereinafter "3Com"), the manufacturer of the communications equipment allegedly provided under the Rental Agreement.

Viewpoint alleges many additional facts in its forty-nine page, one hundred sixty-eight paragraph Facts section of its Amended Answer, Affirmative Defenses, Amended Counterclaim, and Third Party Complaint (hereinafter "Counterclaim").  Viewpoint's central allegation is that its Rental Agreement with DLL was only one of a complex series of contracts and relationships between itself, DLL, Capital 4, and 3Com.  Based on the inter-relationships between these contracts, Viewpoint argues that its obligation to pay DLL was extinguished when Capital 4 stopped providing telecommunications services.[1]  A more detailed account follows.

Viewpoint alleges that in January 2004 Capital 4 developed a program for selling telecommunication services to businesses, which it branded the "Power of $Zero Program"

---

[1]Viewpoint has also alleged that DLL, Capital 4, and 3Com have engaged in similar fraudulent acts affecting at least eighteen other businesses.  (Countercl. ¶ 148).  DLL has filed similar suits, which have been assigned to the undersigned, against other companies that have allegedly violated their respective Rental Agreements under the same 3Com Power of $Zero Solution at issue here.  See De Lage Landen Fin. Servs. v. Rasa Floors, LP, 08-cv-0533 (motion to dismiss counterclaims granted in part and denied in part); De Lage Landen Fin. Servs. v. Grayson County Coll., 08-cv-0532 (settled); De Lage Landen Fin. Servs. v. Barton Nelson, Inc., 08-cv-0530 (motion to dismiss counterclaims denied and case subsequently settled); De Lage Landen Fin. Servs. v. Mid-America Healthcare, LP, 08-cv-1264 (motion to dismiss for lack of personal jurisdiction and improper venue denied and case subsequently settled).

Furthermore, a suit filed by 3Com against Capital 4 about their relationship under the 3Com Power of $Zero Solution is currently pending in the Southern District of New York.  See 3Com Corp. v. Capital 4, Inc., et al., S.D.N.Y. 07-cv-8707.  Similarly, DLL filed a suit against Capital 4 in the Eastern District of Pennsylvania, which is stayed pending the outcome of the 3Com and Capital 4 litigation.  See De Lage Landen Fin. Servs. v. Capital 4, Inc., 07-cv-3262 (Yohn, J.).

(hereinafter "Program").  (Countercl. ¶ 54).  Pursuant to a Customer Agreement with Capital 4,

customers would receive all of their telecommunications services—local and long distance

phone, cellular phone, and internet services—for three to seven years at a flat monthly rate plus

either free telephone equipment from 3Com, a cash bonus, or a combination of both.  (Countercl.

¶ 55(a)-(b)).  Under the Program, Viewpoint asserts that Capital 4 would arrange for a customer

to borrow money from an equipment leasing company, such as DLL, and the customer would

repay the borrowed money with interest, pursuant to a Rental Agreement with the leasing

company.  (Countercl. ¶ 55(b)).  The leasing company then paid the borrowed money to Capital

4, which in turn used most of the money to provide the telephone services for the customers.

(Countercl. ¶ 55(b), (f)).  Capital 4 did not provide services itself but instead contracted with

licensed telephone service companies.  (Countercl. ¶ 55(h)).  Viewpoint alleges that Capital 4

represented that if Capital 4 failed to deliver services, the customer could cancel and owe

nothing.  (Countercl. ¶ 55(c)).  In addition, Viewpoint alleges the Program contained a warranty

for service if Capital 4 became insolvent.  (Countercl. ¶ 55(e)).

Viewpoint further alleges that Capital 4 would make a small payment from the borrowed

money to 3Com (if the customer chose the free equipment option) or to the customer (if the

customer chose the  cash bonus option).  (Countercl.  ¶ 54(d)).  Capital 4 would also make a

small payment to any value-added reseller who sold the program to the customer.  (Countercl. ¶

54(e)).  Viewpoint claims that the customer would then make monthly payments to the leasing

company to repay its loan, and any excess amount not needed to repay the loan would "pass

through" from the leasing company to Capital 4 as "deferred maintenance."  (Countercl. ¶ 54(g)).

