**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DE LAGE LANDEN FINANCIAL SERVICES, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| RASA FLOORS, LP | : | NO. 08-533 |
| v. | : | |
| | : | |
| 3COM CORPORATION, AND CAPITAL 4, INC. | : | |
| | : | |

_____

| | | |
|---|---|---|
| DE LAGE LANDEN FINANCIAL SERVICES, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| VIEWPOINT COMPUTER ANIMATION, INC. | : | NO. 08-534 |
| | : | |
| v. | : | |
| | : | |
| 3COM CORPORATION, AND CAPITAL 4, INC. | : | |
| | : | |
| v. | : | |
| | : | |
| NORTH CENTRAL COMMUNICATIONS CORP. | : | |

**Baylson, J.**                                                    **August 20, 2010**

## MEMORANDUM RE: DEFENDANTS' MOTION FOR CLASS CERTIFICATION

**I.      Introduction**

        The issue presented is whether the Court should certify class actions in these

two consolidated cases.  Before reviewing the extensive factual record and discussing the

analysis of legal issues, it is relevant to note the recently changing landscape of class action

jurisprudence. Modern Federal Rule of Civil Procedure 23 ("Rule 23") became effective in 1966,

and ushered in a momentous period of "complex litigation." In a class action, counsel for the plaintiff is formally only representing the named plaintiff. However, the plaintiff, as class representative, and by extension, the plaintiff's counsel, are acting for, realistically if not legally, hundreds, thousands, or in some cases, millions of people. By definition, the court has determined all of them are "similarly situated." In a suit for damages, which reflects virtually all class actions except those asserting civil rights violations, the court must also find that common questions "predominate," and a suit brought by a single plaintiff often results in damages being awarded for the entire "class."

The Supreme Court, in its landmark <u>Eisen v. Carlisle and Jacquelin</u> decision, 417 U.S. 156 (1974), essentially adopted a pleadings standard for their lower federal courts to apply in determining whether a case should be maintained as a class action. With this fairly liberal and easy to satisfy threshold, district judges began certifying numerous classes. Two frequent examples of the types of cases often certified as class actions include Sherman Act § 1 antitrust claims and Rule 10(b)(5) securities fraud claims. The damages exposure to a defendant or defendants was drastically increased from what could be expected to be awarded to a single plaintiff, as to whom damage was usually finite and reasonably calculated, to damages that would be reflective (and sometimes approximate) of the injury caused to countless individuals and/or entities who had claims similar to the class representative. In practice, the lawyers representing class action plaintiffs controlled the cases, and developed substantial expertise (and wealth) from learning how to gather evidence, present damage theories, and administer class actions—at the same time tremendously increasing the settlement pressure on defendants by virtue of the increased damages exposure. This commentary is not necessarily critical of class actions—they

provide remedial justice for serious wrongdoing, and obviate multiple lawsuits by individual plaintiffs who have been injured and often will forego their own lawsuit because of the expense and bother, even though they have meritorious rights for damages or other relief.

In more recent years, and partly as a result of amendments to Rule 23 that took effect in 1998—principally, the allowance of an interlocutory appeal from a district court decision approving or denying a class action—circuit courts began to take a closer look at district court decisions, and, in particular, the economic consequences of class actions.  In its recent decision in In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305 (3d Cir. 2008), the Third Circuit developed rigorous standards that a district court judge must apply in order to certify a class, which require looking "rigorously" at many details concerning class actions, including the underlying merits of the litigation and the fairness to defendants, and basically ushered in a new day of determining whether to certify class actions.

Here, Plaintiff De Lage Landen Financial Services, Inc. ("DLL") brought suit in two separate cases against two separate Defendants:  first, against Defendant Viewpoint Computer Animation, Inc. ("Viewpoint") (Civ. Docket No. 08-534), and second, against Defendant Rasa Floors, LP ("Rasa") (Civ. Docket No. 08-533).  In both cases, DLL brought one count for breach of contract and one count for unjust enrichment, to recover damages resulting from an alleged breach of an equipment rental contract entered into between the parties.  Also in both cases, each respective Defendant brought counterclaims against Plaintiff DLL; additionally, each Defendant subsequently brought claims against Third-Party Defendants 3Com Corporation ("3Com") and

Capital 4, Inc. ("Capital 4").[1]  The two cases were ultimately consolidated for purposes of

discovery pursuant to this Court's Order of April 14, 2009.

The Defendants, Rasa and Viewpoint, have refused to pay Plaintiffs, and have brought

counterclaims alleging breach of contract, fraud and other claims against DLL, and also against

third party Defendant 3Com.  Rasa and Viewpoint have moved to be designated as class

representatives for similarly situated individuals who were likewise customers of DLL and

3Com.  Thus, presently before the Court is Defendant Viewpoint's and Defendant Rasa's joint

second amended motion for class certification under Fed. R. Civ. P. 23 (Doc. No. 109), in which

Defendants seek to certify a main class and three subclasses relating to the various counts they

asserted against Plaintiff DLL and Third-Party Defendants 3Com and Capital 4.  For the reasons

set forth in this Memorandum, the motion for class certification will be denied.

## II.     **Procedural History and Factual Background**

### A.     **Procedural History**

#### 1.     **DLL. v. Viewpoint Case (Civ. Docket No. 08-534)**

Plaintiff DLL filed its complaint against Defendant Viewpoint on February 1, 2008 (Doc.

No. 1).  On May 16, 2008, Viewpoint filed its answer and counterclaims (Doc. No. 6), bringing

counterclaims against Plaintiff DLL, as well as claims against additional Third-Party Defendant

Capital 4[2].  On June 5, 2008, Plaintiff DLL filed a motion to dismiss the counterclaim (Doc. No.

9). On July 14, 2008, Defendant Viewpoint filed an Amended Answer, Affirmative Defenses,

---

[1]In the DLL v. Rasa case, Civ. Docket No. 08-533, Plaintiff DLL also filed a third-party
complaint against North Central Communications Corporation.

[2]Because Capital 4 is now a defunct corporate entity, it is not an active party in this case
and is not represented by counsel.

Amended Counterclaim and Third-Party Complaint, this time bringing counterclaims against Plaintiff DLL as well as claims against Third-Party Defendants Capital 4 and 3Com (Doc. No. 14). On July 28, 2008, this Court filed an order denying Plaintiff DLL's initial motion to dismiss the counterclaim as moot (Doc. No. 17).

On August 15, 2008, Plaintiff DLL filed a motion to dismiss Defendant Viewpoint's amended counterclaim (Doc. No. 19), to which Viewpoint responded on September 24, 2008 (Doc. No. 21) and supplemented on October 9, 2008 (Doc. No. 24). DLL replied on October 27, 2008 (Doc. No. 26), and on March 11, 2009, this Court ruled on the motion to dismiss the amended counterclaim, both granting in part and denying in part (Doc. No. 40; De Lage Landen Fin. Services, Inc. v. Viewpoint Computer Animation, Inc., 2009 WL 678635 (E.D. Pa. Mar. 11, 2009) (Baylson, J.)). On September 30, 2008, Defendant Viewpoint filed its "Motion Under Rule 14 for Leave to Join Third Party Defendants, Motion Under Rules 19 and 20 for Leave to Join Additional Counterclaim Defendants, and Brief in Support Thereof" (Doc. No. 23), which this Court granted on October 22, 2008 (Doc. No. 27).

On January 23, 2009, Third-Party Defendant 3Com filed a motion to dismiss the claims asserted against it by Defendant Viewpoint (Doc. No. 31). Viewpoint responded on February 2, 2009 (Doc. No. 35), and 3Com replied on February 11, 2009 (Doc. No. 36). On April 1, 2009, this Court ruled on 3Com's motion to dismiss, both granting in part and denying in part (Doc. Nos. 43, 44; De Lage Landen Fin. Services, Inc. v. Viewpoint Computer Animation, Inc., 2009 WL 902365 (E.D. Pa. Apr. 1, 2009) (Baylson, J.)).

On April 16, 2009, Defendant Viewpoint filed its Second Amended Answer, Affirmative Defenses, Amended Counterclaim and Third-Party Complaint (Doc. No. 49). Plaintiff DLL filed

its answer on June 1, 2009 (Doc. No. 62), as did Third-Party Defendant 3Com (Doc. No. 63). On July 29, 2009, 3Com filed an amended answer and affirmative defenses (Doc. No. 79).

## 2. **DLL v. Rasa Case (Civ. Docket No. 08-533)**

Plaintiff DLL filed its complaint against Defendant Rasa on February 1, 2008 (Doc. No. 1). On May 22, 2008, Defendant Rasa filed a motion to dismiss for lack of jurisdiction and improper venue (Doc. No. 7), to which DLL responded on June 20, 2008 (Doc. No. 14). Rasa replied on June 27, 2008 (Doc. No. 15), and also on the same date filed a motion requesting oral argument on the motion (Doc. No. 16). The Court held oral argument on September 17, 2008, after which the parties filed post-hearing briefing as follows: Plaintiff DLL on October 1, 2008 (Doc. No. 24), and Defendant Rasa on October 6, 2008 (Doc. No. 27). Defendant Rasa supplemented its post-hearing briefing on October 9, 2008 (Doc. No. 28), to which Plaintiff DLL responded on October 14, 2008 (Doc. No. 29). On November 4, 2008, the Court issued its opinion and order denying Defendant Rasa's motion to dismiss (Doc. No. 32; De Lage Landen Fin. Services, Inc. v. Rasa Floors, LP, 2008 WL 4822033 (E.D. Pa. Nov. 4, 2008) (Baylson, J.)).

