**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DE LAGE LANDEN FINANCIAL SERVICES, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| RASA FLOORS, LP | : | NO. 08-533 |

| | | |
|---|---|---|
| DE LAGE LANDEN FINANCIAL SERVICES, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| VIEWPOINT COMPUTER ANIMATION, INC., et al. | : | NO. 08-534 |

**MEMORANDUM RE: PLAINTIFF'S AND OTHER PARTIES' MOTIONS
FOR SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF
CONTRACT CLAIM AND DEFENDANTS' COUNTERCLAIMS**

**TABLE OF CONTENTS**

I.    Factual and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B.    Rasa Floors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    C.    Viewpoint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    D.    NCC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.   Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.    Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    B.    Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.  Under Pennsylvania Law, DLL Is Entitled to Summary Judgment that Defendants Breached the Contract Between Defendants and DLL, as a Matter of Law . . . . . . . . . 16

    A.    As a Matter of Law, DLL Has Established that Defendants Breached Their Lease Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.      Defendants' Defenses Are Unavailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

           1.     Defendants Cannot Establish that the Lease Agreements
                   Are Unconscionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
           2.     Rasa's Argument Regarding Breach by DLL Is Without Merit . . . . . . . 24
           3.     Defendants' Arguments Regarding Breach by DLL and Mutual
                   Mistake Are Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
           4.     Defendants' Argument Regarding Illegality Are Without Merit . . . . . . . 29

VI.    Assertions By Third Party HP Do Not Prevent the Entry of Summary
     Judgment in Favor of DLL and Against Rasa, Viewpoint and NCC . . . . . . . . . . . . . . . . 32

V.     DLL Is Entitled to Summary Judgment on Defendants' Counterclaims . . . . . . . . . . . . 35

    A.      Defendants Have Not Shown a Genuine Issue of Material Fact
            as to Fraudulent Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

           1.     Defendants Have Not Established Misrepresentation by Capital 4 . . . . . 37
           2.     Conduct of Capital 4 May Not Be Imputed to DLL . . . . . . . . . . . . . . . . 39

                   a.     Defendants' Theory of Apparent Agency Is Without Merit  . . . . 42
                   b.     Defendants' Theory of Agency by Estoppel Is Without Merit  . . 45
                   c.     Defendants' Agency Arguments Are an Attempt to
                        Circumvent Language of Finance Lease Contracts . . . . . . . . . . 45

           3.     Defendants Have Not Established Misrepresentation by DLL and
                   DLL Had No Obligation to Disclose Information to Defendants  . . . . . . 47

    B.      Claims Under Various Consumer Protection Laws . . . . . . . . . . . . . . . . . . . . . . . 50
    C.      Defendants' RICO Claims Against DLL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

           1.     Elements of a RICO Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
           2.     Defendants Fail to Establish the Requisite Elements of Their
                   RICO Counterclaims Against DLL . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VI.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

O:\CIVIL 07-08\08-533 DeLage v. Rasa\DLL Table Contents MSJ.wpd

**Baylson, J.**                                                             **July 28, 2011**

Plaintiff De Lage Landen Financial Services, Inc. (hereinafter "Plaintiff" or "DLL") has moved for summary judgment pursuant to Fed. R. Civ. P. 56 on its sole claim in this case, for breach of contract, against Defendants Rasa Floors & Carpet Cleaning, LLC ("Rasa"); Viewpoint Computer Animation, Inc. ("Viewpoint"); and third-party Defendant Northcentral Communications, Corp. ("NCC") (hereinafter collectively "Defendants") (ECF Nos. 189, 191 in C.A. 08-533; 171 in C.A. 08-534), and on Defendants' Counterclaims against DLL.  There has been extensive briefing and oral argument on the parties' claims, and related issues.

The contracts between DLL and Defendants each state that Pennsylvania law will control and the Court has determined that Pennsylvania law will govern DLL's claims.  After review of the briefs and other filings accompanying the parties' motions and cross motions, the Court concluded DLL was entitled to summary judgment in its favor as to its claims and entered an Order to this effect on June 24, 2011 (ECF No. 259 in C.A. 08-533; 229 in C.A. 08-534).  Denial of Defendants' Cross Motions for Summary Judgment was subsumed in the entry of summary judgment in favor of DLL.  This Memorandum will explain the reasons for the Order.  This Memorandum will additionally address DLL's Motions for Summary Judgment as to Defendants' counterclaims against DLL and will grant summary judgment in favor of DLL on Defendants' counterclaims against DLL.

I.      **Factual and Procedural History**

   A.      **Background**

The parties are familiar with the lengthy factual and procedural background of this case and thus, the Court briefly restates only those facts relevant to the summary judgment motions.

The Court held hearings and made relevant findings of fact in conjunction with Defendants'

Motions for Class Certification.  The Court's August 20, 2010 Memorandum denying

Defendants' class motions described the nature of the contracts at issue as follows:

> Under its "Power of $Zero" ("POZ") program, the now-defunct Capital 4[, Inc. ("Capital 4")][1] offered telephone and internet services to business customers for a set monthly fee, and for a fixed period of time.  In addition to receiving telephone and internet services provided by Capital 4, customers had the option of receiving either (1) networking and telephone equipment, (2) a cash rebate, or (3) a combination of equipment and a partial cash rebate. At some point after Capital 4's POZ program was up and running, 3Com [Corporation ("3Com")] became aware of and interested in the program.  Beginning in 2005, Capital 4 and 3Com entered into a series of contractual agreements defining their roles respecting the POZ agreement, in which, among various contractual obligations, Capital 4 would provide customers with 3Com networking and telephone equipment.

> To finance the cost of the equipment and/or cash rebates, Capital 4 arranged with financial institutions to act as funding sources for Capital 4 customers.  5/5/10 Hr'g Tr., Testimony of Steven Majer, Jr., 14-15, 27-29.  DLL was one of these such lenders. 5/4/10 Hr'g Tr., Testimony of Douglas Cunningham, 57-58.  Thus, under the POZ program, POZ customers entered into two separate contracts: (1) a POZ Customer Agreement with Capital 4 ("POZ Customer Agreement"), and (2) an equipment lease or rental agreement with a leasing company such as DLL ("Lease Agreement") which was referred to in the POZ Customer Agreement as a "Funding Agreement."  DLL and 3Com's Joint Post-Hearing Br. 4.

De Lage Landen Fin. Servs, Inc. v. Rasa Floors, LP, 269 F.R.D. 445, 454 (E.D. Pa. 2010)

(Baylson, J.).

As noted above, DLL entered into two different types of agreements.  DLL and Capital 4

entered into a Business Communications Program Agreement ("Program Agreement"), which

outlined DLL's and Capital 4's roles as lender/lessor and vendor, respectively.  Plaintiff's

Appendix to Statement of Undisputed Facts, Ex. D.  The Program Agreement stated that lease

agreements could include "Soft Costs" such as service, maintenance, installation, delivery,

---

[1] Because Capital 4 is now a defunct corporate entity, it is not an active party in this case and is not represented by counsel.  De Lage Landen Fin. Servs, Inc., 269 F.R.D. at 450 n.2.

software, and training associated with leased equipment, and that DLL would fund Capital 4 for service and maintenance quarterly or monthly, less DLL's administrative fee.  Pl.'s App. to Statement of Undisputed Facts, Ex. D at ¶ A(8).

DLL's separate Lease Agreements[2] with customers specified that DLL had no responsibility for service or maintenance related to leased equipment, but that lease payments could "INCLUDE THE COST OF MAINTENANCE AND/OR SERVICE BEING PROVIDED BY THE SUPPLIER AND/OR MANUFACTURER[.]" App. Ex. C at § 7.  Thus, "[e]ach customer's monthly fee was apportioned to the lender for the lease payment on equipment, and to Capital 4 for the telephone and internet services."  De Lage Landen Financial Services, Inc., 269 F.R.D. at 454 (citing 5/5/10 Hr'g Tr., Majer, 32-33).

DLL originally filed suit in two separate cases against two separate Defendants, Viewpoint and Rasa, for breach of contract and unjust enrichment on February 2, 2008.  Id. at 449.  Defendants brought several counterclaims against DLL and brought third party claims against 3Com and Capital 4.  Id.  The cases were consolidated for purposes of discovery on April 14, 2009.  Id. With leave granted by the Court, DLL filed a third-party complaint against NCC on October 5, 2009 (ECF No. 105 in C.A. 08-533).  The Court has issued decisions on several motions to dismiss during this period, resulting in the narrowing of claims and counterclaims. See De Lage Landen Financial Services, Inc., 269 F.R.D. at 449-51.

---

[2] Rasa's agreement with DLL is entitled "Rental Agreement."  For the purpose of clarity, this Court will simply refer to Defendants' agreements with DLL collectively as "Lease Agreements." As mentioned above, the agreement between Capital 4 and DLL are referred to in this Memorandum as the "Program Agreement."  The separate agreements between each Defendant and Capital 4 are referred to in this Memorandum as "Customer Agreements."

On March 24, 2011, following substantial discovery, DLL filed Motions for Summary Judgment on its breach of contract claims against Rasa, Viewpoint, and NCC and on Defendants' counterclaims (ECF Nos. 189, 191 in C.A. 08-533; 171 in C.A. 08-534).  Defendants filed responsive briefs on May 16, 2011 (ECF Nos. 222, 225 in C.A. 08-533; 205 in C.A. 08-534).  Defendants' responses included cross motions for summary judgment, but their initial briefing was limited to DLL's claims, pursuant to this Court's Order of April 15, 2011 (ECF No. 211 in C.A. 08-533; 189 in C.A. 08-534).  DLL filed a Consolidated Reply Brief on May 31, 2011 (ECF No. 240 in C.A. 08-533; 211 in C.A. 08-534).

Pursuant to this Court's procedures on summary judgment motions, DLL's Motions for Summary Judgment are accompanied by multi-paragraph Statements of Undisputed Facts (ECF Nos. 190, 192 in C.A. 08-533; 172 in C.A. 08-534).[3]  Although Defendants have each filed counter-statements asserting that many of these facts are disputed, these "disputes" are really in the nature of legal arguments rather than factual disputes (ECF Nos. 222, 225 in C.A. 08-533; 204 in C.A. 08-534).  Furthermore, the Court finds significant that, in filing Cross-Motions for Summary Judgment on Contract Claims, Defendants each state that there is "no genuine issue of material fact on the defenses raised by [Defendants] to the contract claims of DLL, and [Defendants are] entitled a judgment as a matter of law."  ECF Nos. 222 at 2, 225 at 2 in C.A.

---

[3] DLL's briefs and Statements of Undisputed Facts and the responses filed by Defendants thereto largely address legal arguments and facts applicable equally to both Defendants and third-party Defendant NCC.  For the sake of clarity, this Court will cite to the filings directed towards the case between DLL and Rasa, C.A. 08-533, where the facts or legal arguments apply to all parties.

08-533; 205 at 2 in C.A. 08-534.  The Court will accept DLL's facts as undisputed as the record

will show that none of the asserted "disputes" are "genuine."[4]

     **B.**    <u>**Rasa Floors**</u>

     In support of its Motion for Summary Judgment, DLL filed a Statement of Undisputed

Facts consisting of 63 paragraphs and supported by a number of exhibits (ECF No. 190 in C.A.

08-533).  Paragraphs 1 through 7 describe the relationship between DLL and Capital 4, which are

two separate companies.  Paragraphs 8 through 18 describe the POZ Program and the manner by

which Capital 4 used its network of VARs to sell the program and several different financial

institutions, such as DLL, as funding sources.

     Rasa is in the business of selling and cleaning carpets in Texas.  5/4/10 Hr'g Tr.,

Testimony of Michael Rasa, 66.  The business has offices in approximately seven locations,

about 150 employees, and $50,000,000 in annual revenue.  Michael Rasa Dep. at 13-14, 67.

Michael D. Rasa ("Mr. Rasa") is the principal and Chief Executive Officer of Rasa.  <u>Id.</u> at 13.

Rasa was introduced to the POZ program by Douglas Cunningham ("Mr. Cunningham"), the

president and owner of NCC, which was also a POZ VAR.  5/4/10 Hr'g Tr., Rasa, 67, 82.  Prior

to entering into the POZ program, Mr. Rasa met once with Mr. Cunningham, for not more than

20 or 30 minutes.  Rasa Dep. 22, Mar. 11, 2010.  Rasa entered an agreement to participate in the

---

[4]  Under the current Fed. R. Civ. P. 56, "[a] party asserting that a fact . . .  is genuinely disputed
must support the assertion by . . . citing to particular parts of materials in the record[.]"
Conclusory statements or legal conclusions, even if characterized as disputes of fact, contained
within a party's submissions are "entirely insufficient" to create a genuine dispute and withstand
a motion for summary judgment.  <u>Ashton v. Whitman</u>, 94 F. App'x 896, 902  (3d Cir. 2004)
(legal conclusion contained in deposition testimony could not create a genuine dispute over
whether documents were exculpatory or material); <u>c.f.</u>  <u>Kirleis v. Dickie, McCamey & Chilcote,
P.C.</u>, 560 F.3d 156, 161 (3d Cir. 2009) ("[C]onclusory, self-serving affidavits are insufficient to
withstand a motion for summary judgment.").