Viewpoint further asserts that there were contractual relationships between DLL, 3Com,

and Capital 4.  Viewpoint claims that on January 31, 2005, Capital 4 entered into an agreement

with 3Com, called the "Strategic Alliance Agreement," under which Capital 4 would promote

and exclusively use 3Com communication equipment in the Program, and 3Com would assist

Capital 4 in marketing the Program and establishing relationships with 3Com resellers.

(Countercl. ¶ 59-60; Ex. 5).[2]  Viewpoint further alleges that on March 10, 2005, 3Com and

Capital 4 furthered their relationship with the "Rules of Engagement Addendum to Strategic

Alliance Agreement" (hereinafter "Addendum"), in which 3Com acquired the right to brand the

program as its own, the "3Com Power of $Zero Solution."  (Countercl.  ¶¶ 67-68(f); Ex. 7).  The

Addendum addressed the involvement of DLL, which would remain the sole owner of equipment

leased pursuant to the Program, and required Capital 4 to notify 3Com of any changes in its

Rental Agreement with DLL.  (Countercl. ¶¶ 68(h)-(i); Ex. 7, p. 8 ¶ 6(g)).  Further, Viewpoint

alleges that the Addendum provided that as long as DLL was used as the funding source, Capital

4 and 3Com value-added resellers of the Program got a 50% discount on 3Com equipment.

(Countercl. ¶ 69).

According to Viewpoint, Capital 4 and 3Com entered into two additional agreements, the

"Operations Agreement" and "License Agreement" on November 10, 2006.  (Countercl. Exs. 3,

14).  The Operations Agreement contained a "Go Dark Agreement," obligating 3Com to pay for

---

[2]Viewpoint has attached this agreement, and the other agreements discussed in the
following paragraphs, as exhibits to its Counterclaim.  DLL has not challenged the authenticity of
those agreements.  A district court may consider a "document integral to or explicitly relied upon
in the complaint."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)
(citation omitted); see also Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d
1192, 1195 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic
document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims
are based on the document").  Therefore, this Court will take into consideration these documents
as attached to the Counterclaim.

all communication services required to be provided by Capital 4 under its existing contracts if

Capital 4 could not provide those services.  (Countercl. ¶ 120(f); Ex. 3, p. 12 ¶ 4.3.3(d)).

Viewpoint also alleges that on February 7, 2005, DLL and Capital 4 entered into a Business

Communications Program Agreement, or master program agreement, a standard form document

used to establish financing arrangements for equipment vendors.  (Countercl. ¶¶ 62; Ex. 6).  The

agreement allowed DLL to provide equipment leases in the name of Capital 4.  (Countercl. ¶

63(b); Ex. 6 § B).

  Viewpoint also describes the 3Com/Capital 4 website, pursuant to the Addendum, which

explained the Power of $Zero Partnership and the 3Com Power of $Zero Solution.  (Countercl.

¶¶ 70-72).  Specifically, the website's general terms and conditions described the relationship

between the Customer Agreement and the Rental Agreement, the obligations of the customer

under the Agreements, and the responsibilities of Capital 4, 3Com, and DLL under the

Agreements.  (Countercl. ¶ 70; Ex. 1, p. 4-7).  Viewpoint suggests that this website, together with

its Customer Agreement, led it to believe that the Power of $Zero Program was maintained by a

"partnership" that consisted of 3Com, Capital 4, and DLL.[3]  (Countercl. ¶ 86(k)).  Viewpoint

alleges that the Customer Agreement it signed with Capital 4 incorporated the general terms and

conditions found on the website.  (Countercl. ¶ 80, 82; Ex. 1, p. 1).  The terms and conditions

included a forum selection and choice of law clause choosing Texas.  (Countercl. Ex. 1, p. 7.)