On November 18, 2008, Defendant Rasa filed its Answer, Affirmative Defenses, Counterclaim and Third-Party Complaint, bringing counterclaims against Plaintiff DLL, as well as claims against Third-Party Defendants 3Com and Capital 4 (Doc. No. 34). On December 8, 2008, Plaintiff DLL filed a motion to dismiss Defendant Rasa's counterclaim (Doc. No. 38), to which Rasa responded on January 16, 2009 (Doc. No. 44). DLL replied on January 23, 2009 (Doc. No. 49). The Court ruled on DLL's motion on March 5, 2009, both granting in part and denying in part (Doc. No. 58; De Lage Landen Fin. Services, Inc. v. Rasa Floors, LP, 2009 WL 564627 (E.D. Pa. Mar. 5, 2009) (Baylson, J.)).

On January 23, 2009, Third-Party Defendant 3Com filed its motion to dismiss the claims asserted against it by Defendant Rasa (Doc. No. 47), to which Defendant Rasa responded on February 24, 2009 (Doc. No. 54). 3Com filed its reply on February 26, 2009 (Doc. No. 56). The Court ruled on 3Com's motion on March 31, 2009, both granting in part and denying in part (Doc. No. 64; De Lage Landen Fin. Services, Inc. v. Rasa Floors, LP, 2009 WL 884114 (E.D. Pa. Mar. 31, 2009) (Baylson, J.)).

On February 17, 2009, the Court issued an Order (Doc. No. 52) requesting that Defendant Rasa file a brief memorandum explaining whether it properly added 3Com and Capital 4 as Third-Party Defendants. Rasa filed its memorandum on this issue on February 19, 2009 (Doc. No. 53), and 3Com responded on February 26, 2009 (Doc. No. 57).

On April 16, 2009, Defendant Rasa filed its Amended Answer, Affirmative Defenses, Counterclaim and Third-Party Complaint (Doc. No. 70). Plaintiff DLL responded on June 1, 2009 (Doc. No. 85), as did Third-Party Defendant 3Com (Doc. No. 88). 3Com subsequently filed an amended answer on July 28, 2008 (Doc. No. 99).

On August 26, 2009, Plaintiff DLL filed a motion for leave to file a third-party complaint in order to assert claims against North Central Communications Corporation ("NCC") (Doc. No. 101). Rasa responded on September 3, 2009 (Doc. No. 102), and DLL replied on September 14, 2009 (Doc. No. 103). The Court granted DLL's motion for leave to file its third-party complaint on October 2, 2009 (Doc. No. 104), and on October 5, 2009, DLL filed its third-party complaint against NCC (Doc. No. 105). NCC filed a motion to dismiss the third-party complaint on November 24, 2009 (Doc. No. 106), to which DLL responded on December 18, 2009 (Doc. No. 111). NCC replied on December 28, 2009 (Doc. No. 116), and on March 2, 2010, the Court

issued its ruling denying NCC's motion to dismiss (Doc. Nos. 124, 125; <u>De Lage Landen Fin.</u> <u>Services, Inc. v. Rasa Floors, LP</u>, 2010 WL 742625 (E.D. Pa. Mar. 2, 2010) (Baylson, J.)).

On June 10, 2010, Plaintiff DLL filed a request to enter default against NCC for failure to plead or otherwise defend (Doc. No. 144), and on June 15, 2010, NCC filed its Answer, Affirmative Defenses, Third-Party Complaint and Cross-Claim Against 3Com (Doc. No. 147). On July 7, 2010, Plaintiff DLL filed its answer and affirmative defenses to NCC's counterclaims (Doc. No. 151), and on July 16, 2010, 3Com filed its answer and affirmative defenses to NCC's claims against it, as well as its own counterclaims against NCC (Doc. No. 155). On July 29, 2010, Plaintiff DLL and Third-Party Defendant NCC stipulated and agreed that DLL would file an amended third-party complaint (Doc. No. 156), and on that same date, DLL filed its amended third-party complaint against NCC (Doc. No. 158).

### 3.    Class Certification Issue

On April 14, 2009, this Court entered an Order on both dockets consolidating the two cases for purposes of discovery (DLL v. Viewpoint, Civ. Docket No. 08-534, Doc. No. 47; DLL v. Rasa, Civ. Docket No. 08-533, Doc. No. 67). For purposes of clarity, the Court will, going forward, refer only to the docket number for each respective docket entry as each entry appears on the DLL v. Viewpoint docket, Civ. Docket No. 08-534—even though the same class certification papers have been filed and thus appear on both cases' dockets.

On April 30, 2009, Defendant Viewpoint filed a motion for class certification under Fed. R. Civ. P. 23 (Doc. No. 50). Pursuant to this Court's Order of July 24, 2009 (Doc. No. 76), Viewpoint's motion for class certification was withdrawn without prejudice as of July 22, 2009, and re-filed on July 24, 2009 (as Doc. No. 77). On November 11, 2009, Viewpoint filed its

memorandum in support of its motion for class certification (Doc. No. 81). On November 24, 2009, Plaintiff DLL filed its response to the class certification motion (Doc. No. 85), as did Third-Party Defendant 3Com (Doc. No. 87). Defendant Viewpoint filed its reply on December 18, 2009 (Doc. No. 93). The Court held oral argument on Viewpoint's class certification motion on December 23, 2009.

As required by the Court's post-oral argument Order of December 24, 2009 (Doc. No. 99), the parties filed contention statements as to material facts relevant to maintaining the case as a class action: Plaintiff DLL's was filed on January 15, 2010 (Doc. No. 102); Defendants Viewpoint's <u>and</u> Rasa's was jointly[3] filed on January 28, 2010 (Doc. No. 103); and Third-Party Defendant 3Com's was filed on February 12, 2010 (Doc. No. 104). Plaintiff DLL responded to Defendants Viewpoint's and Rasa's contention statement on February 24, 2010 (Doc. No. 106), as did Third-Party Defendant 3Com (Doc. No. 107). Defendants Viewpoint and Rasa replied to Plaintiff DLL's contention statement on February 28, 2010 (Doc. No. 110), and to Third-Party Defendant 3Com's contention statement on March 1, 2010 (Doc. No. 112). Also as required by the Court's Order of December 24, 2009, the parties sent letters to the Court explaining their positions regarding further procedures to address the class certification issue: 3Com's letter was sent on February 26, 2010; DLL's letter was sent on February 26, 2010; and Viewpoint's and Rasa's joint letter was sent on February 26, 2010, and supplemented on February 28, 2010.

On February 28, 2010, Defendants Viewpoint and Rasa jointly filed a second amended

---

[3]Defendants Viewpoint and Rasa joined together in their contention statement, stating that "[b]ecause these two cases have been previously consolidated . . . and because it is anticipated . . . that Rasa may well join as a putative class representative, Rasa has joined in the contention statement." (Defs.' Contention Statement 1 n.1).

motion for class certification under Fed. R. Civ. P. 23 (Doc. No. 109). The Court subsequently held a recorded telephone conference on the record on March 3, 2010 (transcript at Doc. No. 115) to discuss the class action issue. As a result, the Court's Order of March 8, 2010 (Doc. No. 113) required the parties to timely file pre-hearing statements and objections to such statements, which they subsequently did (see Doc. Nos. 116, 118, 119, 121, 122, 123, 124).

On May 4 and 5, 2010, the Court held a two-day evidentiary hearing on the class certification motion, after which the Court required further briefing from the parties on the issues. Defendants Viewpoint and Rasa filed their joint post-hearing brief in support of class certification on June 4, 2010 (Doc. No. 134). On June 25, 2010, Plaintiff DLL responded in opposition to class certification (Doc. No. 135), as did Third-Party Defendant 3Com (Doc. No. 137); additionally, on that same date, Plaintiff DLL and Third-Party Defendant 3Com jointly responded in opposition to class certification (Doc. No. 136). Defendants Viewpoint and Rasa filed their joint reply brief in support of class certification on July 14, 2010 (Doc. No. 140).

Finally, the Court asked the parties in its letter dated July 15, 2010 to comment on the Third Circuit's recent opinion in Sullivan v. DB Investments, Inc., --- F.3d ---, 2010 WL 2736947 (3d Cir. July 13, 2010). The parties timely submitted their responses on July 23, 2010: DLL docketed its response (Doc. No. 141), while 3Com, Viewpoint, Rasa, sent their letters to chambers.