POZ Program through a POZ Customer Agreement with Capital 4 on December 5, 2005,

choosing to receive a cash rebate rather than receiving new telephone equipment.  Statement of

Undisputed Facts and Rasa's Resp. at ¶ 16-18; Pl.'s App. Ex. G.   DLL is not named as a party to

the Customer Agreement.  Id.  On December 6, 2005, Mr. Rasa signed a document entitled

"Rental Agreement," to which DLL is also a party.  Rasa Dep. 33.  There is no dispute that Mr.

Rasa signed the Rental Agreement, has admitted that he had failed to read it, and has stated that

if he had read it, he would not have signed it.  5/4/10 Hr'g Tr., Rasa, 70, 88.

Paragraphs 19 through 30 describe the agreement entered into between DLL and Rasa.

Through the Rental Agreement, DLL agreed to rent to Rasa one Intertel Telephone System and

two hundred business telephones, Pl.'s App. Ex. C.  at 1, equipment which Rasa had previously

rented from Intertel.  Statement of Undisputed Facts and Rasa's Resp. at ¶ 17.

Section 2 of the Rental Agreement states, in part, that Rasa's "obligation to pay the

Rental Payments and other Rental Agreement obligations is absolute and unconditional and is

not subject to cancellation, reduction, setoff or counterclaim" and specifies the Agreement to be

"NON-CANCELLABLE."  Id. at ¶ 2.  Section 5 expressly disclaims any warranties as to the

fitness or merchantability of the equipment, stating that Rasa's "OBLIGATION TO PAY IN

FULL ANY AMOUNT DUE UNDER THE RENTAL AGREEMENT WILL NOT BE

AFFECTED BY ANY DISPUTE, CLAIM, COUNTERCLAIM, DEFENSE OR OTHER RIGHT

WHICH YOU [Rasa] MAY HAVE OR ASSERT AGAINST THE SUPPLIER OR THE

EQUIPMENT MANUFACTURER."  Id. at ¶ 5.  Further, Section 7 of the Rental Agreement

provides that

> IN THE EVENT THE RENTAL PAYMENTS INCLUDE THE COST OF
> MAINTENANCE AND/OR SERVICE BEING PROVIDED BY THE SUPPLIER

> AND/OR THE MANUFACTURER, YOU [Rasa] ACKNOWLEDGE THAT WE [DLL] ARE NOT RESPONSIBLE FOR PROVIDING ANY REQUIRED MAINTENANCE AND/OR SERVICE FOR THE EQUIPMENT.  YOU [Rasa] WILL MAKE ALL CLAIMS FOR SERVICE AND/OR MAINTENANCE SOLELY TO THE SUPPLIER AND/OR MANUFACTURER AND SUCH CLAIMS WILL NOT AFFECT YOUR [Rasa's] OBLIGATION TO MAKE ALL REQUIRED RENTAL PAYMENTS.

Id. at ¶ 7.

Section 14 of the Rental Agreement states, inter alia, that Rasa is in default if Rasa "fail[s] to pay any Rental Payment or other sum when due."  Id. at ¶ 14.  Section 15 defines the available remedies to DLL.  Id. at ¶ 15.

Section 21 of the Rental Agreement states that Rasa "agrees that this Rental Agreement is a Finance Lease as that term is defined in Article 2A of the Uniform Commercial Code ("UCC")."  Id. at ¶ 21.

Section 22 of the Rental Agreement between Rasa and DLL, entitled "Choice of Law" states, in relevant part,

> This Rental Agreement shall in all respects be interpreted and all transactions subject to this Rental Agreement and all rights and liabilities of the parties under the Rental Agreement shall be determined and governed as to their validity, interpretation, enforcement and effect by the laws of the Commonwealth of Pennsylvania except for local filing requirements.

Pl.'s App. Ex. C at ¶ 22.

Section 23 states "This Rental Agreement contains the entire agreement and understanding."

Above Mr. Rasa's signature, dated December 5, 2005, the Agreement states "You [Rasa] acknowledge that the Equipment shown above has been received, has been put in use, is in good working order, and is satisfactory and acceptable."  Pl.'s App. Ex. C.

The facts are undisputed that Rasa did not have any direct contact with DLL in signing

the contract with DLL, but all of the discussions and negotiations took place through the Capital 4 VAR.  Statement of Undisputed Facts and Rasa's Resp. at ¶ 51.  However, while the document is "co-branded" with the names of Capital 4 and DLL, Capital 4 is not named as a party or signatory to the Rental Agreement.  Statement of Undisputed Facts and Rasa's Resp. at ¶ 21, Pl.'s App. Ex. C.

Paragraphs 31 through 44 describe DLL's funding of the Rental Agreement, Capital 4's insolvency as of September 2007, the company's resulting cessation of telephone and internet services, and Rasa's payment default.  There is no dispute that DLL reduced Rasa's Rental Payments as of October 2007, to eliminate the portion of the fee paid to Capital 4 for telephone services, and that Rasa failed to pay DLL as of October 7, 2007.   Statement of Undisputed Facts and Rasa's Resp. at ¶ 38-39.

Paragraphs 45 to 63 relate to the Rasa counterclaims against DLL, addressed below.  Mr. Rasa's interest in the POZ program was to obtain a single bill for telephone and internet services with a locked-in price for the full term of the contract.   Statement of Undisputed Facts and Rasa's Resp. at ¶ 49.  Mr. Rasa believed, based on his conversation with Mr. Cunningham, that if Capital 4 stopped providing telephone and internet services, Rasa could terminate its involvement with the POZ program without penalty or further obligation to anyone.  Id. at ¶ 59; Rasa Dep. at 116.  There is no dispute that, given Mr. Rasa's failure to read the Rental Agreement, Mr. Rasa did not realize that the Rental Agreement involved a lease of Rasa's existing Intertel telephone system. Id. at ¶ 58.  Mr. Rasa acknowledged in his deposition that, had he read the agreement, he would have understood that he was agreeing to rent his company's current system from DLL.  Id.; Rasa Dep. at 117.  Mr. Rasa further acknowledged that, had he

understood the terms of the contract, he would not have signed it.  Rasa Dep. 43, 117.

DLL filed this cause of action for breach of contract against Rasa on February 1, 2008. ECF No. 1 in C.A. 08-533.

### C.    Viewpoint

The discussion concerning Viewpoint requires little in addition to the discussion above relating to Rasa.  Viewpoint is a firm headquartered in Needham, Massachusetts, that creates on-air promotions for cable network series.  Matthew Kelley Dep. at 13.  As with Rasa, Viewpoint was introduced to DLL and Capital 4 by a third-party VAR, Technology Asset Services ("TAS"). De Lage Landen Fin, Servs., Inc., 269 F.R.D. at 454; 5/4/10 Hr'g Tr., Testimony of Matthew Kelley, 210.  Viewpoint's controller, Matthew Kelley, read the agreements several times before advising the company's president, Carlo DiPersio, who made the decision that Viewpoint would join the POZ program.  Id.; 5/4/10 Hr'g Tr., Kelley, 211, 220-21, 227; Pl.'s App. Ex. C.

As a result of these discussions, Viewpoint entered into a POZ Customer Agreement with Capital 4 that is undated.  Pl.'s App. Ex. G.  Viewpoint selected the equipment option of the POZ Program and received the equipment listed in the Lease Agreement as two telephone systems, 56 business telephones, and two chassis.  5/4/10 Hr'g Tr., Kelley at 205; Kelley Dep. at 90.  DLL and Viewpoint signed an agreement, entitled "Business Communications Lease Agreement" ("Lease Agreement"), identical in all material terms to the agreement between DLL and Rasa, on October 12, 2005.  Pl.'s App. Ex. C at 1.  There is no evidence in the record of any discussions directly between Viewpoint and DLL in conjunction with entering into the Lease Agreement.

A "primary catalyst" for Viewpoint's conversations with the Capital 4 VAR regarding the POZ program was Viewpoint's interest in obtaining new telephone equipment.  5/4/10 Tr. at 216;

Kelley Dep. at 21.  Viewpoint received the leased equipment, and, as of the date of the Class

Certification Hearing, the company still possesses the equipment.  Statement of Undisputed Facts

and Viewpoint's Resp. at ¶ 17.  However, Viewpoint believed that it was getting the telephone

equipment "for free," although the company had entered into equipment leases prior to its

agreement with DLL and has acknowledged that the Lease Agreement with DLL looked similar

to those prior leases.  Statement of Undisputed Facts and Viewpoint's Resp. at ¶ 59.  Mr. Kelley

read the Customer and Lease Agreements prior to signing, and he testified in his deposition that

he thought DLL was helping to provide telephone and internet services and that the Lease

Agreement related to payments for services.  Kelley Dep. at 35.

It is undisputed that Viewpoint made payments to DLL through December 2007.

Statement of Undisputed Facts and Viewpoint's Resp. at ¶ 35.  As discussed above, Capital 4

ceased providing services as of October 2007 and DLL reduced the rental payments to eliminate

payment for telephone and internet services.  Statement of Undisputed Facts and Viewpoint's

Resp. at ¶ 35.  Viewpoint ceased payment to DLL as of January 2008.  Statement of Undisputed

Facts and Viewpoint's Resp. at ¶ 38-39.

DLL filed this cause of action for breach of contract against Viewpoint on February 1,

2008.  ECF No. 1 in C.A. 08-534.

**D.     NCC**

DLL's statement of undisputed facts as to NCC, although different on some specifics,

follows the same structure as with Rasa, and need not be repeated again.

NCC is a Texas-based business that sells and services business telephone systems.  5/4/10

Hr'g Tr., Cunningham, 8; Cunningham Dep. at 6-7.  Mr. Cunningham is the president and part-

owner of NCC.  Cunningham Dep. at 5; Pl.'s App. Ex. C.  NCC was a POZ VAR for Capital 4

and sold the POZ Program to approximately 56 customers, including Rasa.  5/4/10 Hr'g Tr.,

Cunningham, 11-15, 35; Cunningham Dep. at 162-63.  During NCC's tenure as a POZ VAR, the

company had approximately 22 employees and annual revenues of about $3 million.

Cunningham Dep. at 6-7.  In addition to serving as a POZ VAR, NCC also participated in the

program.  NCC entered into a POZ Customer Agreement with Capital 4 on April 1, 2005,

electing to receive both a new telephone system and a cash rebate.  Pl.'s App. Ex. G.  On April

18, 2005, NCC entered into a lease agreement with DLL, entitled "Business Communications

Rental Agreement" ("Least Agreement"), signed by Mr. Cunningham and a representative of

DLL.  Pl.'s App. Ex. C.  Although the form of the contract between DLL and NCC is slightly

different than DLL's agreements with Rasa and Viewpoint, the contract also specifies that

Pennsylvania law will control and remaining terms at issue in this case are essentially the same as

in the Rasa and Viewpoint agreements.

        NCC was familiar with DLL's role as an equipment leasing company prior to entering

into the NCC Rental Agreement at issue in this case, through NCC's prior role as a vendor of

equipment leased to customers who had obtained funding through finance leases with DLL.

Statement of Undisputed Facts and NCC's Resp. at ¶ 58.  However, Mr. Cunningham did not

read the NCC Rental Agreement prior to signing it.  Statement of Undisputed Facts and NCC's

Resp. at ¶ 63.  Mr. Cunningham believed that, if the company did not receive telephone and

internet services, NCC would be able to cancel "the whole contract program."  Id. at 65;

Cunningham Dep. at 104.

It is undisputed that, subsequent to Capital 4 ceasing to provide telephone and internet services, NCC stopped payments to DLL as of September 2007.  Statement of Undisputed Facts and NCC's Resp. at ¶ 40-42.

## II.    Legal Standards

### A.    <u>Summary Judgment</u>

Summary judgment is appropriate if the movant can show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5]   A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  <u>Id.</u>

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to

---

[5]  Amendments to the Federal Rules Of Civil Procedure became effective on December 1, 2010. The oft-cited summary judgment standard formerly found in Rule 56© is now located in Rule 56(a), with one alteration: the substitution of the word "dispute" for "issue," which the Rules Advisory Committee explained better describes the summary judgment inquiry, but does not affect the substantive standard or the applicability of prior decisions construing the standard. Fed. R. Civ. P. 56(a); Fed. R. Civ. P. 56 Advisory Committee's Note.

Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court order, the amended rule governs all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable."  United States Courts, Rules and Procedures, Rules and Forms Amendments Effective 12/1/10 (Jan. 11, 2011, 1:36 PM), http://www.uscourts.gov/RulesAndPolicies/FederalRulemaking/Overview/RulesForms120110. aspx.  Thus, when necessary, the Court quotes to the amended rule.

that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477

U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the

light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

> **B.    Choice of Law**

A federal court sitting in diversity must apply the choice-of-law rules of the forum state.

Berg Chilling Sys. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006).  Accordingly, Pennsylvania

law applies to the choice of law analysis.

Defendants contend that their Lease Agreements with DLL should be read together with

the POZ Customer Agreements Defendants entered into with Capital 4 and which contain choice

of law provisions stating that Texas law applies, in contradiction with the choice of law

provisions in the Lease Agreements.

Pennsylvania has adopted Section 187 of the Restatement (Second) of Conflict of Laws

and "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice

of law provisions in contracts executed by them."  Gay v. CreditInform, 511 F.3d 369, 389 (3d

Cir. 2007) (quoting Kruzits v. Okuma Mach. Tool , 40 F.3d 52, 55 (3d Cir. 1994).  However, the

choice of law analysis is "issue-specific" and the Court must examine whether "different states'

laws . . . apply to different issues in a single case."  Atl. Pier Assocs., LLC v. Boardakan Rest.