_____

  [3]Viewpoint's allegations consistently assert that DLL, Capital 4, and 3Com constituted a "partnership," but Viewpoint does not allege any specific partnership agreement.  This allegation continues into its RICO counterclaim, as discussed below.  Viewpoint may be referring to the "Power of $Zero Partnership" mentioned in several of the documents attached as exhibits to the Counterclaim, including the website.  However, those documents do not identify the specific members of that "Partnership."  (See Countercl. Ex. 1, p. 2 ¶ 2).

Viewpoint alleges that Capital 4 first proposed the 3Com Power of Zero Solution to Viewpoint on April 27, 2005. (Countercl. ¶ 76). After the sales meeting, Viewpoint claims that Capital 4 made it an offer for a six-year contract, consisting of the Customer Agreement, Schedule A (listing Viewpoint's monthly payments), and four pages of general terms and conditions from the Power of Zero website. (Countercl. ¶ 77(b), 82; Ex. 1). Viewpoint alleges that the offer was written by Capital 4 and the "Power of $Zero Partnership" and that Viewpoint did not prepare any part of the offer. (Countercl. ¶¶ 83-84). Viewpoint accepted Capital 4's offer.[4] (Countercl. ¶ 85). Subsequent to signing the offer, Viewpoint alleges that Capital 4 transmitted a credit application to Viewpoint, which Viewpoint completed and returned to Capital 4. (Countercl. ¶ 87-90; Ex. 10). According to Viewpoint, it did not know the identity of the equipment supplier (DLL) prior to signing the contract. (Countercl. ¶ 96(g)).

After Viewpoint signed the Customer Agreement and submitted its credit application, Viewpoint avers that Capital 4 transmitted to it the Rental Agreement, which indicated the Rental Agreement was from Capital 4 Financial Services, "A Program of De Lage Landen Financial Services." (Countercl. ¶ 91; Ex. 1 p. 8). Viewpoint signed the Rental Agreement on August 16, 2005 and alleges that it returned the Rental Agreement to Capital 4 and the Power of $Zero partnership. (Countercl. ¶ 92; Ex. 1 pp. 8-9). On or about October 12, 2005, Viewpoint alleges that DLL countersigned the Funding Agreement and returned a copy to Viewpoint. (Countercl. ¶ 93). Viewpoint further claims that on September 20, 2005, Viewpoint [sic, should be "Capital 4"] sent an invoice to DLL for $127,055.36 for the telephone equipment Capital 4 sold to DLL

---

[4]Viewpoint does not allege the date that it signed the Customer Agreement with Capital 4. Viewpoint's Exhibit 1 is a undated copy of the Customer Agreement signed by Viewpoint and not counter-signed by Capital 4. (Countercl. Ex. 1, p. 1).

and shipped to Viewpoint, plus sixty months deferred maintenance at $691.16 per month. (Countercl. ¶ 105, Ex. 11).  Viewpoint alleges that phone service began October 17, 2005. (Countercl. ¶ 114).  Viewpoint further alleges that it in January 2006 it began receiving monthly statements from Capital 4, Inc. for the Power of $Zero Program for $3,606.65, with adjustments thereto.  (Countercl. ¶ 113-15; Ex. 13).  Monthly statements continued through September 15, 2007.  (Countercl. ¶116).

By letter dated September 25, 2007, Capital 4 informed its customers, including Viewpoint, that it could no longer meet its obligations under the Customer Agreement, including provision of telecom services.  (Countercl. ¶ 128; Ex. 16).  Viewpoint alleges that on August 20, 2007, 3Com invoked its Go Dark Agreement with Capital 4, but failed and refused to pay the telecommunications service providers.  (Countercl. ¶ 127).  Facing the loss of such services, Viewpoint alleges that its business was in jeopardy, and it began a search for a new telecommunications services provider.  (Countercl. ¶ 131).  Viewpoint claims that it now pays a higher monthly amount for the same services it contracted for through the Power of $Zero partnership.  (Countercl. ¶ 132).