### 4. Defendant Viewpoint's and Rasa's Counterclaims and Third-Party Claims

On April 16, 2009, in both the DLL v. Rasa and DLL v. Viewpoint cases, Defendants Viewpoint and Rasa—both represented by the same counsel—filed their amended answer,

affirmative defenses, counterclaim, and third-party complaint[4]; these claims were re-stated by

Defendants in their jointly-filed Second Amended Motion Under Rule 23 for Class Certification

(Doc. No. 109) filed on February 28, 2010. The counts raised, along with how Defendants plan

to pursue them with respect to the class certification issue, and which proposed class or subclass

they entail, were described by Defendants as follows:[5]

| Count | Claim | Proposed Class or Subclass |
|-------|-------|----------------------------|
| 1 | Indemnification (against Capital 4) | Entire class (not expected to be defended) |
| 2 | Indemnification (against 3Com) | Entire class |
| 3 | Breach of Contract (against Capital 4) | Entire class (not expected to be defended) |
| 4 | Breach of Contract (against 3Com) | Entire class |
| 5 | Breach of Third Party Beneficiary Contract (against 3Com) | Entire class |

---

[4]In the DLL v. Viewpoint case (Civ. Docket No. 08-534), this document was titled "Second Amended Answer, Affirmative Defenses, Amended Counterclaim and Third Party Complaint," and was docketed at number 49, whereas in the DLL v. Rasa case (Civ. Docket No. 08-533), this document was titled "Amended Answer, Affirmative Defenses, Counterclaim and Third Party Complaint," and was docketed at number 70.

[5]The actual counts and claims differed within each Defendant's respective amended answer, affirmative defenses, counterclaim, and third-party complaint. Specifically, while both Viewpoint's and Rasa's first ten Counts were the same, starting at Count 11, the Counts differed as follows:
- Viewpoint: Count 11 for Violation of Pennsylvania's Consumer Protection Law; Count 12 for Violation of Texas' Consumer Protection Law; Count 13 for Federal RICO; Count 14 for Recision; Count 15 for Usury: Texas; Count 16 for Criminal Usury: Pennsylvania; Count 17 for Massachusetts Regulation of Business Practices for Consumer Protect Act Claim.
- Rasa: Count 11 for Violation of Texas' Consumer Protection Law; Count 12 for Federal RICO; Count 13 for Recision; Count 14 for Usury: Texas; Count 15 for Criminal Usury: Pennsylvania.

| 6 | Breach of Second Third Party Beneficiary Contract (against 3Com) | Entire class |
|---|---|---|
| 7 (amended) | Fraudulent Misrepresentations (against Capital 4 and 3Com) | Subclass A |
| 8 | Fraudulent Misrepresentations (against DLL) | Subclass B |
| 9 | Conspiracy to Commit Fraud (against DLL and Capital 4) | Subclass B |
| 10 | Conspiracy to Commit Fraud (against 3Com and Capital 4) | Subclass B |
| 11 | Violation of Pennsylvania Consumer Protection Law | Dismissed |
| 12 (amended) | Violation of Texas' (and other states') Consumer Protection Law | Subclass C |
| 13 | Federal RICO | Subclass B |
| 14 | Recision | Non-class |
| 15 | Usury: Texas | Non-class |
| 16 | Criminal Usury: Pennsylvania | Non-class |

**5.    Defendant Viewpoint's and Rasa's Proposed Class and Subclasses**

Defendants Viewpoint's and Rasa's jointly-filed second amended motion for class certification seeks to certify the following main class and three subclasses:

First, Defendants seek to certify the following main class for their contract claims against 3Com and Capital 4, which encompass Counts 1-6 of their second amended answer, affirmative defenses, amended counterclaim and third-party complaint ("Second Amended Counterclaim"):

> Main Class: "All entities who entered into a written contract under either the Power of $Zero or 3Com Power of $Zero programs, or who personally guaranteed any equipment rental agreement entered into as a part of the Power of $Zero or 3Com Power of $Zero programs, from the beginning of the Power of $Zero program until November 29, 2007. Those who entered

-12-

into such contracts after November 29, 2007, are expressly excluded from the class."

(Defs.' Second Amend. Mot. for Class Cert. 3-4.)

Second, Defendants seek to certify the following subclass "A" for their common law and statutory fraud claims against 3Com and Capital 4, which encompass Counts 7 and 12 of their Second Amended Counterclaim:

> Subclass A:  "All members of the main class who signed a [customer service agreement] after March 10, 2005, and before November 29, 2006."

(Defs.' Second Amend. Mot. for Class Cert. 12.)

Third, Defendants seek to certify the following subclass "B" for their common law fraud and RICO claims against DLL, 3Com, and Capital 4, which encompass Counts 8, 9, 10, and 13 of their Second Amended Counterclaim:

> Subclass B:  "All members of the main class who signed a [customer service agreement] after March 10, 2005, and before March, 2006, having DLL as the equipment leasing company."

(Defs.' Second Amend. Mot. for Class Cert. 12.)

Finally, Defendants seek to certify subclass "C" as follows:

> Subclass C:  "Those members of the main class who are residents of . . . : Georgia, Massachusetts, New York, North Carolina, Tennessee and Texas."

(Defs.' Second Amend. Mot. for Class Cert. 27.)

## B.    Factual Background

The parties are familiar with the lengthy factual background of this case, and thus, the Court briefly restates only those facts relevant to the class certification issue.  Additionally, the Court notes that, pursuant to its duties under In re Hydrogen Peroxide Antitrust Litigation, 552

F.3d 305 (3d Cir. 2008)—which are more fully explained below—the following facts come not only from the pleadings and the parties' numerous papers filed throughout the case, but also from witness testimony received at the two-day evidentiary hearing the Court held on the class certification issue, the parties' exhibits introduced at the hearing, and the parties' post-hearing briefing.

The relevant facts are as follows:  Under its "Power of $Zero" ("POZ") program, the now-defunct Capital 4 offered telephone and internet services to business customers for a set monthly fee, and for a fixed period of time.  In addition to receiving telephone and internet services provided by Capital 4, customers had the option of receiving either (1) networking and telephone equipment, (2) a cash rebate, or (3) a combination of equipment and a partial cash rebate.  At some point after Capital 4's POZ program was up and running, 3Com became aware of and interested in the program.  Beginning in 2005, Capital 4 and 3Com entered into a series of contractual agreements defining their roles respecting the POZ agreement, in which, among various contractual obligations, Capital 4 would provide customers with 3Com networking and telephone equipment.

To finance the cost of the equipment and/or cash rebates, Capital 4 arranged with financial institutions to act as funding sources for Capital 4 customers.  (5/5/10 Hr'g Tr., Testimony of Steven Majer, Jr., 14-15, 27-29.)  DLL was one of these such lenders.  (5/4/10 Hr'g Tr., Testimony of Douglas Cunningham, 57-58.)  Thus, under the POZ program, POZ customers entered into two separate contracts:  (1) a POZ Customer Agreement with Capital 4 ("POZ Customer Agreement"), and (2) an equipment lease or rental agreement with a leasing company such as DLL ("Lease Agreement") which was referred to in the POZ Customer Agreement as a

-14-

"Funding Agreement."  (DLL and 3Com's Joint Post-Hearing Br. 4.)  Each customer's monthly fee was apportioned to the lender for the lease payment on equipment, and to Capital 4 for the telephone and internet services.  (5/5/10 Hr'g Tr., Majer, 32-33.)

Defendant Viewpoint, a Massachusetts company, is a putative class representative for the main class and all three subclasses.  Viewpoint was introduced to the Capital 4 POZ program by Technology Asset Services ("TAS"), a company acting as a POZ reseller (otherwise known as a "Value Added Reseller," or "VAR") for the POZ program.  (5/4/10 Hr'g Tr., Testimony of Matthew Kelley, 210.)  Before executing its POZ Customer and Lease Agreement, Viewpoint representatives met with TAS on a number of occasions to review TAS' POZ proposal.  (5/4/10 Hr'g Tr., Kelley, 229.)  Viewpoint's controller, Matthew Kelley, read the agreements several times before advising the company's president, Carlo DiPersio, who made the decision that Viewpoint would join the POZ program.  (5/4/10 Hr'g Tr., Kelley, 211, 220-21, 227.)  In making its decision, Viewpoint relied on both written materials and oral representations from TAS.  (5/4/10 Hr'g Tr., Kelley, 210-12, 230, 232.)  According to Viewpoint, some of the oral representations may have been inconsistent with the documentation it reviewed.  (5/4/10 Hr'g Tr., Kelley, 213-14.)  One of the oral representations made by TAS to Viewpoint was that Viewpoint would receive "free" telephone equipment.  (5/4/10 Hr'g Tr., Kelley, 216.)  Viewpoint's primary motivation for entering the POZ program was to obtain free equipment and to set a fixed monthly cost for telecommunications services.  (5/4/10 Hr'g Tr., Kelley, 215-16.)

Defendant Rasa, a Texas company, is also a putative class representative for the main class and all three subclasses.  Rasa was introduced to the POZ program by Douglas Cunningham ("Cunningham"), the president and owner of NCC, which was also a POZ VAR.  (5/4/10 Hr'g

Tr., Testimony of Michael Rasa, 67, 82.) Cunningham met with Rasa once, for around 20 or 30 minutes, prior to Rasa entering the POZ program. (Rasa Dep. 22, Mar. 11, 2010.) The meeting at which Rasa signed the POZ Customer and Lease Agreement lasted no more than 15 minutes. (Rasa Dep. 33). The principal owner of Rasa, Michael Rasa, did not read the agreements before signing because he trusted Cunningham, and thus, he based his decision solely on what Cunningham told him. (5/4/10 Hr'g Tr., Rasa, 70, 79-80.) Mr. Rasa believes that some of what Cunningham told him differed from what was set forth in the agreements he signed. (5/4/10 Hr'g Tr., Rasa, 70.) Mr. Rasa also believes that if he had read the agreements prior to signing, he would not have signed them. (5/4/10 Hr'g Tr., Rasa, 70, 88.) Rasa chose to receive a cash rebate, and therefore did not receive 3Com equipment in connection with the POZ program.[6] (5/4/10 Hr'g Tr., Rasa, 68.)