Partners, 647 F. Supp. 2d 474, 488 (E.D. Pa. 2009) (Robreno, J.) (citing  Berg Chilling Sys., 435

F.3d at 462).

Courts of this jurisdiction generally examine the breadth or narrowness of a choice of law

provision to determine whether the parties intended a choice of law provision to cover all claims

arising out of the parties' association.  Compare Jiffy Lube Int'l, Inc. v. Jiffy Lube, 848 F. Supp.

569, 576 (E.D. Pa. 1994) (Van Antwerpen, J.) (determining that a choice of law provision stating that the agreement should be "construed, interpreted and enforced in accordance with the laws of the State of Maryland" did not include tort claims); with Stone St. Servs, Inc. v. Daniels, No. CIV. A. 00-1904, 2000 WL 1909373 at *4 (E.D. Pa. Dec. 29, 2000) (Padova, J.) (concluding a provision stating that the "'obligations of the parties . . . shall be governed, interpreted, construed, and enforced' in accordance with Pennsylvania law . . . contemplate[d] actions relating to the validity of the underlying agreement"); see also In re Allegheny Int'l, Inc., 954 F.2d 167, 178 (3d Cir. 1992) (determining that an agreement that a contract was to be "governed by, and construed in accordance with, the laws" covered a fraudulent inducement claim). Pennsylvania courts will not disregard a contractual choice of law provision unless that provision infringes upon strong public policy interests.  Kruzits, 40 F.3d at 56.

This Court can discern no reason to ignore the unequivocal choice of law provision in the Lease Agreement and concludes that Pennsylvania contract law applies to DLL's breach of contract claims.  Furthermore, the language of the choice of law provision stating that "the Rental Agreement shall in all respects be interpreted and all transactions subject to this Rental Agreement and all rights and liabilities of the parties under the Rental Agreement shall be determined and governed as to their validity, interpretation, enforcement and effect by the laws of the Commonwealth of Pennsylvania" is a broad provision.  Pl.'s App. Ex. C at § 22.  The provision appears to this Court to cover all claims going to the validity of the contract, including Defendants' counterclaims of fraudulent misrepresentation.

Pennsylvania courts will uphold an express choice of law provision if: "(1) the contract bears a reasonable relationship to the state whose law is chosen to govern" and (2) "application

-14-

of the chosen law does not violate a 'strong public policy' that would otherwise protect a party."
Cottman Transmission Sys., Inc. v. Melody, 869 F. Supp. 1180, 1183 (E.D. Pa. 1994) (Joyner,
J.).  This Court finds that the parties' choice of Pennsylvania law is reasonable given that DLL's
principle place of business is Pennsylvania.  Defendants have advanced no argument that Texas
"has a materially greater interest" in the enforceability of the parties' contracts or that applying
Texas law to determine the enforceability or validity of the contracts "would be contrary to a
fundamental policy" of Texas law.  Gay, 511 F.3d at 390.  Thus, this Court will honor the
parties' agreed-upon choice of law.

Defendant's primary argument in favor of applying Texas law is based on their contention
that the Lease and Customer Agreements must be construed together and that the choice of law
provision in the Customer Agreement somehow invalidates the contrary provision contained in
the Lease Agreement.  As discussed below in examining the substance of DLL's claims, the
Court rejects Defendants' argument that the two contracts are sufficiently interrelated that they
should be read together so as to contradict the clear intent of the parties as expressed in the Lease
Agreements.  Furthermore, Defendants have not offered any further argument in support of this
Court finding that either Texas or Massachusetts have a greater interest in protecting businesses
located within those states than Pennsylvania does in protecting its own businesses.  Id.  Nor
have Defendants offered any argument that applying the laws of another state would engender a
different result as to either DLL's contract claims or Defendants' common law counterclaims.
Thus, the Court sees no strong public policy counseling against the application of Pennsylvania
law in this case.[6]

---

[6] The Court has determined that Defendants state statutory claims have no merit in light of a
failure to establish a genuine issue of material fact regarding agency and will dispense with

**III.    Under Pennsylvania Law, DLL Is Entitled to Summary Judgment that Defendants Breached the Contract Between Defendants and DLL, as a Matter of Law**

In its Motions for Summary Judgment, DLL contends that Defendants breached their individual Lease Agreements with DLL by failing to make payments when due without valid excuse or affirmative defense.  A breach of contract action involves (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages.  Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 716 (Pa. Super. Ct. 2005).  Defendants have raised counterclaims alleging fraud, which goes to the enforceability of the contract and will be addressed separately below.  There is no dispute that each Defendant entered into a Lease Agreement with DLL.  Thus, the Court limits its initial discussion to the existence of a breach of a duty imposed by the individual contracts.  Defendants have each raised identical defenses of unconscionability, mutual mistake, breach by DLL, and illegality.  Rasa has additionally raised a separate defense of mutual mistake on different facts.

**A.    As a Matter of Law, DLL Has Established that Defendants Breached Their Lease Agreements**

Pursuant to 13 Pa. C.S.A. § 1102(b)(1), Pennsylvania adopted the Uniform Commercial Code ("U.C.C.") to, inter alia, "simplify, clarify and modernize the law governing commercial transactions."  De Lage Landen Fin. Servs, Inc. v. Rozentsvit, 939 A.2d 915, 919 (Pa. Super. Ct. 2007).  Article 2A of the U.C.C., entitled "Leases," was adopted in Pennsylvania at 13 Pa. C.S.A.

---

determining whether or not Defendants may assert statutory claims under Texas and Massachusetts law.

§§ 2A101 et seq.[7]  Accordingly, this Court will interpret the parties' agreements pursuant to the U.C.C., in particular Article 2A.

Under Pennsylvania law, when the court determines a contract to be clear and unambiguous in its terms, the court should construe the contract as a matter of law and summary judgment is appropriate.  PSC Info Group v. Lason, Inc., 681 F. Supp. 2d 577, 585 (E.D. Pa. 2010) (Yohn, J.) (citing Allegheny Int'l v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994) (applying Pennsylvania law)).  Although parties may disagree as to the interpretation of contract provisions, such a dispute will not necessarily render a contract provision ambiguous.  Id. (citing Halpin v. LaSalle Univ., 639 A.2d 37 (Pa. Super. Ct. 1994); Lamar v. Granger, 99 F. Supp. 17 (W.D. Pa. 1951)).

Under Pennsylvania law, "when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement."  PSC Info Group, 681 F. Supp. 2d at 585 (quoting Steuart v. McChesney, A.2d 659, 661 (Pa. 1982)).  "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract[,]" Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93 (3d Cir. 2001) (quoting Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)), unless a party puts forth evidence capable of demonstrating a latent ambiguity.  Id. (citing Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1013-14 (3d Cir. 1980)).  "Courts do not assume a contract's language was chosen carelessly, nor do they assume the parties were

---

[7] Defendants' contentions that the U.C.C. does not apply because the contracts between Capital 4 and Defendants involved the rendition of services fails.  As the Court discusses below, the contracts at issue in the dispute between DLL and Defendants are finance lease transactions governed by U.C.C. §2A-103, adopted by the Pennsylvania Legislature at 13 Pa.C.S.A. § 2A103, separate and distinct from the POZ Customer Agreements between Capital 4 and Defendants.

ignorant of the meaning of the language employed." Crawford Cent. Sch. Dist. v. Commonwealth, 888 A.2d 616, 623 (Pa. 2005) (citing Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 429 (Pa. 2001)). Furthermore, failure to read a contract does not excuse a party from being bound by its terms. Schwartz v. Comcast Corp., 256 F. App'x 515, 520 (3d Cir. 2007) (citing Simeone v. Simeone, 581 A.2d 162, 165 (Pa. 1990)).

Upon close reading of the plain language of the Lease Agreements and consideration of the Agreements' structure, the Court finds the terms to be clear and unambiguous. Moreover, the parties do not dispute the terms of the contract except that Defendants argue that certain provisions of the Lease Agreement should be read in light of extrinsic evidence and the Customer Agreements with Capital 4. Statement of Undisputed Facts and Rasa's Resp. at ¶¶ 19-30. To the extent that Defendants seek to change the meaning of the terms of the Lease Agreements based on the terms of the Customer Agreements, this Court finds such extrinsic evidence to be barred. Thus, the Court must give effect to the language of the Lease Agreement.

The explicit terms of the contracts clearly state that Defendants are in breach if any company "fail[s] to pay any Rental Payment or other sum when due." Id. at ¶ 14. It is undisputed that Rasa stopped paying DLL starting on October 7, 2007, and, thus, defaulted on its obligations to DLL under the plain language of the Lease Agreement. Statement of Undisputed Facts and Rasa's Resp. at ¶¶ 38-39. Viewpoint similarly stopped payment in January 2008 and NCC in September 2007. Statement of Undisputed Facts and Viewpoint's Resp. at ¶ 38-39; Statement of Undisputed Facts and NCC's Resp. at ¶ 40-42.

Furthermore, the explicit terms of the Lease Agreements, as well as their structures, define these contracts as finance lease transactions governed by Article 2A of the U.C.C.,

-18-

adopted in Pennsylvania as 13 Pa. C.S.A.§ 2A103(g).  Pl.'s App. Ex. C at ¶ 21.   Finance lease transactions are described in the comments to Section 2A103 as the "product of a three party transaction" in which a supplier "manufactures or supplies the goods pursuant to the lessee's specification" and the lessor and lessee "enter into a lease or sublease of the goods." 13 Pa. C.S.A.§ 2A103(g), cmt.  "Due to the limited function usually performed by the lessor, the lessee looks almost entirely to the supplier for representations, covenants and warranties."  Id.

Section (g) of the comment to 13 Pa. C.S.A.§ 2A103(g) states, and Pennsylvania courts have held, that even "[i]f a transaction does not qualify as a finance lease, the parties may achieve the same result by agreement[.]"  See De Lage Landen Fin. Servs, Inc. v. M.B. Mgmt Co., Inc., 888 A.2d 895, 901 (Pa. Super. Ct. 2005) (holding that the "parties in the case sub judice [were] bound by the language" defining the contract to be a finance lease pursuant to U.C.C. Article 2A) (citing GE Capital Corp. v. Nat'l Tractor Trailer Sch., Inc., 667 N.Y.S.2d 614 (N.Y. Sup. Ct. 1997)).

As parties to valid finance lease transactions, Defendants' payment obligations "under the lease contract [became] irrevocable and independent upon [Defendants'] acceptance of the goods," pursuant to 13 Pa. C.S.A. § 2A407(a)(b) (2008), which extends "the classic 'hell or high water' clause to a finance lease that is not a consumer lease."  13 Pa. C.S.A.§ 2A407(a)(b), cmt. 1; see also C & J Vantage Leasing Co. v. Wolfe, 795 N.W.2d 65, 77 (Iowa 2011) ("If an agreement qualifies as a finance lease under the UCC, an express hell-or-high-water clause is unnecessary because such a provision automatically attaches to a finance lease by statute."). (citing U.C.C. § 2A-407).

-19-

Section 21 of the Lease Agreements explicitly defines each agreement as "Finance Lease."  Pl.'s App. Ex. C.  Sections 5 and 7 of the Lease Agreements, which make payment obligatory and unconditional, disclaim any warranties, and transfer to the lessee any warranties made by the manufacturer, confirm that the Agreements are structured to function as finance leases.  Furthermore, consistently with M.B. Management and General Electric Capital, this Court finds Defendants are "bound by the language" of Section 21 of the Lease Agreements agreeing to enter into a finance lease as defined by the U.C.C.  Id. at 901.

The terms of the Lease Agreements explicitly reflect Section 2A407(a)(b) , stating that Defendants' "obligation to pay the Rental Payments and other Rental Agreement obligations is absolute and unconditional" and that Defendants' obligations to pay in full will not be "NOT BE AFFECTED BY ANY DISPUTE, CLAIM, COUNTERCLAIM, DEFENSE OR OTHER RIGHT WHICH YOU [Defendants] MAY HAVE OR ASSERT AGAINST THE SUPPLIER OR THE EQUIPMENT MANUFACTURER."  Pl.'s App. Ex. C at ¶¶ 2, 5.  Thus, notwithstanding its arguments to the contrary, Defendants entered into lease finance transactions with DLL and were obligated to meet their commitments under the Lease Agreements regardless of any failure to perform by Capital 4 under the Customer Agreements.

As Defendants failed to pay fees to DLL, Defendants have defaulted on the terms of their contracts with DLL.  See De Lage Landen Fin. Servs, Inc. v. Rozentsvit, 939 A.2d 915, 921 (Pa. Super. 2007) (lessee, under a finance lease of ultrasound equipment and associated hardware and software, breached contract for refusal to pay due to supplier's failure to provide software where "payment obligations were 'absolute, unconditional, and [were] not subject to cancellation, reduction, setoff or counterclaim'"); M.B. Mgmt, 888 A.2d at 901 (lessee of copy machine in

breach of finance lease for failure to make payments to lessor, where lease obligated lessee to make payments regardless of whether the copier satisfied the lessee's use requirements and lessee accepted delivery of equipment).

## B.   Defendants' Defenses are Unavailing

The Court rejects all of the defenses alleged by Defendants, including unconscionability, mutual mistake, breach by DLL, and illegality.  Defendants have failed to show any precedent applying Pennsylvania law which supports the defenses it has asserted to DLL's claims.