### C.    Class Allegations

In addition to the allegations advanced on behalf of itself, Viewpoint alleges that it seeks the certification of the following class: "All people or entities who entered into a contract under the 'Power of $Zero,' program, or the '3Com Power of $Zero™' program with Capital 4, Inc., 3Com Corporation, or the 'Power of $Zero™ Partnership.'" (Countercl. ¶ 149(a)).  Viewpoint alleges that there are at least 100 and may be as many as 5,000 potential class members. (Countercl. ¶ 151).  Viewpoint further asserts that its counsel represents approximately twenty-

five parties who would qualify as class members.  (Countercl. ¶ 157).

### C.     Procedural History

DLL filed its Complaint for breach of contract and unjust enrichment on February 1, 2008 (Doc. No. 1).  Viewpoint filed an Answer and Counterclaim against DLL and Capital 4 on May 16, 2008 (Doc. No. 6), and DLL moved to dismiss the counterclaims (Doc. No. 9).  Viewpoint filed an Amended Answer, Third Party Complaint, and Counterclaim against DLL, Capital 4, and 3Com on July 14, 2008 (Doc. No. 14).  As such, this Court denied DLL's initial Motion to Dismiss as moot (Doc. No. 17).  DLL filed a Motion to Dismiss the Amended Counterclaim on August 15, 2008 (Doc. No. 19).  On September 30, 2008, Viewpoint filed a Motion for Joinder to join Capital 4 and 3Com as Third Party Defendants and Additional Counterclaim Defendants (Doc. No. 23), which this Court granted on October 22, 2008 (Doc. No. 27).[5]

The counterclaims alleged by Viewpoint against DLL are as follows:

| | |
|---|---|
| Count VIII | Fraudulent Misrepresentation |
| Count IX | Conspiracy to Commit Fraud |
| Count XI | Violation of Pennsylvania Consumer Protection Law |
| Count XII | Violation of Texas Consumer Protection Law |
| Count XIII | Violation of the Federal RICO statute |
| Count XIV | Request for Rescission of Contracts |
| Count XV | Violation of Texas Usury law |
| Count XVI | Violation of Pennsylvania Criminal Usury law |

## II.    Legal Standards

### A.     Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds the sum or value of

---

[5]3Com has also filed a motion to dismiss the counterclaims against it under Fed. R. Civ. P. 12.  (Doc. No. 31).

$75,000, exclusive of interest and costs.

   **B.   Standard of Review**

   When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

the Court may look only to the facts alleged in the complaint and its attachments.  Jordan v. Fox,

Rothschild, O'Brien & Frankel, 20 F.3d 1251, 1261 (3d Cir. 1994).  The Court must accept as

true all well-pleaded allegations in the complaint and view them in the light most favorable to the

plaintiff.  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).  The

motion will be granted only when it is certain that no relief could be granted under any set of

facts that plaintiff could prove.  Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).

   A valid complaint requires only "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In order to state a valid complaint a plaintiff

must make a "showing" that is more than just a blanket assertion that he is entitled to relief.

Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The Supreme Court has also

cautioned "that without some factual allegation in a complaint, a claimant cannot satisfy the

requirement that he or she provide not only 'fair notice' but also 'grounds' on which the claim

rests."  Id. (citing Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 n.3 (2007)).

   Furthermore, any allegations of fraud must comply with the standard set out under

Federal Rule of Civil Procedure 9(b), which provides that, "[i]n all averments of fraud or

mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  This

requirement of particularity means a plaintiff must plead the circumstances surrounding the

alleged fraud in order to put the defendant on notice of the precise misconduct at issue.  See

Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).