NCC is a Texas-based POZ VAR that sold the POZ Program to approximately 56 customers, including Rasa. (5/4/10 H'rg Tr., Cunningham, 8, 33, 51.) NCC was also a POZ customer, and as such, is also a putative class member. (5/4/10 H'rg Tr., Cunningham, 12-15, 35.) NCC signed up for the POZ program after meeting with Capital 4 representatives in Houston because NCC was required to become a POZ customer in order to act as a POZ VAR. (5/4/10 H'rg Tr., Cunningham, 10-13.) NCC developed and used its own marketing materials to sell the POZ program. (5/4/10 H'rg Tr., Cunningham, 52-54; Cunningham Dep. 53, 61-62, 174, Aug. 12, 2009.) Most NCC sales pitches were made face-to-face with the customer. (5/4/10 H'rg Tr., Cunningham, 37). NCC salespeople had discretion with respect to sales presentations,

---

[6]Rasa's equipment was instead manufactured by a company called "Intertel." (5/4/10 H'rg Tr., Cunningham, 49.)

and the questions asked by customers varied.  (5/4/10 H'rg Tr., Cunningham, 38-39, 52-54.)

Although NCC initially used a sales script with customers, it eventually abandoned the script

because the script proved to have little effect.  (5/4/10 H'rg Tr., Cunningham, 24, 38.)  NCC did

not use a script when pitching the POZ program to Rasa.  (5/4/10 H'rg Tr., Cunningham, 24.)

Some NCC sales of the POZ program were completed quickly, while others took between 20 and

30 meetings to finalize.  (5/4/10 H'rg Tr., Cunningham, 37.)  NCC conveyed information to

customers outside of the documents it provided, and was aware that some customers did not read

the agreements before signing.  (5/4/10 H'rg Tr., Cunningham, 47-49.)  Cunningham himself had

not read all of the agreements when he sold the POZ program to Rasa.  (5/4/10 H'rg Tr.,

Cunningham, 118, 122.)

The sales experience for each individual POZ customer differed based on a variety of

factors.  Customers received information about the POZ program through a combination of

written materials, telephone calls, and in-person meetings.  (6/24/09 Havens Dep. 12-13, 17, June

24, 2009; Bohn Dep. 32-33, June 23, 2009; Pennington Dep. 9-10, Oct. 21, 2009.)  In-person

meetings were not scripted, but consisted of a sales pitch tailored to the individual customer,

often by a POZ VAR with whom the customer had a preexisting relationship and who thus knew

the customer's individual needs.  (Havens Dep. 13-14; Udashen Dep. 55, July 23, 2009.)

Customers asked questions during the sales process that received particularized responses.

(5/4/10 Hr'g Tr., Kelley, 211.)  Ultimately, the information received by a POZ customer

depended on the questions they asked and the responses provided by the POZ VAR.  (5/4/10

Hr'g Tr., Cunningham, 38-39.)  Capital 4 and POZ VARs sometimes conducted sales

presentations using visual aids such as Microsoft PowerPoint slides (Berg. Dep. 15, June 24,

2009) and dry erase boards (Havens Dep. 61). Some POZ VARs created their own marketing materials. (5/4/10 Hr'g Tr., Cunningham, 54.) Viewpoint testified that it viewed a video presentation regarding the POZ program (5/4/10 Hr'g Tr., Kelley, 215), while other customers were shown the POZ website (Cunningham Dep. 42-43.)

Additionally, there was no single, standard POZ Customer Agreement. Capital 4's POZ program used approximately 23 different POZ Customer Agreements, and the various agreements differed in a variety of material ways (5/5/10 Hr'g Tr., Testimony of Dean Whitehouse, 118-29.) The branding on the various agreements differed: some contained only Capital 4 logos; some contained 3Com logos; some included POZ VAR logos; others included some or all of the above. (5/5/10 Hr'g Tr., Whitehouse, 119.) The agreements also differed in substance: some provided the customer's right to cancel within the Customer Agreement itself, while others incorporated a right to cancel in an eBrochure (5/5/10 Hr'g Tr., Whitehouse, 123-24); 5 of the 23 agreements did not contain a termination provision (5/5/10 Hr'g Tr., Whitehouse, 126); some agreements obligated Capital 4 to pay the funding source following a customer's good-cause termination, while at least 10 did not (5/5/10 Hr'g Tr., Whitehouse, 126-28); 12 versions of the agreement include some form of a warranty, while 11 did not include a warranty (5/5/10 Hr'g Tr., Whitehouse, 128-29); some agreements varied in length, as one contained 13 paragraphs, while another contained 19 paragraphs (5/5/10 Hr'g Tr., Whitehouse, 122-23); some agreements incorporated an eBrochure, of which at least 9 different versions were used, and nothing in the text of any customer agreement indicates which specific eBrochure it incorporated (5/5/10 Hr'g Tr., Whitehouse, 130).

There were also differences among the POZ customers as to whether they read or fully

understood the agreements that they signed. Some customers fully read the agreements (Childers Dep. 18, 27, July 23, 2009; Bickoff Dep. 10-11, Oct. 6, 2009); others read only a portion of the agreements (Berg Dep. 22; Havens Dep. 27-28); some did not read the agreements at all (Cunningham Dep. 65-67; Rasa Dep. 26-27, 29-31, 33, 42-44). Nevertheless, in deciding to participate in the POZ program, customers consistently relied on various oral representations made during the course of their unique sales process. (5/4/10 Hr'g Tr., Rasa, 70, 79-80, Kelley, 210-12, 230, 232; Wujek Dep. 43-44, Oct. 6, 2009; Bader Dep. 23, Oct. 6, 2009; Vignos Dep. 24-25, 39, 60, 102, Oct. 6, 2009; Fleischer Dep. 13, Oct. 6, 2009; Ruffino Dep. 35-36, Oct. 20, 2009; Pennington Dep. 34; Berg Dep. 36; Childers Dep. 101, 132; Spurgeon Dep 32, July 23, 2009.)

Among customers who contend that they understood the agreements, some understood that they had no contract with 3Com. (Wujek Dep. 18, 32; Ruffino Dep. 20-21; Bohn Dep. 100; Berg Dep. 82.) These customers understood that their POZ Customer Agreement was only with Capital 4. (Wujek Dep. 37-38; Bickoff Dep. 25-26; Vignos Dep. 26; Redfern Dep. 13, Oct. 6, 2009; Ruffino Dep. 19-20, 36, 52; Havens Dep. 74; Childers Dep. 17; Udashen Dep. 9.) Some customers understood that 3Com had no involvement except as the equipment manufacturer, and where they received 3Com equipment as part of the program, they believed that Capital 4 was the party providing the equipment. (Childers Dep. 112-14; Wujek Dep. 34-35; Ruffino Dep. 20-21, 51-52.)

Customers who believed that 3Com defrauded them differ as to how they believe they were defrauded. For some customers, the only fraud consisted of Capital 4 going out of business (Ruffino Dep. 80-81; Berg Dep. 86-88); for others, the fraud was that the customer did not

receive free equipment (Udashen Dep. 77), or that the parties engaged in the transactions should have known that Capital 4 was going to fail (Berg Dep. 88). Some customers do not believe any fraud occurred. (Wujek Dep. 51-52; Vignos Dep. 73; Havens Dep. 62, 70-72, 78; Spurgeon Dep. 25-26.) Some customers—including both Viewpoint and Rasa—believed that they received what they bargained for, at least until September 2007, when Capital 4 stopped providing telephone and internet services. (5/4/10 Hr'g Tr., Rasa, 81-82; Vignos Dep. 106-07; Ruffino Dep. 65-66; Pennington Dep. 15; Berg Dep. 87-88; Udashen Dep. 28, 65-66.) Additionally, some POZ customers understood that they were entering into a lease agreement with a funding source (Webster Dep. 115-116, Sept. 10, 2008; Wujek Dep. 21-22; Redfern Dep. 16-17), while others did not (Ruffino Dep. 45-46; Havens Dep. 20). Further, some customers believed that the equipment they received as part of the program was free of charge (Vignos Dep. 21-22; Havens Dep. 13), while others understood their obligations to a financial institution to pay for the equipment (Wujek Dep. 22, 27, 34; Bader Dep. 24; Redfern Dep. 16-17, 25, 27-28; Webster Dep. 115-16; Bohn Dep. 54-57; Childers Dep. 140-41).

III.    **Contentions and Legal Standards**

Rasa and Viewpoint contend that these cases should be maintained as class actions because of their substantial evidence that DLL and 3Com have committed fraud and breached the contracts they entered into with hundreds of customers. Rasa and Viewpoint assert that a class is appropriate here because the facts underlying their counterclaims are complex and because the individual damages are not high, and thus, individual suits will not be filed, allowing DLL and 3Com to escape liability for their wrongdoing. Rasa and Viewpoint assert that the principles of Rule 23 mandate class action treatment, and that common questions predominate because the

scheme was essentially the same despite the small differences in language in certain agreements, and despite variations between written agreements and oral representations made as part of the selling process to customers.