### 1.   Defendants Cannot Establish that the Lease Agreements are Unconscionable

Pursuant to 13 Pa. C.S.A. § 2A108(a), a court may, as a matter of law, refuse to enforce a portion of a lease contract or the contract in its entirety if it finds the contract "or any clause of a lease contract to have been unconscionable at the time it was made."  A court may also fashion "appropriate relief" when it determines "a lease contract or any clause of a lease contract has been induced by unconscionable conduct."  13 Pa. C.S.A. § 2A108(b).   The Court decides the issue of unconscionability as a matter of law.  Todd Heller, Inc., v. UPS, Inc., 754 A.2d 689, 700 (Pa. Super. Ct. 2000).

A determination of unconscionability requires a two-fold determination, that "the contractual terms are unreasonably favorable to the drafter," i.e., substantive unconscionability, "and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions[,]" i.e. procedural unconscionability or "unfair surprise."  Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999) (citing Bensalem Twp v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1312 (3d Cir. 1994); Ferguson v. Lakeland Mut. Ins. Co., 596 A.2d 883, 885 (Pa. 1991); Bishop v. Washington, 480 A.2d 1088, 1094 (Pa 1984); Germantown Mfg. Co. v.

Rawlinson, 491 A.2d 138, 145-46 (1985)); see also Hopkins v. New Day Fin., 643 F. Supp. 2d 704, 716 (E.D. Pa. 2009) (Slomsky, J.) (asking, under Pennsylvania law, "whether one of the parties lacked a meaningful choice about whether to accept the provision in question and the challenged provision or contract unreasonably favors the other party to the contract").

The crux of Defendants' lengthy unconscionability argument is that no "man in his senses, not under delusion, would" agree to pay the agreed-to amount for the equipment promised in the Lease Agreements and the services provided through the Customer Agreements. Viewpoint's Resp. Br. at 20.  The Third Circuit has stated that a finding of substantive unconscionability requires that the party challenging contractual terms show that they are "unreasonably or grossly favorable to one side and to which the disfavored party does not assent."  Green Tree, 183 F.3d at 181.  As the Tenth Circuit has implied in Colorado Interstate Corp. v. CIT Group/Equip. Fin., Inc., 993 F.2d 743, 749 (10th Cir. 1993), finance lease transactions are not one-sided transactions, but, rather, assist lessors in securing funding for equipment which "would not otherwise be available."  Furthermore, in each case, Defendants assented to the terms of and signed the Lease Agreements.  They are now bound by that act, whether Defendants took the step to read the agreements or not.  If Defendants now take issue with the quality of the equipment provided for the price offered, their remedy is not with DLL. Rozentsvit, 939 A.2d at 920 (noting that "[t]he party merely financing the transaction has no control over its manufacture, is not involved in the selection of the product nor in any way makes a representation as to its quality or soundness") (quoting Nath v. Nat'l Equip. Leasing Corp., 439 A.2d 633, 636 (Pa. 1981)).

As to procedural unconscionability, where "a contract provision affects commercial entities with meaningful choices at their disposal, the clause in question will rarely be deemed unconscionable." Denlinger, Inc. v. Dendler, 608 A.2d 1061, 1068 (Pa. Super. Ct. 1992) (quoting Vasilis v. Bell of Pennsylvania, 598 A.2d 52, 54 (Pa. Super. Ct. 1991)). Defendants, each experienced commercial business entities, have produced no basis upon which to conclude that Defendants lacked meaningful choice in entering into their Lease Agreement.

Defendants contend that the terms of the Lease Agreements, which define the contracts as finance lease transactions governed by Article 2A, "effect a material shifting of risk which [Defendants] would not reasonably expect to encounter in contracting for telephone and internet access services." Viewpoint's Resp. Br. at 35. This argument is a restatement of Defendants' mutual mistake defense as it relies on Defendants' avowed position that Defendants did not know that they were entering into contracts for financing of leased equipment. As discussed below, the Court finds this argument to have no merit. Furthermore, as discussed throughout this opinion, the objected-to terms of Defendants' Lease Agreements are consistent with terms of Article 2A finance lease transactions, which have been found valid and enforceable by Pennsylvania courts. See Rozentsvit, 939 A.2d at 921; M.B. Mgmt, 888 A.2d at 901.

As the Tenth Circuit has discussed, the enforceability of hell or high water provisions is key to making financing accessible for potential lessors. Colorado Interstate Corp, 993 F.2d at 749. Furthermore, the policy justifications behind imposing unconditional obligations on lessees in finance lease transactions are particularly relevant in industries such as telecommunications "where advances in technology significantly decrease the value of equipment that is quickly

-23-

becoming obsolete." Id. (citing In re O.P.M. Leasing Services, Inc., 21 B.R. 993, 1006-07 (Bankr. S.D.N.Y. 1982)).

As Defendants have established neither that the terms of the Lease Agreements were unfairly favorable to DLL, nor that Defendants were the victims of unfair surprise or a lack of meaningful choice, this Court finds that Defendants' unconscionability argument is without merit.

### 2.      Rasa's Argument Regarding Breach By DLL is Without Merit

Rasa contends that DLL first breached the contract because DLL failed take steps to make certain that (a) Capital 4 used the lease money to purchase Rasa's used Intertel telephone equipment and (b) Capital 4 delivered title for that equipment to Rasa.  Rasa Resp. Br. at 16-17. Enforcing a hell or high water clause contained within a finance lease, the Tenth Circuit rejected a similar argument that a lessee "was deprived of the very item contemplated by the contract" in Colorado Interstate Corp., 993 F.2d at 749.  The Tenth Circuit relied on Stewart v. United States Leasing Corp., 702 S.W.2d 288 (Tex. App. 1985), in which the Texas Court of Appeals found a vendor who failed to deliver subject of lease agreement was not an agent of the lessor.   Stewart, 702 S.W.2d at 290.  Without that agency relationship, the Texas court concluded that "any claims regarding the equipment were to be made solely against the vendor."  Id.

Hell or high water clauses are consistently found to be  "standard in [commercial] finance leases because the quality of the leased goods is the responsibility of the supplier whose warranties extend through the lease to the lessee."  Info. Leasing Corp. v. Chambers, 789 N.E.2d 1155, 1163 (Ohio Ct. App. 2003); see Wells Fargo Bank, N.A. v. Brooks America Mortg. Corp., 419 F.3d 107, 110 (2d Cir. 2005) ("Non-performance by the lessor [in a finance lease] is

irrelevant, at least when the lessee was a sophisticated party and the party asserting the right to
rental payments is a good-faith assignee."); Harte-Hanks Direct Marketing/Baltimore, Inc. v.
Varilease Tech. Fin. Group, Inc., 299 F. Supp. 2d 505, 522 (D. Md. 2004) (enforcing hell or high
water provision of finance lease against lessee notwithstanding failure of lessor to provide paid-
for maintenance services and noting that even parole evidence that parties did not intend lessee
"to assume an unconditional duty to pay if the maintenance services ceased" could not overcome
clear and unambiguous language of contract). Thus, "the obligation of the lender is fully met
when the funds required have been provided." Rozentsvit, 939 A.2d at 921 (citing Trial Court
Opinion, entered June 1, 2007, at 3); see also Lyon Financial Services Inc. v. Woodlake Imaging,
LLC, No. Civ. A. 04-CV-334, 2005 WL 331685 at *4-5 (E.D. Pa. Feb. 9, 2005) (Diamond, J.)
("Courts regularly enforce 'hell or high water' provisions, particularly in finance lease
transactions where the lessor's only obligation is to provide money.").

     The Lease Agreement between Rasa and DLL reflects an acknowledgment by Mr. Rasa
that "the Equipment [that was the subject of the Lease Agreement] ha[d] been received, ha[d]
been placed in use, [was] in good working order and [was] satisfactory and acceptable." Pl.'s
App. Ex. C. Having determined that it must enforce the terms of Rasa's finance lease with DLL,
this Court concludes that Rasa cannot overcome the clear and unambiguous terms of the Rental
Agreement and any claims Rasa has regarding the delivery and title of the telephone equipment
are not the responsibility of DLL.

### 3. Defendants' Arguments Regarding Breach By DLL and Mutual Mistake are Without Merit

     Defendants each contend that DLL engaged in a breach of contract due to the termination
of telephone and internet services. In the alternative, Defendants rely on a defense of mutual

mistake, contending that Defendants and DLL believed themselves to be entering into contracts for services.

Notwithstanding the Court's decision not to allow the pleadings to be amended (over three years after the start of this litigation) to include a defense of mutual mistake, it is clear that the doctrine of "mutual mistake" has no place in this litigation because the doctrine requires that both parties to a contract are mistaken.  See Zurich Am. Ins. Co. v. O'Hanlon, 968 A.2d 765, 770 (Pa. Super. Ct. 2009) (quoting Holmes v. Lankenau Hosp., 627 A.2d 763, 767–68 (Pa. Super. Ct. 1993) ("Mutual mistake exists, however, only where both parties to a contract [are] mistaken as to existing facts at the time of execution. Moreover, to obtain reformation of a contract because of mutual mistake, the moving party is required to show the existence of the mutual mistake by evidence that is clear, precise and convincing.")).  Defendants assert that DLL was mistaken that the Lease Agreements were "purely to lease equipment," but have produced no evidence in support.  There is no evidence whatsoever that DLL was mistaken in terms of the obligations of it and its contracting parties.

In the alternative, Defendants argue that Customer and Lease Agreements must be viewed together to explain the payments by DLL to Capital 4 for services.  Viewpoint's Resp. Br. at 37. The Court finds it unnecessary to read the two contracts as one to explain the payments to Capital 4 as DLL's Lease Agreements specified that lease payments could "INCLUDE THE COST OF MAINTENANCE AND/OR SERVICE BEING PROVIDED BY THE SUPPLIER AND/OR MANUFACTURER[.]"  Pl.'s App. Ex. C at § 7.  Accordingly, as discussed in this Court's August 10, 2010 Memorandum, "[e]ach customer's monthly fee was apportioned to the lender for the lease payment on equipment, and to Capital 4 for the telephone and internet services."  De

Lage Landen Fin. Servs, Inc., 269 F.R.D. at 454 (citing 5/5/10 Hr'g Tr., Majer, 32-33).  It is undisputed that DLL collected those funds for services from Defendants and paid them to Capital 4 and that DLL ceased to do so, reducing charges to Defendants, when Capital 4 stopped providing telephone and internet services.  See Statement of Undisputed Facts and Rasa's Resp. at ¶¶ 38-39; Statement of Undisputed Facts and Viewpoint's Resp. at ¶ 35; Statement of Undisputed Facts and NCC's Resp. at ¶ 41.

Furthermore, for the Court to construe the Lease Agreements between Defendants and DLL and the Customer Agreements between Defendants and Capital 4 together as one agreement is contrary to the express terms of the contracts and unfounded in Pennsylvania law.  Both agreements specify that they are separate and distinct contracts.  The POZ Customer Agreement expressly states that "all obligations under any funding agreements are explicitly separate and distinct from this Agreement[.]  Pl.'s App. Ex. G at ¶ 9.  Similarly, the Lease Agreements state that each contract "contains the entire agreement and understanding."  Pl.'s App. Ex. C at ¶¶ 23.  As Rozentsvit, 939 A.2d at 921, and M.B. Management, 888 A.2d at 901, make clear, Pennsylvania appellate courts have concluded that it is appropriate to interpret a finance lease as an enforceable contract, separate from a supplier's obligations to a lessee.  Even were the contracts to be construed together, nothing in the Customer Agreements would invalidate the "hell or high water" clause contained within the Lease Agreements binding Defendants to perform regardless of any breach by Capital 4 of its obligations under the Customer Agreement.

The Court is unswayed by Defendants' reliance IFC Credit Corp. v. Burton Indus., 536 F.3d 610 (7th Cir. 2008).  In IFC Credit, the Seventh Circuit determined, pursuant to Illinois law, that an "Equipment Rental Agreement" containing a "hell or high water" clause and a "Hardware

Application" were "executed together" and should be "construed together."  536 F.3d at 613,

614.  IFC Credit is distinguishable in several respects.  First, unlike both the Customer and

Rental Agreements in this case, neither contract at issue in IFC Credit contained a provision

defining either agreement as separate and distinct.  Second, the same two parties entered into

both the "Equipment Rental Agreement" and the "Hardware Application," which both covered

lease of telecommunications equipment.  536 F.3d at 612.   The cases before this Court address

Lease Agreements for telephone equipment between DLL and Defendants, Pl.'s App. Ex. C at 1,

and the separate Customer Agreements for the provision of telephone and internet services

between Defendants and Capital 4,  Pl.'s App. Ex. G.

Finally, the Hardware Application in IFC Credit contained a condition precedent that

specified that the Equipment Rental Application would not be binding until the leased equipment

was "mounted in [the defendant's] phone closet."  Id. at 615.  As the supplier failed to perform

this condition,"no equipment lease ever existed [and] neither party was bound by the Equipment

Rental Agreement's terms. . . . [I]t was as if the Equipment Rental Agreement – along with its

'hell-or-high-water' and assignment clauses – never existed in the first place."  Id. at 615.

Viewpoint and NCC clearly accepted the new telephone equipment leased through the Rental

Agreements and Mr. Rasa signed an acknowledgment of receipt and acceptance of his used

equipment and has maintained possession of the equipment since prior to Rasa's entrance into

the Lease Agreement.  Defendants can point to no provision analogous to the one in IFC Credit

within either the Customer or Lease Agreements rendering Defendants' agreements with DLL

null based on nonperformance of service obligations by Capital 4.  Thus, this Court must give

full effect to the terms of the Lease Agreements, as well as 13 Pa. C.S.A. §2A407(a)(b),

-28-

obligating Defendants to perform.