III.    **Parties' Arguments**

DLL's Motion to Dismiss argues that each of Viewpoint's counterclaims against it should be dismissed based on Viewpoint's failure to state a claim under Fed. R. Civ. Pro. 12(b)(6).  As a preliminary matter, DLL argues that Pennsylvania law should apply to all of Viewpoint's tort-based claims based on the choice of law provision in the Rental Agreement.  With regards to Viewpoint's fraudulent misrepresentation claim, DLL argues that Viewpoint has not pled facts stating that DLL made the allegedly fraudulent misrepresentations and that the parol evidence rule and gist of the action doctrine bar Viewpoint's fraudulent misrepresentation allegations.  As such, DLL argues that Viewpoint's conspiracy, RICO, and rescission claims must be dismissed because they are based on the underlying fraudulent misrepresentation claim.  DLL contends that the conspiracy and RICO claims also must be dismissed because they were not adequately pled. DLL claims that Pennsylvania Consumer Protection claim does not apply to the business purchases made here, and the Texas statutory claims are improper where none of the parties are from Texas.  DLL argues that Viewpoint can not plead a claim under Pennsylvania criminal usury law because the statute contains no private right of action.  Finally, DLL claims that the class action claim must be dismissed because Viewpoint has not satisfied the requirements of Fed. R. Civ. P. 23.

Viewpoint responds that Texas law applies to all of its counterclaims because the Rental Agreement and Customer Agreement should be construed together and the two contracts contain contradictory choice of law provisions, Pennsylvania and Texas.  When two inconsistent clauses appear in a single contract, Viewpoints argues that the first executed provision must prevail. Viewpoint asserts that the choice of law clause from the Customer Agreement, choosing Texas

law, was signed first and thus controls over the clause in the Rental Agreement, choosing

Pennsylvania law.  As to the individual counterclaims, Viewpoint argues that it has adequately

pled that DLL made fraudulent misrepresentations and that the Texas parol evidence rule and gist

of the action doctrine do not bar the fraudulent misrepresentation, conspiracy, RICO, or

rescission claims.  Further, Viewpoint argues that it adequately pled its conspiracy and RICO

claims.  Viewpoint concedes that the Pennsylvania Consumer Protection Law does not apply but

argues that the Texas Consumer Protection Law and Texas usury claims do apply.  Viewpoint

withdraws its Pennsylvania criminal usury claim.  Finally, Viewpoint alleges that dismissing its

class action claims would be premature since it has not yet sought certification.

IV.   **Discussion**

        In this case, Viewpoint alleges counterclaims against DLL that are highly similar to

counterclaims alleged by a defendant in another case filed by DLL and pending before the

undersigned, De Lage Landen Fin. Servs. v. Rasa Floors, LP, 08-cv-0533.  Both Viewpoint and

the defendant in that case, Rasa, are represented by the same counsel and pled similar facts.

Furthermore, DLL moved to dismiss both Viewpoint and Rasa's claims on similar grounds.  As

such, the claims and legal arguments made in Rasa are nearly identical to those made in the

instant case.  This Court issued an opinion in Rasa, in which it granted in part and denied in part

DLL's motion to dismiss.  2009 WL 564627 (E.D. Pa. March 5, 2009).  Because the legal

arguments are highly similar, this Court will reference as follows its decision in Rasa to the

extent applicable as described below.

        **A.      Choice-of-Law Clauses**

        As described above, the parties disagree about the application of two different choice-of-

law clauses found within the Customer and Rental Agreements.[6]  This Court's analysis of the

choice-of-law issue in <u>Rasa</u> is directly applicable here.  See <u>Rasa</u>, 2009 WL 564627 at *5-6.

Based on that analysis, this Court cannot conclude at this stage without discovery whether the

Agreements should be construed together and therefore which law should apply.  Viewpoint has

alleged sufficient facts, which this Court must accept as true, to support that the contracts could

be construed together, requiring the Court to perform a choice of law analysis.

**B.      Fraudulent Misrepresentation Claim (Count VIII)**

1.      <u>DLL's Role in Misrepresentation</u>

DLL first alleges that Viewpoint has not adequately pled fraudulent misrepresentations

made by DLL and instead has only alleged misrepresentations by Capital 4 and 3Com.  The

Court is satisfied that Viewpoint has sufficiently alleged DLL's role in the fraudulent

misrepresentations claimed.  Specifically, Viewpoint's Counterclaim paragraphs 86(j)-(k), 91,

93, 108, and 144-45 name DLL as being involved in the alleged misrepresentations.