DLL and 3Com dispute all of the above and assert that there are many variations among contracts with individual customers, and that many customers relied on oral representations in making their agreements, which varied for each different POZ VAR. Therefore, DLL and 3Com argue that common questions do not predominate, and that it would be grossly unfair to DLL and 3Com to defend these cases as a class action.

The class action device is appropriate in cases where it "saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." <u>Gen. Tel. Co. of the Sw. v. Falcon</u>, 457 U.S. 147, 155 (1982) (quoting <u>Califano v. Yamasaki</u>, 442 U.S. 682, 701 (1979)). A party seeking class certification bears the burden of proving that the proposed class action satisfies the requirements of Rule 23. <u>Johnston v. HBO Film Mgmt., Inc.</u>, 265 F.3d 178, 183-84 (3d Cir. 2001). Rule 23(a) and (b) provide a structured analysis that is "designed to insure that a proposed class has 'sufficient unity so that absent class members can fairly be bound by decisions of class representatives.'" <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 309 (3d Cir. 1998) (quoting <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 621 (1997)); <u>In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 782 (3d Cir. 1995) (emphasizing that "Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiff's and counsel's ability to fairly and adequately protect class interests").

The proponent of class certification bears the burden of demonstrating that all requirements of Rule 23(a) are satisfied, and that at least one of the conditions enumerated in Rule 23(b) is met. Chiang v. Veneman, 385 F.3d 256, 264 (3d Cir. 2004). Thus, a plaintiff must first satisfy Rule 23(a) by showing:

> (1) the class is so numerous that joinder is impracticable ("numerosity");
> (2) there are questions of law or fact common to the class ("commonality");
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and
> (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy").

Fed. R. Civ. P. 23(a). If the four threshold requirements of 23(a) are satisfied, the party moving for class certification must then show that the action is maintainable by demonstrating that one of the requirements of 23(b) is met. See Johnston, 265 F.3d at 183-84. Here, Defendants Viewpoint and Rasa seek certification under 23(b)(3), which provides for certification when

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) lists the following four non-exclusive factors pertinent to the determination of whether these "predominance" and "superiority" requirements are met: (1) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Id.

The Third Circuit recently clarified the legal standard for class certification and district

courts' attendant duties in <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305 (3d Cir. 2008). In that case, the district court had granted class certification based on only threshold showings under Rule 23, and had failed to resolve significant disputes between expert witnesses that bore on the class certification decision. Finding this conclusion improper, the Third Circuit held that "the decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met." <u>Id.</u> at 307. "[P]roper analysis under Rule 23 requires <u>rigorous consideration</u> of all the evidence and arguments offered by the parties," <u>id.</u> at 321 (emphasis added), and district courts must "consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class," <u>id.</u> at 320. District courts must "resolve all factual or legal disputes relevant to class certification, <u>even if they overlap with the merits</u>." <u>Id.</u> at 307 (emphasis added). "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." <u>Id.</u> at 320. The Third Circuit made clear that "[g]enuine disputes with respect to Rule 23 requirements must be resolved, after considering all relevant evidence submitted by the parties." <u>Id.</u> at 324 (internal citation omitted).

<u>Hydrogen Peroxide</u> governs this Court's consideration of Viewpoint's and Rasa's motion for class certification. Thus, in conducting its "rigorous analysis," the Court follows the Third Circuit's instruction to "delve beyond the pleadings to determine whether the requirements for class certification are satisfied." <u>Id.</u> at 316. Because such an analysis encompasses a thorough examination of the factual and legal allegations, a court may conduct a "preliminary inquiry into the merits," and "consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take." <u>Id.</u> at 317.

IV.    **Discussion**

A.    **Choice of Law**[7]

Putative class members have a due process right to have their claims governed by the

state law applicable to their dispute.  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821-23

(1985).  Thus, before addressing Rule 23, the Court begins its analysis by briefly raising the

choice-of-law issues potentially present in Defendants' putative class claims.  See Powers v.

Lycoming Engines, 328 Fed. Appx. 121, 124 (3d Cir. 2009) (non-precedential) ("The District

Court was correct to begin its analysis by considering choice of law.  A necessary precondition to

deciding Rule 23 issues is a determination of the state whose law will apply."); Huber v. Taylor,

469 F.3d 67, 82-83 (3d Cir. 2006) (consideration of the requirements for certification must be

conducted in light of the correct jurisdiction's law).

A federal court sitting in diversity must apply the choice-of-law rules of the forum state.

---

[7]Related to the choice of law issue is the Court's request that the parties review and
address the Third Circuit's recent holding in Sullivan v. DB Investments, Inc., --- F.3d ---, 2010
WL 2736947 (3d Cir. July 13, 2010).  Each party submitted to the Court a five-page letter brief
regarding Sullivan's impact, if any, on the present class certification issue.  Without rehashing
the issues raised by the parties in their letter briefs, the Court simply states that after review, it
finds that Sullivan provides support for this Court's ultimate conclusion on the class certification
issue.  While Sullivan vacated and remanded a district court's granting of two nationwide
settlement classes—a factual context different from the present case—its holding is still relevant
to:  (1) the potential conflict of law issues in the present case, where here, as DLL correctly
argues on page 3 of its letter brief, Defendants seek to certify claims under state consumer
protection statutes even though such statutes may not give rise to a viable claim, such that
Defendants seek to create a separate subclass consisting only of POZ customers from states with
favorable consumer protection laws—a potentially flawed strategy; and (2) the predominance
prong of under Rule 23(b)(3).  As explained in this opinion, the Court makes no definitive
finding with respect to the choice of law issues, primarily because its holding is based on the fact
that Defendants fail to meet the predominance prong, and the fact that there are serious
management problems, discussed infra.  Even still, Sullivan underscores principles that support
this Court's holding that granting class certification given the present circumstances would be
improper.

Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006). Accordingly, Pennsylvania law applies here. "Pennsylvania uses a two-step process to resolve choice-of-law questions. First, the court must determine whether there is a real conflict. Second, if there is an actual conflict, the court must then decide which state has the greater interest in applying its law." Blain v. Smithkline Beecham Corp., 240 F.R.D. 179, 192-93 (E.D. Pa 2007); see also Hammersmith v. TIG Ins. Co., 480 F.3d 220, 231-33 (3d Cir. 2007) (Baylson, J., sitting by designation) ("We must first determine whether there is an 'actual' conflict between the [laws of two different states]. . . . [Where] there is a true conflict . . . we must determine which state has the most significant relationship to this dispute."). If the result is the same after applying the respective law of each state to the same set of facts, there is no conflict. See Shutts, 472 U.S. at 839 n. 20. In other words, there is no conflict where the application of either state's law renders the same result. Berg Chilling, 435 F.3d at 462. A true conflict, on the other hand, exists when the governmental interests of both jurisdictions would be impaired if their law was not applied. Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 n.15 (3d Cir. 1991).

In the present case, the parties differ in their arguments on this issue. Defendants Viewpoint and Rasa argue that a specific state's law should apply to each of their common law claims. (See Defs.' Second Amended Mot. for Class Cert. ¶¶ 13-14 (seeking to apply Texas law to all proposed class members' breach of contract claims against 3Com and Capital 4); ¶¶ 36-36 (seeking to apply Pennsylvania law to all proposed class members' common law fraud claims against 3Com and Capital 4); ¶ 71 (seeking to apply Texas law to all proposed class members' civil conspiracy claims).) DLL and 3Com, however, jointly argue that choice of law issues in the present case create numerous "true" conflicts, and that Defendants offer no plan as to how the

Court should manage a trial in which it must apply the "laws of thirteen different states." (DLL's and 3Com's Joint Post-Hearing Br. 28-30.)

Defendants' argument that a single state's law should apply to their various claims, and that any minimal conflicts are easily resolvable, is not as likely to stand up under review as Defendants would have the Court believe. Indeed, DLL and 3Com raise a variety of relevant variances in state laws respecting Defendants' claims. (DLL's and 3Com's Joint Post-Hearing Br. 28-30.) Such variances could be lethal to a motion for class certification, as "[a]ttempting to apply the law of a multiplicity of jurisdictions can present problems of manageability for class certification under Rule 23(b)(3)." Lycoming Engines, 328 Fed. Appx. at 127 (citing In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1018 (7th Cir. 2002) ("Because these claims must be adjudicated under the law of so many jurisdictions, a single . . . class is not manageable"); In re Am. Med. Sys., Inc., 75 F.3d 1069, 1085 (6th Cir. 1996) ("If more than a few of the laws of the [numerous] states differ, the district judge would face an impossible task of instructing a jury on the relevant law")). Indeed, class certification movants must credibly demonstrate, through an "extensive analysis" of state law variances, "that class certification does not present insuperable obstacles." Lycoming Engines, 328 Fed. Appx. at 124 (quoting In re Sch. Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986)). This comprehensive analysis is necessary because an aggregate class action should not alter the applicable substantive legal rights of the plaintiffs. Id. (citing Shutts, 472 U.S. at 821) (constitutional limitations on choice of law apply even in nationwide class actions). "Irreconcilable conflicts can be an impediment to certification because they can offset the analysis of the legal commonality, typicality, and adequacy requirements of Rule 23(a), and the superiority and predominance factors of Rule 23(b)(3)." Id. Here, Defendants' briefs

essentially ignore or minimize these issues.