Defendants seek to alter the terms of the Lease Agreements based on language contained in Defendants' wholly separate agreements with Capital 4 in a manner contrary to the clear and unambiguous terms of the agreement between Defendants and DLL. As stated above, where the Court deems a contracts' terms clear and unambiguous, the parties are barred from introducing extrinsic evidence to modify those terms, unless a party can present evidence of a latent ambiguity, which Defendants have not done. See Bohler-Uddeholm Am., Inc., 247 F.3d at 93.

### 4. Defendants' Arguments Regarding Illegality are Without Merit

Defendants contend that Capital 4 did not seek the proper Massachusetts or Texas licenses and, thus, was not authorized to provide telephone and internet services in the states in which Defendants received services. Rasa's Resp. Br. at 8-12. According to Defendants, DLL knew that at least a portion of the funds collected from Defendants were for services. Defendants contend that DLL aided Capital 4 in its purportedly illegal venture by "passing through payment for unlicensed telephone services provided by Capital 4." Id. Defendants argue that under International Aircraft Sales, Inc. v. Betancourt, 582 S.W.2d 632, 635 (Tex. Civ. App. 1979), that act was "in furtherance of [an] unlawful object," rendering the Lease Agreements unenforceable.

Betancourt, 582 S.W.2d at 633-34, addressed a contract between a supplier of electronics components and smugglers of those components for resale in Mexico. The Texas Court of Appeals declared the contract between these parties unenforceable against the smugglers because the suppliers both (1) knew when entering into the contract that the smugglers intended to use the goods for an unlawful purpose and (2) aided the smugglers in their "unlawful design to violate the law." Id. at 635.

Even if Texas law applied to the enforceability of Defendants' Lease Agreements, which this Court has determined it does not, Betancourt does not establish the contracts to be unenforceable.  Defendants' argument relies solely on an affidavit by Defendants' counsel that he was unable to find a service provider certificate of authority issued by the Public Utility Commission ("PUC") for the State of Texas to Capital 4, Inc., but that the Texas PUC had issued a certificate to Capital 4 Outsourcing, Inc.[8]  Defs.' App. to Resp. to Statement of Undisputed Facts Ex. 13 at ¶ 4.  Viewing this fact in the light most favorable to Defendants, the affidavit does not establish that Capital 4 intended to operate without a license.  Thus, even if this Court were to agree with Defendants that it must construe the Customer and Lease Agreements together, which it will not do, Defendants have provided no evidence upon which to infer that Capital 4 entered into the Customer Agreements with Defendants or the Program Agreement with DLL with an "unlawful design to violate the law." Id. at 635.  Moreover, even if a reasonable jury could infer from the facts asserted that Capital 4 operated without a license in Texas, Defendants have provided no evidence that DLL knew the status of Capital 4's authority to provide services when entering into its Program Agreement with Capital 4 or its Lease Agreements with Defendants, or even in the period during which Capital 4 provided telephone and internet services to Defendants.

Defendants also contend the DLL violated so-called federal and state anti-cramming and -slamming laws because a portion of DLL's bills to Defendants contained charges for telephone and internet services.  Rasa Counterclaim Br. at 12-13 (citing 47 U.S.C. § 258; 16 T.A.C. § 26.32; 16 T.A.C. § 26.130); Viewpoint Counterclaim Br. at 12-13 (citing 47 U.S.C. § 258;

---

[8] Viewpoint has not submitted a corresponding affidavit addressing regulation by the applicable Massachusetts agency.

M.G.L.A. c. 93, §§ 108-113.

The federal anti-slamming law "prohibits telecommunication carriers from making unauthorized changes to the provider of telephone service, i.e., switching the customer to another company's service without the customer's permission[.]"  AT & T Corp. v. Dataway Inc., 577 F. Supp. 2d 1099, 1109 (N.D. Cal. 2008) (citing AT & T Corp. v. FCC, 323 F.3d 1081, 1082 (D.C. Cir. 2003); see also 47 U.S.C. § 258(a) (2008)).  The Texas and Massachusetts anti-slamming laws, 16 T.A.C. § 26.130; M.G.L.A. c. 93, §§ 108-113, provide the same protection by prescribing procedures that telecommunications providers must follow to change a customer's selection of provider.  The Texas anti-cramming law protects customers from unauthorized telecommunications charges by prescribing procedures that telecommunications providers must follow "to obtain and verify customer consent for charges."  16 T.A.C. § 26.32.

DLL is not a telecommunications carrier, nor is DLL's conduct the type of conduct that was intended to be regulated by the state and federal statutes cited by Defendants.  Defendants have not asserted that DLL subjected Defendants to unauthorized charges or switched Defendants' providers without their consent.  Even had DLL done so, the charges for services that Defendants contend are regulated by the statutes cited are not at issue in this case.  It is undisputed that DLL eliminated the charges to Defendants for telephone and internet services and the Pass-Thru payments to Capital 4 when Capital 4 ceased to provide telephone and internet services to Defendants.  Statement of Undisputed Facts and Rasa's Resp. at ¶¶ 38-39; Statement of Undisputed Facts and Viewpoint's Resp. at ¶ 35; Statement of Undisputed Facts and NCC's Resp. at ¶ 41.  Finally, even had DLL not performed some obligation under the anti-cramming or anti-slamming statutes, that is not a basis upon which to invalidate the Lease Agreements.

Applying Pennsylvania law to Defendants' arguments regarding Capital 4's authorization to provide services and DLL's compliance with state and federal telecommunications statutes, the Court cannot conclude that the Lease Agreements "violate[d] a provision of a statute" or could not "be performed without violation of such a provision[.]"  Development Fin. Corp. v. Alpha Hous. & Health Care, 54 F.3d 156, 163 (3d Cir. 1995) (quoting American Ass'n of Meat Processors v. Casualty Reciprocal Exch., 588 A.2d 491, 495 (Pa. 1991)).  DLL and Defendants "entered into a valid contract for a valid purpose[,]" Contractor Industries v. Zerr, 359 A.2d 803, 807 (Pa. Super. Ct. 1976); "neither the subject matter of the contract, nor its performance, was illegal."  Id. (failure to obtain necessary permits for swimming pool construction resulting in a pool that violated a municipal ordinance was merely a "collateral illegality," given that the "formation or performance of the contract [was not] forbidden.").  This Court concludes that Defendants' defense of illegality is without merit.

**IV.    Assertions By Third Party HP Do Not Prevent the Entry of Summary Judgment in Favor of DLL and Against Rasa, Viewpoint, and NCC**

HP is the successor in interest to third-party Defendant 3Com, and is represented by different counsel from Rasa, Viewpoint and NCC.  HP has now filed an opposition to DLL's Motions for Summary Judgment.  See ECF Nos. 230-233 in C.A. 08-533; 202-204 in C.A. 08-534.   HP has disputed a number of facts asserted by DLL against Defendants and has also added additional facts of its own.  Most of these purportedly disputed facts are presented as legal conclusions, are simply not relevant to DLL's breach of contract claim, or merely restate assertions made by DLL or one or more of the Defendants.

HP's core assertion is that Defendants were under the mistaken belief that the payments to DLL were solely for telephone and internet services and that DLL had knowledge or reason to

know that Defendants were so mistaken.  HP further asserts that there is a genuine dispute of material fact as to whether the amounts charged to Defendants under the Lease Agreements were reasonable.  As to Rasa, HP asserts that DLL never obtained title to the telephone equipment leased by Rasa prior to entering into its separate agreements with DLL and Capital 4, and, thus, the agreement is unenforceable on a number of grounds.  See ECF No. 231 in C.A. 08-533 at 9-10; ECF No. 203 in C.A. 08-534 at 8-9.

Based on these assertions, HP has attempted to advance new affirmative defenses of mutual mistake and unilateral mistake.  HP's argument regarding a purported mutual mistake regarding title to Rasa's equipment is addressed above in the Court's discussion of Defendants' mutual mistake defense and has no merit.  Furthermore, HP has provided no evidence that DLL had "an erroneous belief" regarding the title to the telephone equipment to be leased by Rasa at the time of formation of the contract.  See Step Plan Servs, Inc. v. Koresko, 12 A.3d 401, 410 (Pa. Super. Ct. 2010) (quoting Hart v. Arnold, 884 A.2d 316, 333–35 (Pa. Super. Ct. 2005)).  As to HP's argument regarding unilateral mistake, HP has provided no evidence that DLL knew or should have known that any Defendant was mistaken as to the terms of their Lease Agreement at the time of formation.  See  Pa. Tpk. Comm'n v. K & S Trucking LLC, 362 F. Supp. 2d 598, 606 (E.D. Pa. 2005) (Rufe, J.).  The Court will deny HP's motion to add affirmative defenses for reasons set forth in this Court's Order denying HP's Motion for Reconsideration dated April 27, 2011 (ECF No. 220 in C.A. 08-533; 196 in C.A. 08-534).

HP argues, as well, that the Lease Agreements are substantively unconscionable because the amounts paid by Defendants to DLL were unreasonably high, and procedurally unconscionable because the Lease Agreements were contracts of adhesion.  Thus, HP contends

-33-

Defendants lacked meaningful choice as to the terms of the contracts. This Court has addressed the question of the substantive terms of the Lease Agreements above and has concluded that the contract terms were not substantively unconscionable. The Court has further found that Defendants did not lack meaningful choice in entering into their respective contracts. The Court concludes that the standard form nature of the finance lease does not support a finding of procedural unconscionability.

This case is distinguishable from De Lage Landen Financial Services v. Perez, No. Civ.A. 00-CV-3314, 2003 WL 223874767 (E.D. Pa. 2003) (Melinson, Magistrate J.), cited by HP, in which Judge Melinson ruled a finance lease for office furniture between DLL and a physician to be unconscionable. In Perez, DLL's assignor paid the vendor in full for the leased equipment prior to the expected delivery of the equipment, which never occurred. Id. at *2. As assignee of the finance lease, DLL sought to enforce lease payments against Dr. Perez, who had never received his furniture. Id. at *1. In contrast to Perez, each Defendant in this case accepted the equipment leased by DLL and utilized it for at least two years prior to their decision to cease making payments to DLL. As DLL points out, Rasa and Viewpoint both testified that they believed to have received the benefit of their bargain under their Lease Agreements until Capital 4 stopped providing telephone and internet services. Statement of Undisputed Facts and Rasa's Resp. at ¶ 37; Statement of Undisputed Facts and Viewpoint's Resp. at ¶ 72. In contrast, Dr. Perez never received the benefit of his bargain.

Furthermore, Dr. Perez's was arguably closer to a consumer than a commercial entity. See Denlinger, 608 A.2d at 1068 (deemed the question of a party's identity as a consumer, rather than a commercial entity, relevant to analysis of procedural unconscionability and meaningful

choice); c.f. <u>Wells Fargo Bank</u>, 419 F.3d 107, 110 (affirming the district court's decision to uphold a hell or high water clause in a finance lease between a "good faith" assignee and a "sophisticated businessman" of twenty years experience). Thus, Dr. Perez's position relative to DLL can be distinguished from Defendants, who are clearly commercial entities.

Finally, HP contends that the UCC does not apply to Rasa's Lease Agreement because title to Rasa's Intertel equipment was not transferred to DLL and to Defendants' Lease Agreements generally because they were primarily contracts for services. This argument fails for several reasons. First, as discussed at length above, the Lease Agreements are Article 2A finance lease transactions as provided for in the express terms of the contract. Second, also discussed above, the Lease Agreements acknowledge receipt of the equipment by each Defendant. Neither Article 2A or the Lease Agreements required transfer of title as a condition precedent to enforceability of the contracts. Third, the express terms of the Lease Agreements state clearly that lease of equipment is the primary function of the agreements and that provision of services by a supplier or manufacturer is ancillary to the agreements. <u>See</u> Pl.'s App. Ex. C.

For the foregoing reasons, this Court rejects the defenses raised by HP to DLL's contract claims.

## V.   <u>DLL is Entitled to Summary Judgment on Defendants' Counterclaims</u>

The following counterclaims brought by Defendants against DLL have survived DLL's Motions to Dismiss: Fraudulent Misrepresentation (Count 8), Violations of State Consumer Protection Laws (Count 10), and Violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962©, (d), (Count 9). ECF Nos. 170 at ¶¶ 277-318, 172 at ¶¶ 289-330 in C.A. 08-533; ECF No. 150 at ¶¶ 295-336 in C.A. 08-534. These

counterclaims against DLL are stated in documents entitled "Second Amended Answer, Affirmative Defenses, Counterclaim and Third Party Complaint," (ECF No. 170 in C.A. 08-533); "Answer, Affirmative Defenses, Counterclaim, Third Party Complaint and Cross-claim Against 3Com Corporation by Northcentral Communications, Corporation to Amended Third Party Complaint Filed by De Lage Landen Counterclaims" (ECF No. 170 in C.A. 08-533); "Third Amended Answer, Affirmative Defenses, Counterclaim and Third Party Complaint" (ECF No. 150 in C.A. 08-534) (collectively "Answers and Counterclaims"), filed November 15, 2010.