2.      <u>Parol Evidence Rule</u>

DLL next claims that Viewpoint's allegations of fraudulent misrepresentations not within

the Rental Agreement are barred by the Pennsylvania parol evidence rule.  The Court's reasoning

in <u>Rasa</u> as to the parol evidence rule applies here.  See <u>Rasa</u>, 2009 WL 564627 at *6-7.  If

---

[6]The Customer Agreement clause, which is found in the incorporated general terms and
conditions, reads in relevant part: "The Agreement shall be governed by, construed, and enforced
in accordance with, and subject to, the laws of the State of Texas." (Countercl. Ex. 1. p. 7).
The clause in the Rental Agreement reads in relevant part: "This Lease shall in all
respects be interpreted and all transactions subject to this Lease and all rights and liabilities of the
parties under the Lease shall be determined and governed as to their validity, interpretation,
enforcement, and effect by the laws of the Commonwealth of Pennsylvania . . . ."  (Compl. Ex. A
¶ 22).

Viewpoint is able to show after discovery that the two contracts should be construed together, the parol evidence rule would not bar consideration of representations made in one part of the contract to show fraudulent misrepresentations made in the other part.  Even if Viewpoint can not show that the contracts should be construed together, Viewpoint has sufficiently alleged that its claim may fall within the "fraud in the execution" exception to the parol evidence rule under Pennsylvania law or the broader exceptions recognized by Texas law.  See Rasa, 2009 WL 564627 at *6.

        3.      Gist of the Action Doctrine

DLL's final argument to dismiss the fraudulent misrepresentation claim is that Viewpoint is attempting to recover in tort for representations directly addressed by its contract with DLL, which is barred by the gist of the action doctrine.  Again, this Court refers to its reasoning in Rasa that the gist of the action doctrine does not bar Viewpoint's fraudulent misrepresentation claim on a motion to dismiss.  See Rasa, 2009 WL 564627 at *7-8.  Viewpoint has alleged some fraudulent misrepresentations made by DLL and the partnership of DLL, Capital 4, and 3Com that are not specifically covered by the Agreements.  (See Countercl. ¶ 86).

**C.**    **Conspiracy Claim (Count IX)**

Because Viewpoint's underlying fraud claim can go forward, DLL's argument that Viewpoint has not sufficiently pled a substantive fraud claim to establish conspiracy is without merit.  In addition, Viewpoint has adequately pled that DLL entered into agreements and acted in association with Capital 4 and 3Com, the alleged co-conspirators.  However, as this Court explained in Rasa, Viewpoint has not pled that DLL acted with malice or intent to injure as required under Pennsylvania conspiracy law.  See Rasa, 2009 WL 564627 at *8-9.  Yet

-14-

Pennsylvania law may not govern this case, so this Court will not dismiss the conspiracy claim at this stage, without having made a decision on the applicable choice of law.  Furthermore, the Court will grant Viewpoint leave to amend the conspiracy claim to allege facts to show that DLL acted with malice or intent to injure Viewpoint.

### D.      Pennsylvania Consumer Protection Claim (Count XI)

Viewpoint has abandoned its Pennsylvania Consumer Protection claim, since it purchased or leased the goods or services for business purposes, not the personal, family or household purposes protected by the statute.  73 P.S. § 201-9.2.  Viewpoint may seek leave to amend to add a Massachusetts Chapter 93A, Regulation of Business Practices for Consumers Protection, claim. Mass. Gen. Laws ch. 93A, § 11 (2009).

### E.      Texas Consumer Protection claim (Count XII)

DLL argues that the Texas Consumer Protection Claim must be dismissed because DLL is a Michigan corporation with a place of business in Pennsylvania and Viewpoint is a Massachusetts corporation.  In addition, the Rental Agreement contained a Pennsylvania choice of law clause.  However, the Customer Agreement contained a Texas choice of law clause, Capital 4 is a Texas corporation, and Viewpoint alleges that the fraud of which it complains originated in Texas.  As explained in Rasa, this Court has not yet determined how to construe the contracts and their competing choice-of-law clauses, nor has the Court determined whether the statutory claims would fall within the reach of a choice-of-law clause or may instead require a choice-of-law analysis.  See Rasa, 2009 WL 564627 at *11.  For this reason, the Court will not dismiss the Texas Consumer Protection claim at this time.