Nevertheless, in the present case, the Court has not ruled—and need not rule—as to which state's substantive law applies to the various claims asserted by Defendants Viewpoint and Rasa, because the differences between them—if there are any—are not controlling to the Court's decision, explained below, to deny class certification.  See, e.g., Gates v. Rohm and Haas Co., 265 F.R.D. 208, 216 n.13 (E.D. Pa. 2010) (Pratter, J.) ("The Court has not yet determined whether Illinois substantive law or Pennsylvania substantive law applies in this case. . . . [H]owever, the Court need not determine whether Illinois or Pennsylvania substantive law applies to Plaintiffs' claims, because the differences between them . . . are immaterial to the Court's decision to deny class certification." (citing Shutts, 472 U.S. at 816-18)).

**B.**     **Rule 23(a)**

**1.**     **Numerosity**

Regarding the first requirement of Rule 23(a), numerosity requires a finding that the putative class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a).  While "[n]o minimum number of plaintiffs is required to maintain a suit as a class action," "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40," numerosity has been met.  Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).

Here, Defendants Viewpoint and Rasa allege that the putative main class consists of between 280 and 650 members.  (Defs.' Second Amend. Mot. for Class Cert. 4.)  Defendants base this assertion, in part, on deposition testimony of Capital 4 officers taken in a different case who estimated the total number of Power of $Zero and 3Com Power of $Zero customers to be

between 300 to 650, and on contracts produced pursuant to this litigation  (Defs.' Second

Amend. Mot. for Class Cert. 4 n.2.)   The Court is permitted to accept "common sense

assumptions" regarding numerosity.  See Alberton v. Commw. Land Title Ins. Co., 247 F.R.D.

469, 476 (E.D. Pa. 2008), rev'd on other grounds, Hunt v. U.S. Tobacco Co., 538 F.3d 217 (3d

Cir. 2008) (quoting In re Linerboard Antitrust Litig., 203 F.R.D. 197, 205 (E.D. Pa. 2001), aff'd

305 F.3d 145 (3d Cir. 2002)).  Therefore, accepting Defendants' allegations as accurate,

Defendants satisfy the numerosity requirement of Rule 23(a).

## 2.   Commonality

The threshold for establishing Rule 23(a)'s commonality requirement is low.  Chiang,

385 F.3d at 265, 272; Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 182

(3d Cir. 2001).  Because the issue of commonality is subsumed by the predominance requirement

where a plaintiff seeks class certification under Rule 23(b)(3), the Court will address the

commonality prong only briefly.  See Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141,

148 (3d Cir. 2008) (noting that the commonality analysis is subsumed by the predominance

inquiry because the standard under Rule 23(b)(3) is "far more demanding than the Rule 23(a)(2)

commonality requirement" (citation omitted)).

In the Third Circuit, it is well-established that commonality does not require that all

claims and facts among class members be identical; rather, a single common issue of law or fact

shared by the named plaintiffs and the prospective class will suffice.  Chiang, 385 F.3d at 265;

Johnston, 265 F.3d at 184; Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994) ("The

commonality requirement will be satisfied if the named plaintiffs share at least one question of

fact or law with the grievances of the prospective class.").  Moreover, "the existence of

individualized issues in a proposed class action does not per se defeat commonality." Brooks v. Educators Mut. Life Ins. Co., 206 F.R.D. 96, 101 (E.D. Pa. 2002) (citing Johnston, 265 F.3d at 191). "Indeed, the commonality requirement 'may be satisfied by a single common issue.'" Rowe v. E.I. Dupont De Nemours and Co., 262 F.R.D. 451, 456 (D.N.J. 2009) (quoting Baby Neal, 43 F.3d at 56-58).

The commonality requirement is met in the present case because, for each of Defendants' claims asserted against DLL, 3Com, and Capital 4, there is at least one single of law or fact common to all class members. Indeed, whether DLL, 3Com, and Capital 4 fraudulently misrepresented the terms and conditions of the POZ program is a factual and legal claim common to all class members. See, e.g., Johnston, 265 F.3d at 184 (finding commonality where question of whether defendants fraudulently misrepresented a film production investment scheme was common to the putative class). These common questions are sufficient to satisfy the relatively low commonality threshold under Rule 23(a)(2).

### 3. Typicality

Third, in a properly certified class, the claims of the class representatives must be "typical" of the class as a whole. Johnston, 265 F.3d at 184. In considering typicality, the district court must determine whether the named class representatives' "individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." Id. (quoting Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985)). This criteria does not require that all putative class members share identical claims. Id. Indeed, so long as "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established

regardless of factual differences." Id. (quoting Newton, 259 F.3d at 183-84). "Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Baby Neal, 43 F.3d at 58. Here, because Defendants' claims and the claims of the putative class members all arise from the alleged misrepresentations and conduct of DLL, 3Com, and Capital 4, the claims of Rasa and Viewpoint are typical of those of the putative class.

The Court's finding aside, Plaintiff DLL and Third-Party Defendant 3Com present arguments regarding the differences between Viewpoint's and Rasa's claims and the claims of absent class members in the proposed classes. (DLL's and 3Com's Joint Post-Hearing Br. 21-26.) As DLL and 3Com understand, such arguments are better analyzed in the context of the adequacy requirement. (See DLL's and 3Com's Joint Post-Hearing Br. 21 (setting forth these arguments in context of the "adequacy" prong).)

### 4. Adequacy

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006) (quoting Amchem, 521 U.S. at 625). It "assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." Id. (internal quotation omitted). Thus, the Court "must determine whether the representatives' interests conflict with those of the class[,] and whether the class attorney is

capable of representing the class." Johnston, 265 F.3d at 185 (internal citation omitted). The following two-prong inquiry assesses the adequacy of a proposed class representative: (1) whether the proposed class counsel is sufficiently qualified to represent the class; and (2) whether there are "conflicts of interest between the named parties and the class they seek to represent." Prudential, 148 F.3d at 312.

Regarding the "adequacy of counsel" prong, while no clearly defined standard exists to determine whether class counsel is qualified to represent the putative class, the court is required to confirm that the proposed attorneys can handle the representation. See New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007); see also Grasty v. Amalgamated Clothing & Textile Workers Union, 828 F.2d 123, 128-29 (3d Cir. 1987) (noting that "the assurance of vigorous prosecution" by class counsel is a "significant factor" in the Rule 23(a)(4) analysis). This inquiry requires a court to determine whether the proposed class counsel is "qualified, experienced, and generally able to conduct the proposed litigation." Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975) (citation omitted). Here, the Court has no doubt that Mr. Gossett, counsel for Viewpoint and Rasa, is a qualified and experienced trial attorney able to represent his two clients. Nevertheless, Mr. Gossett has not demonstrated any specific experience with class actions, and declined an earlier suggestion by the Court that he retain a class action specialty firm as co-counsel.

Further, the "conflict of interest" step in the adequacy prong is at issue here. DLL and 3Com argue in their joint post-hearing brief that the proposed class includes POZ VARs who were themselves POZ customers, and who sold the POZ program to other putative class members. DLL and 3Com argue that this has caused Viewpoint and Rasa to abandon certain

claims; specifically, claims based on a POZ VARs' oral misrepresentations, and any fraud claims against a POZ VAR, thus prejudicing the rights of absent class members who may be precluded from litigating those claims individually if a class is certified in this matter. (DLL's and 3Com's Joint Post-Hearing Br. 22-25.) DLL and 3Com further argue that these conflicts prevent Mr. Gossett from fairly representing the entire class. (DLL's and 3Com's Joint Post-Hearing Br. 26-27.) Defendants have responded to this argument in their reply brief by suggesting that the written agreements preclude claims based on oral misrepresentations, but this conflicts with Mr. Rasa's own testimony, and has not necessarily been precluded as evidence at trial, and may, under some states' laws, be admissible if Defendants prove fraud. Defendants also assert that any conflict with a VAR can be ignored because DLL did not show that any VAR other than NCC and SolutionPros were customers, but this was not DLL's burden. On this record, there is a conflict.

DLL and 3Com raise strong arguments that operate to preclude the granting of class certification under Rule 23(a)(4)'s adequacy prong. Mr. Gossett represents not only POZ customers, but also, POZ VARs. Indeed, Mr. Gossett represents in this case both Rasa, a POZ customer, and NCC, the POZ VAR who sold the POZ program to Rasa. As discussed above, Mr. Rasa's testimony at the hearing on the class certification issues demonstrated that he relied on various oral representations made by NCC that went beyond, and differed from, the actual terms of the written agreements that Rasa signed. It stands to reason that Rasa's potential misrepresentation or fraud claims may conflict with NCC's position in the litigation. This presents a serious potential conflict for Mr. Gossett. For these reasons, the Court finds that Defendants have not met the "adequacy" prong.

### C.    <u>Rule 23(b)(3)</u>

Finally, class certification also must satisfy the requirements of Rule 23(b); specifically, here, the "twin requirements of Rule 23(b)(3)," these being (1) predominance and (2) superiority. <u>Nafar v. Hollywood Tanning Systems, Inc.</u>, 339 Fed. Appx. 216, 222 (3d Cir. 2009) (citing <u>Hydrogen Peroxide</u>, 552 F.3d at 310). Predominance requires "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." <u>Johnston</u>, 265 F.3d at 185 (quoting Fed. R. Civ. P. 23(b)(3)). Superiority mandates that "the district court determine that the class action is the best method of fairly and efficiently resolving the controversy." <u>Id.</u> (citing Fed. R. Civ. P. 23(b)(3)). Overall, as the Third Circuit has "recognized repeatedly," "[i]ssues common to the class must predominate over individual issues, and the class action device must be superior to other means of handling the litigation." <u>Johnston</u>, 265 F.3d at 185 (citing <u>Newton</u>, 259 F.3d at 186-87; <u>Prudential</u>, 148 F.3d at 313-14).