On June 20, 2011, Defendants also filed Memoranda of Law in Opposition to Motions for Summary Judgment Filed by Plaintiff, De Lage Landen (Second Segment) ("Counterclaim Br."), ECF Nos. 255, 256 in C.A. 08-533; 226 in C.A. 08-534.  With the exception of a statement of "Additional Facts" filed with Defendants' Counterclaim briefs, ECF Nos. 255-1 at 21-24, 256-1 at 20-22 in C.A. 08-533; 226-1 at 21-25 in C.A. 08-534, Defendants have not filed a separate statement of undisputed facts in support of their counterclaims and, instead, have solely relied on their responses to DLL's statement of undisputed facts.

## A.     Defendants Have Not Shown a Genuine Issue of Material Fact as to ___ Fraudulent Misrepresentation

To establish fraudulent misrepresentation under Pennsylvania law a party must establish six elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."  Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 771 (3d Cir. 2009) (citing Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005)).  Pennsylvania law requires that proof of fraud be "clear and convincing."  Woods v.

Era Med LLC, 677 F. Supp. 2d 806, 823 (E.D. Pa. 2010) (citing Mellon Bank Corp. v. First

Union Real Estate Equity & Mortg. Inv., 951 F.2d 1399, 1409 (3d Cir. 1991) (applying

Pennsylvania law)).

      A party asserting fraud must "point to a specific statement that caused a particular harm."

Permenter v. Crown Cork & Seal Co., 38 F. Supp. 2d 372, 382 (E.D. Pa. 1999) (Katz, J.).   A

broken promise to perform or to refrain from performing an act will not suffice as evidence of

fraud.  Mellon Bank Corp., 951 F.2d at 1409.  However, "[a] statement of present intention

which is false when uttered may constitute a fraudulent misrepresentation of fact."  Id. (affirming

the district court's decision that First Union's repudiation of its promise not to prepay mortgages

held by Mellon was not evidence of fraud in the absence of evidence that First Union's original

intent was not to abide by the original agreement) (quoting Brentwater Homes, Inc. v. Weibley,

369 A.2d 1172, 1175 (Pa. 1977)).  In other words, "[a] representation of the maker's own

intention to do or not to do a particular thing is fraudulent if he does not have that intention."

Mellon Bank Corp., 951 F.2d at 1410 (quoting Restatement (Second) of Torts, Section 530(1)).

     **1.**     **Defendants Have Not Established Misrepresentation by Capital 4**

      The essence of Defendants' fraudulent misrepresentation claims are that the "primary

selling point" of the POZ program – "that Capital 4 would provide the same quality and quantity

of telephone and internet services for a period of six years" for the quoted fixed monthly price, in

addition to providing a cash rebate or free telephone system – was fraud.  Rasa's Resp. to

Statement of Undisputed Facts at ¶ 10.  Defendants further assert that the POZ program was an

"attempt" to sell telephone equipment by bundling it with sales of services and that "[u]nknown

to customers, including [Defendants], and specifically concealed from them by the failure to

provide the customers with copies of invoices submitted to DLL by Capital 4, Capital 4 led DLL

to believe that Capital 4 was selling telephone equipment to customers."  Rasa's Resp. to

Statement of Undisputed Facts at ¶ 8.   It is undisputed that Capital 4 sold new telephone

equipment, in combination with telephone and internet services and the option of a rebate, to

Viewpoint and NCC.  Statement of Undisputed Facts and NCC's Resp. at ¶ 18, 36; Statement of

Undisputed Facts and Viewpoint's Resp. at ¶ 17, 69.  This Court is perplexed as to what part of

Capital 4's "attempt" to sell telephone equipment comprises a material misrepresentation.

        However, Defendants do assert that Capital 4 never intended to lawfully provide

telephone and internet services, which, if this were the case, would satisfy the requirement for a

material misrepresentation by Capital 4.  Rasa's Resp. to Statement of Undisputed Facts at ¶ 9.

In support, Defendants point, first, to an affidavit by Defendants' counsel stating that Capital 4,

Inc. did not seek proper state licenses to provide these services in Texas.  Id.; Defs.' Exs. 13.  In

addition, Defendants assert that Capital 4 structured its POZ program around the concept that

customers would pay the same cost for equipment and services that they had previously been

paying for services, but that the allocation for services made by Capital 4 was so small, as

compared to the allocation for equipment, that it was "so unrealistic as to demonstrate the lack of

any true belief that Capital 4 could provide the services," in addition to a telephone system, in the

cases of Viewpoint; a cash rebate, in the case of Rasa; and a telephone system and partial rebate,

in the case of NCC.  Rasa's Resp. to Statement of Undisputed Facts at ¶ 9.

        Viewing the facts in the light most favorable to the nonmoving party, a reasonable jury

could infer at most from the multitude of submissions by Defendants that Capital 4 made a

promise to Defendants that it was not able to keep.  Defendants have pointed to no evidence that

Capital 4 did not intend to fulfill its promise to provide telephone and internet services to its customers and, thus, deceived Defendants at the time they entered into the Customer Agreements. Defendants cannot overcome the undisputed fact that Capital 4 did provide telephone and internet services to each Defendant from the time each entered into the Customer Agreement in 2005 until Capital 4 ceased operations in September 2007. Without additional evidence, the difference between the cost allocation for equipment versus the cost allocation for services is at most evidence of a severely unsustainable business model, not fraud. Ultimately, Capital 4 was unable to meet the promises it made to its customers. However, that failure to perform, without more, cannot provide the basis for Defendants' fraud claims.

### 2.     Conduct of Capital 4 May Not Be Imputed To DLL

Even assuming Defendants have produced sufficient evidence to establish a genuine dispute of material fact as to a fraudulent misrepresentation by Capital 4, Defendants have failed to produce any evidence that DLL was the principal in an agency relationship between DLL and Capital 4 such that DLL would be liable for Capital 4's conduct.

As the Pennsylvania Supreme Court recently stated, in answering a certified question from the Third Circuit, the "imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority." Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Foundation v. PriceWaterhouseCoopers, LLP, 989 A.2d 313, 333 (Pa. 2010). The imputation doctrine presumes that a principal has "selected and delegated responsibility" to its agents and creates incentives for the principal to take care in its selection and delegation. Id. The doctrine protects

a party who conducts business with the principal through its agents "believing the agent's conduct is with the authority of his principal."  Id.

For actions to be imputed, a party must demonstrate an agency relationship by showing (1) "the manifestation by the principal that the agent shall act for him," (2) "the agent's acceptance of the undertaking[,]" and (3) "the understanding of the parties that the principal is to be in control of the undertaking.'"  Morilus v. Countrywide Home Loans, Inc., 651 F. Supp. 2d 292, 299 (E.D. Pa. 2008) (Stengel, J.) (quoting Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980)). Pennsylvania law requires the party asserting an agency relationship to prove its existence "by a fair preponderance of the evidence."  Id. (quoting Volunteer Fire Co. v. Hilltop Oil Co., 602 A.2d 1348, 1351 (1992)).  "The plaintiff need not provide direct proof of authorization so long as 'it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed.'"  Morilus, 651 F. Supp. 2d at 299 (citing B & L Asphalt Indus. v. Fusco, 753 A.2d 264 (Pa. Super. Ct. 2000)).  "Although the question of agency is normally best suited for a fact-finder, it may be resolved on a motion for summary judgment if the facts are not in dispute." Id.

Defendants have not shown that DLL manifested to them that Capital 4 would act on its behalf or that Capital 4 accepted such an undertaking.  In fact, the companies expressly defined their relationship as "other than principal/agent."  Wilcox v. PepsiCo, Inc., 174 F. Supp. 2d 265, 267 (E.D. Pa. 2001) (Giles, J.) (finding significant that the parties agreed that their bottling "agreement was not meant to confer upon either party the benefits or the responsibilities of an agency relationship"); see e.g.  Pl.'s App. Ex. D at § 25.  The Program Agreement between Capital 4 and DLL itself expressly disclaims an agency relationship, stating that "DLL and

-40-

[Capital 4] are separate entities that have entered into this Agreement for independent business reasons.  Neither DLL nor [Capital 4] have acted, act, or shall be deemed to have acted as an agent for the other except with respect to those acts of DLL specifically permitted and actually taken pursuant to and in accordance with the limited power of attorney granted DLL by [Capital 4] in Section 5 hereof."[9]  Pl.'s App. Ex. D at § 25.  In addition, the Program Agreement states that "DLL is not obligated to purchase any Equipment from [Capital 4] or to accept [Capital 4's] prospective contracts or the assignment of [Capital 4's] existing contracts" and that DLL will enter into contracts with lessees/customers "in its sole and absolute discretion."  Pl.'s App. Ex. D at § B(1).   DLL corporate representative Mr. Majer testified in response to questions from this Court at the evidentiary hearing on class certification that, from DLL's business perspective, no agency relationship existed between the two companies.  5/5/10 Tr. 43-44.  More significantly, Mr. Cunningham, in describing NCC's role as a POZ program VAR, stated in his deposition that (1) he never understood NCC to be acting as an agent of DLL, (2) his employees never represented that NCC was acting as an agent of DLL and (3) DLL did not have the power to direct the performance of NCC employees in their capacity as VARs.  Cunningham Dep. at 17-18.

In their Responses to DLL's Statements of Undisputed Facts, Defendants assert a series of facts that they claim establish an agency relationship between DLL and Capital 4, notwithstanding the express language in the Program Agreement.  First, DLL allowed Capital 4's name and logo to be displayed on the top of its loan applications and rental agreements.  Rasa's Resp. to Statement of Undisputed Facts at ¶ 7(a).  Second, DLL, acting through account manager

---

[9] Section 5 of the Program Agreement addresses contract assigned to DLL, not at issue in this case.  Pl.'s App. Ex. D at §5.

Gary Murray, recruited and trained POZ VARs on DLL and its "guidelines and parameters," including how to fill out credit applications and assess whether applicants would meet DLL's financial criteria.  Id. at ¶ 7(b), ©.  Third, DLL authorized Capital 4 and its POZ VARs to act as a conduit between DLL and its customers, (1) obtaining completed DLL credit application forms from customers, (2) submitting completed forms to DLL for approval, (3) informing customers as to whether their applications were approved or declined, (4) providing DLL rental applications to approved customers, and (5) obtaining signed agreements and first rental payments from new customers.  Id. at ¶ 7(d)-(g).  Finally, DLL's invoices to customers included Capital 4 telephone and internet services charges and, if a customer failed to pay, DLL would inform Capital 4 and ask that services be cut off.  Id. at ¶ 7(h), (I).

Pennsylvania law recognizes various theories of agency, but Defendants have only advanced theories as to Capital 4's purported "apparent authority, as where the principal holds one out as agent by words or conduct" or the company's "[a]gency by estoppel."  Garczynski v. Countrywide Home Loans, Inc., 656 F. Supp. 2d 505, 511 (E.D. Pa. 2009) (Baylson, J.) (quoting SEI Corp. v. Norton & Co., 631 F. Supp. 497, 501 (E.D. Pa. 1986)).

### a.    Defendants' Theory of Apparent Agency is Without Merit

Apparent agency exists when a principal has not expressly granted the power to bind the principal but has led "persons with whom [the] agent deals to believe" that the power has been granted, "for instance where 'the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power.'"  Hawthorne v. Am. Mortg., Inc., 489 F. Supp. 2d 480, 486 (E.D. Pa. 2007) (Robreno, J.) (quoting Revere Press, Inc. v. Blumberg, 246 A.2d 407, 410 (Pa. 1968)).

In Morilus, Judge Stengel addressed the relationship between a mortgage company, a mortgage broker, and a debtor, a relationship that this Court finds relevant to the lessor-vendor-lessee triumvirate at issue in this case.  Judge Stengel held that the debtor plaintiffs could not show sufficient control of the broker by the mortgage holder to "such a high degree that the purported agent is deemed to have had almost no independence."  Morilus, 651 F. Supp. 2d at 300.  Judge Stengel found the brokers had no control over the terms of the loan, could not bind the mortgage company in a contractual relationship, and were free to shop a loan to any third-party lender without being beholden to mortgage company.  Id.; see also Hawthorne, 489 F. Supp. 2d at 486 (concluding that mortgage brokers function similarly to insurance brokers, who are generally viewed as having an agency relationship to the insured, rather than the insurer, because brokers are "free to shop an insured's application to different insurers").  Based on these facts, Judge Stengel determined the brokers to be independent contractors and found insufficient evidence to support plaintiffs' claim that they "subjectively believed" the brokers were the company's agents.  Id.

The Court views Capital 4's relationship to DLL as that of an independent contractor, similar to a mortgage or insurance broker, rather than as DLL's agent.  Capital 4 sought to sell telephone equipment in conjunction with telephone and internet services and, pursuant to the Program Agreement, "desire[d] to offer its customers the opportunity to lease, rent, and/or use such equipment" and "to offer DLL the opportunity to enter into lease agreements and rental agreements with such customers."  Pl.'s App. Ex. D at ¶ A.  To that end, the two parties agreed that Capital 4 would provide potential POZ program customers with credit applications and serve as a conduit between DLL and the customers during the application and acceptance process.  The

-43-

parties also agreed that contracts would include "Soft Costs" such as service and maintenance and that DLL would fund Capital 4 for service and maintenance.  Pl.'s App. Ex. D at ¶ A(8).