### F.      RICO Claim (Count XIII)

Viewpoint alleges a claim against DLL under the Racketeer Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 et seq., based on the allegations contained in its Counterclaim.  (Countercl. ¶¶ 284-88).  DLL has moved to dismiss the RICO claim because the underlying fraud claim is invalid and Viewpoint has not sufficiently pled a cause of action.  As the Court explained in Rasa, Viewpoint's allegations are contrary to the distinctiveness rule, which requires that the RICO "person" and the RICO "enterprise" are separate and distinct entities.  See Rasa, 2009 WL 564627 at *9-10.  The Court will allow Viewpoint to amend its RICO claim to cure its improper definition of enterprise and further directs Viewpoint to follow its standard RICO Case Statement (as described in the Order) with respect to its RICO allegations.  The Court will consider the Case Statement as part of the amended pleading.

### G.      Rescission Claim (Count XIV)

DLL argues that Viewpoint's rescission claim must be dismissed because its fraudulent misrepresentation claim is barred by the parol evidence rule and gist of the action doctrine.  Because the Court is not dismissing the fraudulent misrepresentation claim at this stage, it will not dismiss the rescission claim.

### H.      Texas Usury Claim (Count XV)

DLL argues that Viewpoint's Texas usury claim must be dismissed because the parties have no connection to Texas and the Pennsylvania choice-of-law clause applies.  As this Court explained above and in Rasa, it is not yet ruling on how to construe the contracts and on choice of law.  See Rasa, 2009 WL 564627 at *11.  DLL further argues that usury may not be used as a defense where the interest sought is lawful in the place of contracting, the place of performance, or any other place with which the contract has a substantial connection and here the interest is

lawful in Pennsylvania.  <u>Fahs v. Martin</u>, 224 F.2d 387, 397 (5th Cir. 1955).  However, "[w]hether

money paid as interest may be recovered on the grounds that it was usurious depends on the

interpretation of the state law covering the transaction.  It is therefore necessary to determine

what state law governs." <u>Brierley v. Commercial Credit Co.</u>, 43 F.2d 730, 731 (3rd Cir. 1930).

Since this Court must first construe the contracts and then decide which law applies to the

statutory claims, it will not dismiss the Texas usury claim.

I.     **Pennsylvania Criminal Usury Claim (Count XVI)**

Viewpoint withdraws the Pennsylvania criminal usury claim, so it will not be considered.

J.     **Class Action Claim**

DLL argues that Viewpoint has not complied with the Federal Rule 23(a) and (b)

prerequisites to bringing a class action claim.  DLL further claims that a preemptive attack on

class certification in a motion to dismiss is proper under Federal Rule 12(b)(6).  The Defendant

in <u>DLL v. Rasa</u> did not seek class certification.

"Because defendants challenge class certification solely on the basis of the allegations in

the [counterclaim], the proper standard is the same as that applied in deciding a motion to

dismiss for failure to state a claim." <u>Sjoblom v. Charter Commc'ns, LLC</u>, 2007 WL 4560541, at

*6 (W.D. Wis. 2007).  Viewpoint has not yet sought class certification.  However its

Counterclaim contains allegations related to numerosity, commonality, typicality, and adequacy

of representation, as required by Federal Rule 23(a).[7]  (Countercl. ¶¶ 150-54).  Viewpoint also

---

[7]DLL makes specific allegations concerning Viewpoint's attorney, Ronald P. Gossett, as
having a conflict of interest that jeopardizes his adequacy of representation.  Specifically DLL
claims that Mr. Gossett represents 3Com's former general counsel and external counsel, Simon
Hughes.  (Pl.'s Br. 42.)  Viewpoint denies that Gossett is representing Hughes and that there is a
conflict.  (Def.'s Br. Opp'n 5-7.)  The Court may entertain such arguments, if factually

alleged that common questions of law or fact predominate and that a class action is the superior method to resolve the issues raised, as required by Federal Rule 23(b)(3).  (Countercl.  ¶¶ 155-56.)  Therefore, Viewpoint has adequately pled a class action claim to survive DLL's Motion to Dismiss.  DLL may revisit its arguments against the class action once Viewpoint has sought certification of the class.