### 1.    <u>Predominance</u>

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Hydrogen Peroxide</u>, 552 F.3d at 310-311 (quoting <u>Amchem</u>, 521 U.S. at 623). This is a standard "far more demanding" than the commonality requirement of Rule 23(a), <u>id.</u> at 311 (quoting <u>Amchem</u>, 521 U.S. at 623-24), and one that requires "more than a common claim," <u>id.</u> (quoting <u>Newton</u>, 259 F.3d at 187). "Issues common to the class must predominate over individual issues." <u>Id.</u> (quoting <u>Prudential</u>, 148 F.3d at 313-14). As the Third Circuit has explained, "the question of predominance imposes . . . a stringent obligation on the reviewing court to ensure that issues common to the class truly overshadow those pertinent to individuals or to subgroups of class members." <u>Sullivan</u>, --- F.3d ---, 2010 WL 2736947, at *6.

Because the "nature of the evidence that will suffice to resolve a question determines whether the question is common or individual," "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Id. (citation omitted). The Third Circuit in Hydrogen Peroxide emphasized that "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." Id. (emphasis added) (quoting Newton, 259 F.3d at 172.); see also Linerboard, 305 F.3d at 156 ("Clearly, if proof of the essential elements of the cause of action require individual treatment, then there cannot be a predominance of 'questions of law and fact common to the members of the class.'").

In the present case, the evidence before the Court makes clear that individual issues of law and fact predominate over those that are common to class members, such that Defendants have failed to satisfy their burden of showing predominance. The Court does not reach this decision lightly, nor without careful consideration of the facts and evidence before it. Indeed, the parties engaged in in-depth debate as to whether Defendants meet the predominance prong. (See Defs.' Post-Hearing Br. passim; DLL and 3Com's Joint Post-Hearing Br. 12-21; Defs.' Reply Br. 8-9.) The Court, after conducting the requisite "rigorous analysis" pursuant to its duties under Hydrogen Peroxide—which included a full review of the record in this case consisting not only of the pleadings and papers relating to the class certification issue, but also of the evidence, testimony, and exhibits introduced at the two-day class certification hearing, as well as all related post-hearing briefing and correspondence—finds that Defendants Viewpoint and Rasa have failed to meet the predominance prong.

In attempting to show that their claims meet the predominance requirement, Defendants

Viewpoint and Rasa reply principally on In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F.Supp. 450, 563 (D.N.J. 1997), aff'd , 148 F.3d 283 (3d Cir. 1998), arguing that Prudential is analogous to the present case, and thus provides support for their position that their putative classes should be certified.  (Defs.' Post-Hearing Br. 12-18.)  After review, the Court finds that Defendants' reliance on Prudential is misplaced.  DLL and 3Com, however, correctly argue in their joint post-hearing briefing that Third Circuit cases like Johnston, 265 F.3d 178, and In re LifeUSA Holding Inc., 242 F.3d 136 (3d Cir. 2001), are more analogous to the present case. Indeed, Johnston and LifeUSA provide the appropriate analytical framework that the Court applies to the present case.

First, in Johnston, the plaintiffs, investors of a limited partnership formed to finance the production of movies, claimed that the defendants made fraudulent misrepresentations when marketing the limited partnership.  The plaintiffs filed a motion for class certification in the district court, which was denied.  The plaintiffs subsequently appealed to the Third Circuit. Regarding the predominance element, the Third Circuit explained the plaintiffs' argument as follows:

> [P]laintiffs contend that class issues predominate because the defendants made uniform oral and written misrepresentations.  Specifically, they point to the prospectus and argue that because they, as investors, are presumed to have read these materials, the defendants made uniform misrepresentations to all putative class members.  Further, they point to the prospectus wrapper and other uniform internal marketing materials distributed to the brokers that also contain misrepresentations, and claim the brokers relied upon them in making substantially similar and misleading sales recommendations.

Id. at 186.  The Third Circuit disagreed with the plaintiffs, finding that "[t]he evidence of record, however, simply does not support the plaintiffs' claims."  Id.

The Third Circuit then reviewed the evidence in the case, which included deposition testimony and affidavits from multiple plaintiffs showing that some plaintiffs had not received or even read the sales materials or prospectus at issue, but instead, decided to invest based on oral representations.  Id. at 189.  The Third Circuit thus stated that "the record from the plaintiffs' viewpoint is at best inconclusive as to whether the defendants made uniform oral representations in selling units of [the limited partnership]."  Id. at 190.  The Johnston court then noted that "[i]n cases raising issues similar to those here, it has become well-settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action," id. (emphasis added) (citations omitted), and cited to a District of New Jersey case where "the court rejected as insufficient plaintiffs' allegations that the brokers allegedly relied upon uniform marketing materials because the record revealed that individual brokers made individual decisions about . . . what to rely [upon] and what to say to customers," id. (citing Seiler v. E.F. Hutton & Co., 102 F.R.D. 880, 889 (D.N.J. 1984)).

Importantly, the plaintiffs in Johnston had relied on Prudential, just as Defendants Viewpoint and Rasa do in the present case, but the Third Circuit found that the district court did not err in finding Prudential distinguishable.  Id. at 191.  The Third Circuit in Johnston distinguished its facts from those in Prudential as follows:

> Prudential involved uniform, scripted and standard sales presentations by the defendants.  Indeed, in Prudential the district court found specifically that "the oral component of the fraudulent sales presentations did not vary appreciably among class members."  Moreover, the agents in Prudential were career agents who worked exclusively for and were trained uniformly by Prudential, and who relied on uniform sales materials.  Here, however, the plaintiffs did not establish that [units of the limited partnership] were sold according to standard, uniform, scripted sales presentations.  This much is apparent from the starkly different accounts of [various plaintiffs] as to how

> and why they came to invest in [the limited partnership]. Further, the brokers
> denied using uniform presentations . . . . Finally, [two plaintiffs] both testified
> that if they received written sales information or prospectuses from
> defendants prior to purchase, they did not rely on them, nor could they recall
> their substance.

Id. (internal citations omitted). The <u>Johnston</u> court further stated that it had not "overlooked" its

statement in <u>Prudential</u> that "[w]hile individual questions may arise during the course of this

litigation, . . . the presence of individual questions does not per se rule out a finding of

predominance. In particular, the presence of individual questions as to the reliance of each

investor does not mean that the common questions of law and fact do not predominate." <u>Id.</u>

(quoting <u>Prudential</u>, 148 F.3d at 315 (internal quotation omitted)). Even given this principle, the

<u>Johnston</u> court found that:

> Here, however, we do not know the content of the individual representations
> as they were not standard or scripted but were oral and varied. Moreover, we
> do not know whether or to what extent the representations facilitated the sales
> of [shares of the limited partnership]. In the circumstances, we cannot say
> "that questions of law or fact common to the members of the class
> predominate over any questions affecting only individual members." Rule
> 23(b)(3). We emphasize this point to demonstrate that we are in no sense
> undermining <u>Prudential</u>.

Id.

   <u>Johnston</u> made multiple references to <u>In re LifeUSA Holding Inc.</u>, 242 F.3d 136 (3d Cir.

2001), another applicable Third Circuit case also cited by DLL and 3Com in the present case. In

<u>LifeUSA</u>, buyers of deferred annuity contracts brought a class action against the seller company,

LifeUSA, asserting claims including fraudulent nondisclosures and misrepresentations. The

district court certified a class of plaintiffs who purchased the annuity policies, and LifeUSA

appealed. Finding the district court's decision to certify and rely on <u>Prudential</u> to be error, the

Third Circuit in <u>LifeUSA</u> stated:  "Here the plaintiffs assert claims arising not out of one single event or misrepresentation, but claims allegedly made to [thousands of] purchasers by [thousands of] independent agents where . . . the sales presentations (hence the alleged misrepresentations) were neither uniform nor scripted. . . . The District Court's principal reliance on [<u>Prudential</u>] in certifying the . . . class was <u>misplaced and unfortunate</u>."  <u>LifeUSA</u>, 242 F.3d at 145-46.  The <u>LifeUSA</u> court distinguished its facts from those in <u>Prudential</u>, and explained the reason why class certification was inappropriate, as follows:

> <u>Prudential</u>, unlike this case, involved uniform, scripted, and standardized sales presentations. [In] <u>Prudential</u>[,] the oral component of the fraudulent sales presentations did not vary appreciably among class members[, and the] Plaintiffs' allegations and the evidence presented . . . demonstrate[d] that throughout the country, Prudential agents uniformly misled class members with virtually identical oral misrepresentations.
>
> The facts here in the extensive evidentiary record of <u>this</u> case (depositions, affidavits, declarations, and the like) contrast starkly with the facts found in <u>Prudential</u>.  In this case, as we have earlier pointed out, the [annuities were] not sold according to standard, uniform, scripted sales presentations. . . .  Moreover, the selling agents did not employ LifeUSA's marketing materials uniformly.  Some agents discarded the marketing materials entirely.  Agents' sales presentations were individually tailored to each customer's financial objectives.  Significantly, when the plaintiffs testified on deposition, they admitted that if they received information from sales agents prior to purchase, they did not rely on it, nor could they recall its substance.  Indeed, a number of the plaintiffs failed to read or merely glanced at the contracts . . . .  Hence, the facts of this case differ markedly from those which were found in <u>Prudential</u>.  Accordingly, . . . the record is uncompromising in revealing non-standardized and individualized sales "pitches" presented by independent and different sales agents . . . thus making certification of individualized issues inappropriate.