It is undisputed that DLL made the final credit determination "in its sole and absolute discretion," consistent with the terms of the Program Agreement.[10]   Pl.'s App. Ex. J ¶ B(2); Rasa's Resp. to Statement of Undisputed Facts at ¶ 7(d).  At his deposition, Mr. Murray testified that "nothing would happen until [the application] was approved.  Murray Dep. at 137. Furthermore, DLL was not the only financing company used by Capital 4 for the POZ program and Mr. Murray testified, as well that DLL would inform Capital 4 or other vendor if an application was approved because the vendor might "choose a different lender."  Id. at 152.  A reasonable jury could not infer from these facts that the agreement between Capital 4 and DLL constituted authorization of Capital 4 to bind DLL or of DLL to assert control over Capital 4.

Furthermore, none of the facts asserted by Defendants indicate that DLL took any action to lead Defendants "to believe [it] granted certain authority that actually exceed[ed] the scope" of DLL's relationship to Capital 4.  Morilus, 651 F. Supp. 2d at 301.  As to the role played by DLL in training POZ VARs, Judge Stengel rejected the notion that training and monitoring mortgage brokers to ensure adherence to a set of guidelines is a manifestation of control, and, instead, viewed the company's actions as "dictating the base requirements for any business transactions." Id. at 300; see also PepsiCo, Inc., 174 F. Supp. 2d at 268 (agreement providing exclusive regional

---

[10] Through the Program Agreement, DLL agreed to either enter into contracts directly with customers or "to purchase from Vendor] and accept the assignment of Vendor's interest in private label contracts in the Vendor's name[.]"  Each Defendant entered into a separate contract with DLL and different companies provided funding for the POZ program through separate Program Agreements with Capital 4.  This Court does not know whether Capital 4 or any other VAR assigned any contracts to DLL and this Court need not address whether Capital 4 or any VAR acted as DLL's agent in such a case.

rights to "bottle, sell, and distribute the Pepsi beverage[,]" with a commitment that the bottler would meet PepsiCo's standards and allow PepsiCo to inspect their premises did not constitute an agency relationship). This Court finds that DLL's training activities were similarly geared towards maintaining a set of standards related to obtaining and approving credit applications, rather than asserting control over Capital 4.

This Court is left with Defendants' contention that the appearance of Capital 4's name and logo on loan applications and rental agreements resulted in Defendants' perception that they had entered into the Customer Agreement with Capital 4. A reasonable jury could not infer an agency relationship from this fact alone, particularly given that the language of the Rental Agreement clearly states that the only parties to that agreement were Defendants and DLL.

### b. Defendants' Theory of Agency by Estoppel is Without Merit

"Agency by estoppel is applicable where a principal intentionally or negligently leads a third party to believe the agent has the authority to act on the principal's behalf, and the third party relies on the belief." Garczynski, 656 F. Supp. 2d at 511. Based on the reasoning above, rejecting Defendants' claim of apparent agency, this Court finds no basis upon which a reasonable jury could infer that DLL "intentionally or negligently" led Defendants to believe that Capital 4 had the authority to act on DLL's behalf.

### c. Defendants' Agency Arguments are an Attempt to Circumvent Language of Finance Lease Contracts

This Court finds Defendants' agency argument to be yet another attempt to circumvent the plain language of their Article 2A finance lease transactions with DLL, an argument which has been previously rejected by courts in other jurisdictions when addressing finance leases. See e.g Lyon Financial Svcs., Inc. v. Oxford Maxillofacial Surgery, Civ. No. 08-5498, 2009 WL

2170999 (D. Minn. 2009) (finding the fact that a third party vendor "assisted" lessee "in

obtaining funding does not establish agency"); Unistar Leasing, Div. of United Computer Capital

Corp. v. Lipkin, 784 N.Y.S.2d 423, 424 (N.Y. App. Div. 2004) (concluding "defendant's

unsubstantiated allegations of fraud, collusion and the existence of an agency relationship

between plaintiff and [the ATM machine vendor] are 'belied by the express provisions of the

lease agreement'"); but see C & J Vantage Leasing Co. v. Outlook Farm Golf Club, LLC, 784

N.W.2d 753 (Iowa 2010) (finding genuine issue of material fact as to agency where lessor

allowed vendor to place logo on lease agreement, in addition to other factors).

   As Judge McMahon of the Southern District of New York wrote, "finance leases and

explicit contractual waivers . . . would be superfluous unless they rendered relationships between

the lender and the manufacturer of equipment irrelevant." Citicorp Leasing, Inc. v. Kusher

Family Ltd. Partnership, No. 05 Civ 9163 CM MDF, 2006 WL 1982757 at *6 (S.D.N.Y. 2006)

(McMahon, J.) (declining to allow discovery as to whether a lessor and third party vendor were

engaged in a joint venture rendering the lessor liable for the actions of the vendor).  Allegations

that Capital 4 engaged in fraud cannot overcome 12 Pa. C.S.A. § 2A407(a)(b) or the explicit hell

or high water clause contained within the Rental Agreements.  See e.g. Leasetec Corp. v. Orient

Sys., 85 F. Supp. 2d 1310, 1317 (S.D. Fla. 1999) (Dimitrouleas, J.) (enforcing hell or high water

clause where vendors made fraudulent statements to lessees and were only authorized to submit

lease to lessor for review and did not "represent[ ] themselves as being agents of [lessor]").

   Without evidence of an agency relationship and in light of the express provisions of the

Lease Agreements disclaiming any agency relationship between DLL and Capital 4 and declaring

-46-

the Agreements to be Article 2A finance lease transactions, this Court declines to find that any

purported fraudulent conduct by Capital 4 can be imputed to DLL under any theory of agency.

### 3.   Defendants Have Not Established Misrepresentation by DLL and DLL Had No Obligation to Disclose Information to Defendants

Moreover, Defendants have produced no evidence of any false statement made by DLL or

intention by DLL to mislead any Defendant.

A claim for fraudulent misrepresentation based on the omission of a party "has the same

elements as fraud, except that 'an omission is actionable as fraud only where there is an

independent duty to disclose the omitted information.'"  Bucci v. Wachovia Bank, N.A., 591 F.

Supp. 2d 773, 783 (E.D. Pa. 2008) (Brody, J.) (quoting Duquesne Light Co. v. Westinghouse

Electric Corp., 66 F.3d 604, 612 (3d Cir. 1995)); see also In re Lockwood Auto Group, Inc., __

B.R. __, 2011 WL 1597956 at *9 (Bankr. W.D. Pa. Apr. 28, 2011) (Agresti, Chief Bankr. J.)

("[S]ilence cannot amount to fraud in the absence of a duty to speak.") (quoting Gaines v.

Krawczyk, 354 F. Supp. 2d 573, 585-86 (W.D. Pa. 2004) (applying Pennsylvania law)).

Under Pennsylvania law, a duty to disclose does not normally arise between parties to a

particular transaction "unless there is a confidential or fiduciary relationship between the

parties," Gaines, 354 F. Supp. 2d at 586, which, in turn, rarely arises "in a typical transactional

setting unless 'one party surrenders substantial control over some portion of its affairs to the

other.'" Id. See also Drapeau v. Joy Techs, Inc., 670 A.2d 165, 172 (Pa. Super. Ct. 1996) (Beck,

J., concurring) ("The Pennsylvania Supreme Court [has] characterized a confidential relationship

as a relationship with trust and reliance on one side and a corresponding opportunity to abuse that

trust for personal gain on the other.").

Moreover, a lender "does not ordinarily owe a fiduciary duty to a borrower." Bucci, 591 F. Supp. 2d at 783 (quoting Temp-Way Corp. v. Continental Bank, 139 B.R. 299 (E.D. Pa. 1992)). In Bucci, Judge Brody concluded that defendant Wachovia Bank had no duty to disclose information to plaintiff, who was a bank customer, about the actions of plaintiff's bookkeeper, who had cashed checks at Wachovia without plaintiff's authorization. Id. at 777. Judge Brody rejected plaintiff's claim on the basis that plaintiff had made no "allegation that Wachovia had substantial control over the business affairs of [plaintiff's business], or there was any agreement between the parties, or that [plaintiff] relied on the omissions where Wachovia was the only source of information or where [plaintiff's bookkeeper's] activities were not discoverable by other reasonable means, or any other set of facts or circumstances that would give rise to Wachovia's liability for failure to speak." Id. at 783-84.

Defendants have not asserted any facts from which a reasonable jury could infer that DLL had knowledge of a misrepresentation by Capital 4 at the time Defendants entered into the Lease Agreements. Defendants merely assert that DLL "occasioned the fraud perpetuated by Capital 4 by failing to perform any due diligence on the [POZ] program until [December 16, 2005,] several weeks before stopping all funding." Rasa's Resp. to Statement of Undisputed Facts at ¶ 8; Defs. App. Exs. 6; Defs.' App. Exs. 12. From that statement, a reasonable jury could only infer that, at the time DLL entered into the Rental Agreements with Defendants, DLL knew no more about the POZ program than Defendants themselves. Furthermore, as in Bucci, Defendants have not asserted that DLL was Defendants' only source of information about Capital 4 and the POZ program or that they could not have acquired whatever information they believe was withheld by other reasonable means.

-48-

Defendants assert, as well, that DLL "knew" that Capital 4 had offered Defendants a "free rebate," "knew" that the rebate was not "free," and declined to advise Defendants that "the rebate was being misrepresented to [Defendants], and that the rebate was not free." Counterclaim Br. at 7. Even assuming DLL had knowledge that Capital 4 was misrepresenting the character of its offered rebates or the allocation of payments between equipment and service costs, Defendants have made no contention that DLL was in a confidential or fiduciary relationship with any Defendant which would have required disclosure of any known information. Defendants do not and cannot point to a fiduciary relationship based on DLL's role as lender; nor can they assert any sort of relationship of trust and/or reliance, particularly given that at no point did Defendants deal directly with DLL. Nor have Defendants asserted any facts to support a contention that they at any time surrendered any control to DLL. Thus, there no basis upon which a reasonable jury could infer a legal duty that would have required DLL to disclose that knowledge to Defendants or any other "circumstances that would give rise to [DLL's] liability for failure to speak." Id. at 784.

Finally, Defendants assert that "DLL intended to collect substantially all the payments reflected in the financing contract even if Capital 4 stopped providing telephone services." Counterclaim Br. at 7. As discussed above, the Lease Agreements between DLL and each of the Defendants make clear that DLL intended to collect payment for equipment leased to Defendants pursuant to that Agreement, regardless of any breach by Capital 4, pursuant to the hell or high water clauses contained within each agreement. In bringing these actions against Defendants to enforce Defendants' obligations, DLL has acted consistently with the terms of the contracts at issue.

### B.     Claims Under Various Consumer Protection Laws

The entirety of Rasa's argument on its state statutory consumer protection claim reads as

follows:

> claims for relief against DLL . . . for damages under the Texas Deceptive Trade Practices
> and Consumer Protection, V.C.T.A., Bus. & Comm. Code §§ 17.41 et seq., are based, in
> part, on the fraudulent misrepresentations made by DLL's agent to Rasa.  There being
> sufficient summary judgment evidence showing the existence of a genuine issue of
> material fact (i.e. whether DLL had an agency relationship with Capital 4 and/or NCC
> relating to the Rasa transaction), summary judgment on Counts VIII and X should be
> denied.

Rasa's Counterclaim Br. at 14.  The counterclaim briefs filed by NCC and Viewpoint contain

similar language as to their respective claims for damages under V.C.T.A., Bus. & Comm. Code

§§ 17.41 et seq., and the Massachusetts consumer protection laws, Massachusetts Chapter 93A,

Regulation of Business Practices for Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 11

(2009), respectively.  As such, Defendants' statutory counterclaims appear to rely solely on

Defendants' contentions that the actions of Capital 4 or NCC may be imputed to DLL.  This

Court has resolved the issue of agency in the analysis of Defendants' common law fraud

counterclaims and finds that no genuine issue of material fact exists on this issue and that no

reasonable jury could conclude that either Capital 4 or NCC were agents of DLL.  As a result,

this Court concludes that DLL is entitled to summary judgment on Defendants' state statutory

counterclaims.

### C.     Defendants' RICO Claims Against DLL

Defendants assert counterclaims under the RICO Act 18 U.S.C. § 1962©, (d), against

DLL and HP.  Defendants' RICO counterclaims against DLL are stated in their Answers and

Counterclaims.  ECF Nos. 170, 172 in C.A. 08-533; 150 in C.A. 08-534.  As required by the

Court, Defendants Rasa and Viewpoint also each filed a "RICO Case Statement," ECF Nos. 70-2 in C.A. 08-533; 49-2 in C.A. 08-534 (filed April 16, 2009).

In the Court's Scheduling Order dated April 15, 2011 (ECF No. 211), the Court indicated that the RICO counterclaims in this case would be considered as a fourth segment, with a separate briefing schedule. ECF No. 211 at 6 in C.A. 08-533; 189 at 6 in C.A. 08-534. In the Order, the Court indicated that, for reasons there stated, the Court was "unwilling at [that] point to authorize any additional discovery specifically on the RICO claims[.]" Id. Nonetheless, the Court gave Defendants and HP the opportunity to outline for the Court in their briefing on DLL's Summary Judgment Motions any relevant and proper discovery needed regarding the RICO counterclaims. Id. Defendants did not seek any additional discovery in their briefing, and the Court therefore sees no reason to delay consideration of Defendants' RICO counterclaims against DLL at this time. Defendants cannot claim any surprise at this because Defendants discussed their RICO counterclaims in their briefs on the summary judgment motions.