## V.    <u>Conclusion</u>

For the foregoing reasons, DLL's Motion to Dismiss is granted in part and denied in part, with leave to amend.

An appropriate Order follows.

---

supported, when certification of the class is sought.  They are not now relevant.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DE LAGE LANDEN FINANCIAL | : | |
| SERVICES, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 08-00534 |
| | : | |
| v. | : | |
| | : | |
| VIEWPOINT COMPUTER | : | |
| ANIMATION, INC. | : | |
| | : | |
| Defendant. | : | |

**ORDER**

AND NOW, this ____11th____ day of March 2009, after reviewing Plaintiff's Motion to Dismiss Defendant's Counterclaim, it is hereby ORDERED that Plaintiff's Motion is:

(1)      DENIED with respect to Counts VIII, XII, XIV, and XV;

(2)      DENIED with respect to Count IX, but Defendant has leave to amend the Counterclaim to allege malice if it wishes to plead conspiracy under Pennsylvania law;

(3)      GRANTED without prejudice and with leave to amend with respect to the RICO claim in Count XIII; and

(4)      GRANTED with prejudice with respect to the Pennsylvania Consumer Protection claim and Pennsylvania criminal usury claim in Counts XI and XVI.

_____It is FURTHER ORDERED that should Defendant amend its Counterclaim to include a properly pled RICO claim in Count XIII, Defendant must also file a RICO Case Statement, which includes the following, in substance:

-19-

a.      As to each Defendant on the RICO counterclaim, state the alleged misconduct and basis of liability of each Defendant.

b.      As to the racketeering activity alleged under each RICO count, include the following:

     i.      List each predicate act which Plaintiff on the Counterclaim alleges constitutes the RICO violation, including such specifics as names, dates, and types of communications or acts, and in doing so, Plaintiff may incorporate any exhibits to the Counterclaim;

     ii.     Describe how each predicate act is fraudulent and/or part of a pattern of racketeering activity;

     iii.    State how the alleged predicate acts relate to each other as part of a common plan.

c.      Describe in detail the alleged enterprise for each RICO claim.  A description of the enterprise shall include the following information:

     i.      The names of the individuals, partnerships, corporations, associations, or other legal entities that allegedly constitute the enterprise;

     ii.     The structure, purpose, function, and course of conduct of the enterprise;

     iii.    Whether any defendants are employees, officers, or directors of the alleged enterprise;

     iv.     Whether any defendants are associated with the enterprise; and,

     v.      Whether Plaintiff is alleging that the Defendants are individuals or entities separate from the alleged enterprise, that the Defendants are the enterprise itself, or members of the enterprise.

d.      Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.

e.      Describe how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.

f.      Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.

g.      Describe the effect of the enterprise on interstate or foreign commerce.

h.      If the complaint alleges a violation of 18 U.S.C. § 1962(c), state:

     i.      Who is employed by or associated with the enterprise; and,

     ii.     Whether the same entity is both the liable "person" and the "enterprise"

-20-

under 18 U.S.C. § 1962(c).

i.      If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe the alleged conspiracy.

j.      Describe the alleged injury to business or property.

k.      Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.

l.      Provide any additional information that you believe would be helpful in processing your RICO claim.

BY THE COURT:

/s Michael M. Baylson

_____

Michael M. Baylson, U.S.D.J.

O:\CIVIL 07-08\08-534 DLL v. Viewpoint\Memo re DLL MTD.wpd