<u>Id.</u> (emphasis added) (internal quotation marks, citations, and footnote omitted).

Both <u>Johnston</u> and <u>LifeUSA</u> are applicable to the present case, and for the reasons articulated by the Third Circuit in both cases, as discussed above, the facts here are highly

-38-

distinguishable from the facts in Prudential.[8]

First and foremost, the evidence in this case shows that POZ customers, in signing up for the POZ program, relied on unique, varied, non-standard oral communications made by POZ VARs that were particular to each respective customer, and that these oral communications at times differed from the written materials. Indeed, both of the putative class representatives, Viewpoint and Rasa, testified as such at the two-day hearing. (5/4/10 Hr'g Tr., Kelley, 210-12, 213-214, 230, 232 (Viewpoint relied both on written materials and oral representations from TAS, and some of the oral representations may have been inconsistent with the documentation Viewpoint reviewed); 5/4/10 Hr'g Tr., Rasa, 70, 79-80 (Rasa did not read the agreements before signing up for POZ program and instead based his decision solely on what NCC's president and CEO told him, and Rasa believes some of what he was told differed from what was set forth in the agreements).)

Additionally, Douglas Cunningham, the CEO and President of NCC—the VAR which sold the POZ program to Rasa—testified at the hearing that: although NCC initially used a sales script with customers, it eventually abandoned the script because the script had little effect (5/4/10 H'rg Tr., Cunningham, 24, 38); NCC did not use a sales script when pitching the POZ

---

[8]In addition to the Court's stated reasons as to why the facts in Prudential are distinguishable from those in the present case, it should be noted that Prudential involved the certification of a settlement class action involving Prudential's allegedly deceptive nationwide sales practices, as opposed to a class action trial. This contextual difference is worth mentioning, as it provides further justification for distinguishing Prudential from the present case. Indeed, as the Third Circuit has recognized, "A settlement class, as distinct from a class action to be tried, does not implicate trial management problems." LifeUSA, 242 F.3d at 146 n.10 (citing Amchem, 521 U.S. at 620). Here, however, the immense trial management problems that would arise if the Court were to grant Defendants' motion for class certification is one of the primary reasons that granting class certification would be inappropriate, see infra.

program to Rasa (5/4/10 H'rg Tr., Cunningham, 24); NCC developed and used its own marketing materials to sell the POZ program (5/4/10 H'rg Tr., Cunningham, 52-54); and that NCC's salespeople had discretion with respect to sales presentations, and the questions asked by customers varied.  (5/4/10 H'rg Tr., Cunningham, 38-39, 52-54.)  Cunningham also testified that NCC conveyed information to customers outside of the documents it provided, and was aware that some customers did not read the agreements before signing.  (5/4/10 H'rg Tr., Cunningham, 47-49.)

Other evidence in this case further shows that meetings between POZ VARs and POZ customers consisted of a sales pitch tailored to the individual customer (Havens Dep. 13-14; Udashen Dep. 55), that customers asked questions during the sales process that received particularized responses (5/4/10 Hr'g Tr., Kelley, 211), and that, ultimately, the information received by a POZ customer depended on the questions they asked and the responses provided by the POZ VAR (5/4/10 Hr'g Tr., Cunningham, 38-39).  The evidence in this case also shows that each sales pitch entailed the use of different visual aids, including computer slide-shows, video presentations, dry-erase boards, and the POZ website.  (Berg. Dep. 15; Havens Dep. 61; 5/4/10 Hr'g Tr., Cunningham, 54, Kelley, 215.)

In addition to the varying forms of oral communications made to POZ customers, the evidence in this case also indicates that:  there was no single, standard POZ Customer Agreement; the branding on the agreements differed; the agreements varied in their material terms, including with respect to termination provisions; some but not all agreements incorporated a warranty; and that the length of the various agreements differed.

Taken together, the evidence shows that any alleged fraud or misrepresentations occurred

without standard, uniform sales pitches made across-the-board to POZ customers, or without standard, uniform written contractual agreements. This is not a securities fraud case, where the predominance prong would easily be met by the existence of an alleged fraud or misrepresentation having been made in the form of uniform written proxy statements. To the contrary, here, as in Johnston and LifeUSA, the alleged fraud or misrepresentations arise out of unique, varied oral communications that were specific to each POZ customer, or, out of different versions of contractual agreements presented to POZ customers that contained material differences in their composition. Thus, given the overwhelming evidence of the individualized nature of each specific POZ sale, the Court finds that granting class certification would be inappropriate here, as questions of law or fact common to the members of the class do not predominate over any questions affecting only individual members.

### 2.    Superiority

Also under Rule 23(b)(3), courts must determine whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). It is within this requirement that the court should address "the difficulties likely to be encountered in the management of a class action." Johnston, 265 F.3d at 194 (citing Fed. R. Civ. P. 23(b)(3)(D)).

Although the parties' briefing has concentrated on issues of predominance and fairness, which reflects to a large part the testimony taken at the two-day mini hearing, the Court must also consider the issue of management. In this regard, there are substantial doubts that this case can be effectively managed as a single action for the proposed class and subclasses, as defined by Rasa and Viewpoint. First, in terms of geographics, the class members are spread throughout the

United States.  Rasa and Viewpoint assert that they can be representatives of a nationwide class, and that, being represented by a single attorney, they can perform the duties of class representatives.  It is clear that in proving their case, they will have to rely on class members who signed different contracts to appear as witnesses at trial, and who are spread throughout the United States.  This will create difficulties in terms of third party subpoenas, depositions, and other logistical issues that would make discovery exceptionally complex and a single class-wide trial virtually impossible.

Assuming, _arguendo_, that discovery, although complex, would be manageable in that the class representatives, Rasa, Viewpoint, and their counsel, would take appropriate discovery, significant management problems would arise at trial.  As noted above, because this case would require the presentation of several different contracts used by DLL and 3Com, the evidence would have to be categorized for the different subclasses as described by Rasa and Viewpoint. The Court believes that it would be exceptionally difficult for a jury to keep track of the different contracts, each with different contractual provisions, and then correlate those to the Court's charge to the jury on the laws of several states at the end of the case.  As noted above, despite class counsel's assertions that this is basically a simple fraud case, the challenges of explaining to a jury the substantive laws of different states (assuming, _arguendo_, that there are no conflicts of law) are such that the Court does not believe that a single jury, or even _seriatim_ juries, could fairly adjudicate the numerous factual and legal issues in a way that would allow for a trial to be concluded in any reasonable amount of time, or for a verdict that would be fair to the absent class members, as well as fair to DLL and 3COM.  However, "[h]aving determined that the class . . . does not meet the 'predominance' requirement of Rule 23(b)(3), [the Court] need not dwell at length on the superiority requirement of the rule, inasmuch as failure to meet _any_ of the

requirements of Rules 23(a) and (b) precludes certification of a class." LifeUSA, 242 F.3d at 147 (emphasis added) (citations omitted); see also Johnston, 265 F.3d at 194 ("In light of the foregoing discussion [finding that predominance was not met], we need not discuss the superiority requirement at length."). Nevertheless, the Court briefly states that, given its conclusion that the individualized nature of proving the allegations contained in Defendants' claims would present serious and legitimate case management problems, Defendants fail to meet the superiority prong of Rule 23(b)(3) as well.

V.   **Conclusion**

In reviewing the evidence in this case, the Court, pursuant to Hydrogen Peroxide, addressed the factual and legal disputes relevant to the class certification issue, which involved some overlapping with the merits of the case. At the highly informative two-day hearing, Defendants Viewpoint and Rasa failed to make any legitimate showing of evidentiary support for their counterclaims against Plaintiff DLL.[9] Defendants' claims against Third-Party Defendant 3Com, however, may have more potential, but not for the class as defined.

For the aforementioned reasons, Defendants Rasa's and Viewpoint's second amended motion for class certification is denied.

An appropriate Order follows.

A:\DLL v. Viewpoint, DLL v. Rasa - Memo re Mot for Class Cert.wpd

---

[9]Although the focus of the foregoing opinion has been on the class action issue, and on the standards set by Rule 23 as interpreted by the Supreme Court and the Third Circuit, this opinion should note that at the two-day hearing, there was absolutely no evidence of any wrongdoing by DLL. To the extent that this court has to consider the merits of the underlying case as a factor in determining whether Rule 23 machinery should be invoked for a class action, it must and has taken into account the absence of any evidence against DLL, at least from the evidence presented at the hearing. Also, the Court has not discussed the handling of the RICO claim as a class action, but observes that in view of its findings, and the added complexity of a RICO claim, the RICO claim would surely also fail Rule 23's requirements.