It appears to the Court that Defendants anticipate the Court will consider Defendants' RICO counterclaims against DLL at this time rather than waiting for subsequent briefing as to claims between Defendants and HP. Under Rule 56(f), the Court clearly has authority to proceed to determine the Defendants RICO claims against DLL.

_____ **1.**    **Elements of a RICO Claim**

Pursuant to Section 1962© of the RICO Act, it is "unlawful 'for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d

300, 362 (3d Cir. 2010) (quoting 18 U.S.C. § 1962©).

As set forth by the Supreme Court and the Third Circuit, a party bringing a RICO claim

must establish (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity

as well as an injury resulting from the offensive conduct.  Sedima S.P.R.L. v. Imrex Co., 473

U.S. 479, 496 (1985); Warden v. McLelland, 288 F.3d 105, 114 (3d Cir. 2002).  Section 1961(1)

of RICO defines "racketeering activity" by listing criminal conduct that constitutes predicate acts

under the statute, including mail fraud and wire fraud, the predicate acts alleged by Defendants in

this case.  Warden, 288 F.3d at 114 (citing 18 U.S.C. § 1961(a)); see Answers and

Counterclaims, ECF Nos. 170 at ¶¶ 290, 297, 172 at 221, 309 in C.A. 08-533; 150 at ¶¶ 227, 315

in C.A. 08-534.

While fraud constitutes one element of RICO, not every cause of action for fraud will

satisfy the requirements of a RICO claim.  A party "proceeding to trial in a RICO case must show

more than fraud. [The party] must show that the conduct of the fraudulent scheme was

perpetrated through an enterprise." Healthguard of Lancaster, Inc. v. Gartenberg, No. Civ. A. 02-

2611, 2004 WL 632722 at *6 (E.D. Pa. March 5, 2004) (Baylson, J.)  Section 1961(4) defines

"enterprise" to include "any individual, partnership, corporation, association, or other legal

entity, and any union or group of individuals associated in fact although not a legal entity." In re

Ins. Brokerage Antitrust Litig., 618 F.3d at 362-63.

A RICO claimant must also establish a "pattern" of such predicate acts, and show that

this scheme caused injury.  Id.  Under the statute, a "pattern of racketeering activity" means at

least two predicate acts that "are related and that they amount to or pose a threat of continued criminal activity."   H. J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989).

**2.      Defendants Fail to Establish the Requisite Elements of Their RICO Counterclaims Against DLL**

Defendants assert in their Answers and Counterclaims that a RICO enterprise existed consisting of three individuals - F. Davis  Dawson, Ishmael Villa-Lobos, and Gary Murray - and three entities - Capital 4, 3Com, and DLL - who acted together and in concert within the meaning of Section 1961(3).  See Counterclaims, ECF Nos. 170 at ¶¶ 291, 172 at 303 in C.A. 08-533; 150 ¶¶ at 309 in C.A. 08-534.   For present purposes, the Court will accept Defendants' assertions that under Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158 (2001), Defendants have set forth a viable and sufficient definition as to the RICO "enterprise."  See Counterclaims, ECF Nos. 170 at ¶¶ 291-94, 172 at 303-06 in C.A. 08-533; 150 at  ¶¶ 309-12 in C.A. 08-534.

However, as to the other requisite elements of a RICO claim, Defendants resort to the same allegations that they have made in defending against DLL's Motion for Summary Judgment and in Defendants' common law and statutory fraud counterclaims against DLL.  The RICO claims contain nothing new factually and are distinct from Defendants' other counterclaims only in the reference to the statutory language of RICO – asserting that the finance lease transactions entered into between DLL and Defendants were part of a RICO scheme.  Although previously phrasing these claims in terms of a breach of contract, as fraudulent misrepresentations, and as violations of consumer fraud statutes, Defendants now assert that mailings of routine contracts, invoices, and payments by DLL constitute mail fraud; that DLL's e-mails and other internet usage was wire fraud; and that the various commercial acts undertaken by DLL constituted

predicate acts under RICO.  So doing, Defendants merely clothe their legal contentions in RICO language.

Defendants have articulated their RICO counterclaims in several filings to the Court, but in none of those documents have Defendants provided factual or evidentiary support for their RICO counterclaims.  For example, Defendants' RICO Case Statements assert in paragraphs 6-22 that DLL engaged in various conduct that warrants RICO liability, but as noted above, the facts are no different from the facts alleged as constituting breach of contract or fraud, discussed in earlier sections of this memorandum.  ECF Nos. 70-2 in C.A. 08-533; 49-2 in C.A. 08-534. Defendants do not support any of the assertions made with citations to the record that show that DLL's conduct was anything but the ordinary set of business transactions discussed above.

At paragraph 7 of the RICO Case Statement, Defendants allege that, by the time DLL entered into its relationship with Capital 4, DLL "knew that the Federal Trade Commission asserted and the United States Court for the District of New Jersey found" the practices related to the sale and financing of telecommunications services and related products by a company called NorVergence, Inc. were unfair and in violation § 5(a) of the FTC Act, 15 U.S.C. § 45(a).  ECF Nos. 70-2 at ¶ 7  in C.A. 08-533; 49-2 at ¶ 7 in C.A. 08-534.  Defendants allege that DLL "had been a willing participant . . . in leasing fraud, perpetrated by its co-actor, NorVergence, Inc.[;]" and had, as a result, entered into an "Assurance of Discontinuance" regarding its participation; but still proceeded to enter into a contractual relationship with Capital 4, despite its knowledge of and participation in NorVergence, Inc.'s fraudulent activities.  Id.  Defendants include no citation to the opinion of the District of New Jersey and no mention of the case appears in Defendants' summary judgment briefing or its Statements of Disputed and Undisputed Facts.

The uncited quotation is from FTC v. NorVergence, No. Civ. A. 04-5414, 2005 WL 3754864 at ¶¶ 15-16 (D.N.J. July 22, 2005) (Debevoise, J.).  That case addressed conduct of the same vendor at issue in IFC Credit Corp., 536 F.3d at 610, discussed above and relied upon by Defendants.  As the Seventh Circuit described in IFC Credit Corp., NorVergence was a "bogus telecommunications provider" who, like Capital 4, packaged telecommunications equipment with services and the promise of significant savings.  Id, at 611.  However, NorVergence's scheme involved "[t]he supposedly wondrous equipment it sold or rented, which it called a Merged Access Transport Intelligent Xchange (MATRIX) device, [but which] turned out to be a standard integrated-access box with none of the benefits that Norvergence had touted."  IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union, 512 F.3d 989, 991 (7th Cir. 2008); see also IFC Credit Corp., 536 F.3d at 612 n.1 ("[T]he MATRIX was nothing – it was a box filled with a series of wires and an everyday network router that, despite NorVergence's promises, served no purpose in a telecommunications network, much less provided vast savings.").  As Judge Debevoise found in NorVergence, the company also represented to customers the ability to provide long term discounted telecommunications, but failed to disclose that it lacked "a long term commitment from any service provider for the services it was promising to provide consumers" and that the leased equipment would be of little or no value without the promised services.  2005 WL 3754864 at ¶ 14.

Defendants have not provided evidentiary support for similar facts related to Capital 4's own conduct, nor have Defendants provided evidence of a relationship between DLL and NorVergence[11] or why DLL should have been guided in its decision-making regarding Capital 4

---

[11] This Court has only identified one case, Glen & Co. v. Popular Leasing USA, Inc., 819 N.Y.S.2d 210 (Table), 2006 WL 1506137 *1 (N.Y. Sup. April 24, 2006), that identifies DLL as

by Judge Debevoise's decision.  In addition, Defendants have offered no precedential support for

the proposition that a company entering into a business relationship with one company should be

informed or influenced by the history of fraud perpetrated by a wholly unrelated company, albeit

one that operates in the same industry.

At paragraph 80 of their RICO Case Statements, Defendants assert that "all predicate acts

relate to each other as part of a common plan or scheme" and allege certain facts of how DLL

acted.  ECF Nos. 70-2 at ¶ 80  in C.A. 08-533; 49-2 at ¶ 80 in C.A. 08-534.  In particular,

Defendants allege that DLL made certain decisions in reliance on the "'hell or high water'

protection of Article 2(A) of the UCC.  ECF Nos. 70-2 at ¶ 80(3)  in C.A. 08-533; 49-2 at ¶ 80(3)

in C.A. 08-534.  The Court interprets this as an admission by Defendants that the Lease

Agreements between Defendants and DLL are, in fact, valid commercial finance lease

transactions structured pursuant to Article 2A and, hence, that these contracts are covered by the

hell or high water provision provided for in the Lease Agreements and at 13 Pa. C.S.A.§

2A407(a)(b).  Nowhere in any of these documents do Defendants, in any cogent or rational

manner, explain how the ordinary business activities of DLL's finance leases, which the Court

---

having been the assignor of finance leases by NorVergence.  The case was a putative class action
in which plaintiffs alleged that the "named defendant assignees, knew of the alleged
misrepresentations by NorVergence at the time of the assignments of the respective leases."  Id.
However, the opinion simply addresses the validity of a forum selection clause, provides no
information as to DLL's conduct associated with NorVergence, and, most importantly, post-dates
DLL's entry into a relationship with Capital 4.

has found valid and legal in the foregoing portions of this Memorandum, are, suddenly and without any factual support, turned into illegal predicate acts under RICO.

Defendants also submitted briefing on the federal RICO claim in the second segments of Defendants' summary judgment briefs.  ECF Nos. 255, 256 in C.A. 08-533; 226 in C.A. 08-534. This briefing constitutes 2-1/2 pages with only two citations, H. J. Inc., 492 U.S. at 239, cited above for the proposition that a plaintiff seeking to show a "pattern of racketeering activity" must establish that the predicate racketeering acts are "related, and that they amount to or pose a threat of continued criminal activity[;]" and Demauro v. Demauro, 215 F.3d 1311 (1st Cir. 2000) (non-precedential), affirming the district court's dismissal of RICO counts related to a husband's alleged efforts to conceal funds from his wife.   Neither of these cases have any relevance whatsoever to the present case, nor do Defendants attempt to rely on these cases for anything more than general propositions of law.

Defendants' briefs go on to simply repeat verbatim the arguments made in their Answers and Counterclaims, ECF Nos. 170 at ¶¶ 297-300, 147, 162, 209, and 148, 172 at ¶¶ 309-12, 159 in C.A. 08-533; 150 at ¶¶ 284-87, 91, 105 in C.A. 08-534. The Court notes that the referenced paragraphs are stated in completely conclusory language.

Defendants are required by Fed. R. Civ. P. 56(c)(1)(A), as amended, effective December 1, 2010, to cite to "particular parts of materials to the record" for support when "asserting that a fact cannot be or is genuinely disputed."  Defendants only effort to comply with Fed. R. Civ. P. 56(c)(1)(A) regarding the factual assertions in support of the RICO counterclaims is to cite to a section of Defendants' Responses to DLL's Statement of Undisputed Facts and Statement of Undisputed Facts on Cross-Motion for Summary Judgment, entitled "Additional Facts,"

submitted in conjunction with Defendants' counterclaim briefs.  ECF Nos. 255-1 at 21-24, 256-1

in C.A. 08-533; 226-1 in C.A. 08-534.  These facts assert conduct by DLL that the Court finds to

be nothing more than the general back-and-forth correspondence and flow of documents

incidental to a commercial lease financing transaction.  ECF Nos. 255-1  in C.A. 08-533; 49-2 at

¶ 7 in C.A. 08-534. The weakness of Defendants' RICO claims is acknowledged by Defendants'

statement included in the counterclaim briefs, ECF Nos. 255 at 16, 256 at 20 in C.A. 08-533; 226

at 16 in C.A. 08-534. that each Defendant "alleges that the above predicate acts were carried out

by Capital 4, on behalf of itself and the power of $Zero Partnership, which is identified as

including DLL."  This implied admission that Defendants have no RICO claim against DLL

speaks volumes.

Based on the discussion of the RICO allegations, the RICO Case Statement, the

Statement of Disputed and Undisputed Facts, and Defendants' counterclaim briefing, the Court

concludes that Defendants have completely failed to assert a viable RICO claim.  This being the

case, there is no reason to wait for further briefing, and there are no disputed facts which a

reasonable juror could possibly find to support a RICO claim against DLL.  For these reasons,

the Court will grant summary judgment in favor of DLL and against Defendants on Defendants'

RICO claims.

## VI.  <u>Conclusion</u>

After extensive review of the briefs, affidavits and exhibits, and following over three

years of supervising this litigation, this Memorandum has explained the reasons the Court

previously concluded that DLL's agreements with Rasa, Viewpoint and NCC are valid, that there

is no genuine dispute of facts, that each of these Defendants have breached their obligations to

make payments to DLL, and that DLL is entitled to summary judgment at this time as to liability. For the reasons stated above, the Court has now concluded that DLL is entitled to summary judgment on the Counterclaims of Rasa, Viewpoint and NCC

   The Court has not made any decisions as to the amount of damages that each Defendant owes to DLL, but will do so after review of the papers which have recently been filed, as required by the Order previously entered on April 15, 2011 (ECF No. 211 in C.A. 08-533; 189 in C.A. 08-534).

   An appropriate Order follows.

                                        BY THE COURT:

                                        s/Michael M. Baylson

                                        _____
                                        Michael M. Baylson, U.S.D.J.

O:\CIVIL 07-08\08-533 DeLage v. Rasa\DLL MEMORANDUM on MSJ and Counterclaims.wpd